# EXHIBIT A

Daniel J. Hurteau, Esq.
**NIXON PEABODY LLP**
677 Broadway, 10th Floor
Albany, New York  12207
Phone: (518) 427-2650
Email: dhurteau@nixonpeabody.com

*-and-*

Arthur L. Pressman, Esq.
**NIXON PEABODY LLP**
100 Summer Street
Boston, Massachusetts 02110
Phone: (617) 345-1000
Email: apressman@nixonpeabody.com

<u>ATTORNEYS FOR PLAINTIFF</u>

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| G.L.M. SECURITY & SOUND, INC., <br><br> *Plaintiff*, <br><br> - *vs* - <br><br> LOJACK CORPORATION, <br><br> *Defendant*. | **FIRST AMENDED COMPLAINT WITH JURY DEMAND** <br><br> **Civil Action No.:** <br> **10-cv-4701** |

Plaintiff G.L.M. Security & Sound, Inc. ("G.L.M." or "Plaintiff"), by and through its attorneys NIXON PEABODY LLP, for its First Amended Complaint against defendant LoJack Corporation ("LoJack")  alleges as follows:

### <u>NATURE OF ACTION</u>

1.    This action seeks damages for the unfair, deceptive and wrongful acts of LoJack in relation to the business arrangements that it had with G.L.M.

13184474.4

## JURISDICTION AND VENUE

2.      Jurisdiction is based on 28 U.S.C. § 1332, as the parties are of diverse citizenship and the matter in controversy exceeds $75,000, exclusive of interest and costs.

3.      Venue is proper within this District as a substantial part, but not the entirety, of certain acts and transactions or occurrences complained of took place within this District.

## THE PARTIES

4.      G.L.M. is a New York business corporation with a principal place of business in the County of Nassau, Town of Lynbrook, New York.

5.      Since 1973, G.L.M. has been in the business of selling and installing a wide variety of after-market automobile products, such as car security systems, car sound systems and other amenities, to automobile dealers in and around the New York City and Long Island metropolitan area.

6.      LoJack is a Delaware corporation with a principal place of business at 200 Lowder Brook Road, Suite 1000, Westwood, Massachusetts.

7.      LoJack manufactures and sells car security systems in the after-market automobile industry.

## THE FACTS

I.      **The Parties Negotiate and Execute a Distributorship and Installation Agreement.**

8.      In June 2002, the President of Vehicle Manufacturers, Inc. ("VMI"), George Wafer, introduced LoJack to G.L.M. at LoJack's request.  LoJack requested the introduction to facilitate entering into a business relationship with G.L.M. relating to the sale and installation of LoJack products in the New York City and Long Island metropolitan area.  LoJack wanted to use

G.L.M.'s almost thirty-year relationships with many of its dealers to increase LoJack's previously low sales in this market.

9.      Over the course of the next few months, there were numerous phone conversations between  LoJack's President, Joseph Abely, G.L.M.'s President, Gary Tabackman, and VMI's president, George Wafer, to structure an arrangement between the companies.   At all relevant times, Abely was located in Massachusetts and Tabackman and Wafer were in New York.

10.      During their discussions, LoJack represented to G.L.M. on several occasions that it would sell LoJack products to G.L.M. at LoJack's best prices.

11.      On September 15, 2002, LoJack and G.L.M. entered into a LoJack Distributorship and Installation Agreement ("Agreement"), which set out the terms of a business arrangement between LoJack and G.L.M  "with respect to the services to be provided by [G.L.M.] to LoJack and all other matters related thereto."  The Agreement is attached hereto as Exhibit A.

12.      Once the arrangement was structured, Tabackman met Abely and other LoJack sales executives in Massachusetts (where LoJack has its corporate offices) to discuss various business issues.

## II.      The Parties Amend the Agreement and Enter Into New Agreements.

13.      Under the Agreement, G.L.M. became the exclusive re-seller and installer of LoJack brand security systems, parts and related products to approximately 120 automobile dealers in Queens, Suffolk, Nassau and Bronx Counties in New York.

14.      Among other things, the Agreement provided that it would be "construed and enforced under and be governed in all respects by the laws of the Commonwealth of Massachusetts, without regard to the conflict of law principles thereof."

15.     Subsequent to entering into the Agreement, LoJack and G.L.M. entered into other agreements, including oral agreements, that amended the terms of the Agreement, and established other agreements between them that did not relate to "the services to be provided by [G.L.M.] to LoJack and … other matters related thereto."

16.     For example, not long after entering the Agreement, Tabackman asked LoJack to modify the "Net 60 Days" payment term in the Agreement.  LoJack agreed to do so and in June 2004 began sending its invoices to G.L.M marked "Terms: Net 90 Days."

17.     G.L.M.'s payment term stayed at 90 days throughout the years 2004 – 2010.

18.     Over the same period of time, Tabackman requested even better terms and the LoJack credit manager, Steve Manning, from the corporate office in Massachusetts, allowed its "valued partner" G.L.M. extended terms to 120 days – as long as G.L.M. paid up to 90 days at the end of certain quarters.

19.     From time to time, beginning in mid-2006, G.L.M. would take LoJack up on its offer to extend terms to 120 days – and whenever LoJack would ask G.L.M. to get back to 90 days – G.L.M. would do so.

20.     Thus, over the years there developed a practice and agreement between G.L.M. and LoJack that G.L.M.'s payment term would be around 120 days, and no less than 90 days.

21.     Another example of the parties amending the Agreement relates to the number of sales set out in it, which was always viewed by both parties as a goal that they hoped to reach together.

22.     The performance requirements set out were never reached – not even in the first three months – and they were thereafter never reset – with no objection or other action taken by LoJack.

23.     Throughout the term of the Agreement, performance requirements were not discussed or even mentioned by LoJack at any time after the signing of the Agreement, and the parties' relationship reflected that performance goals were not an issue.

### III.     G.L.M. and LoJack Become Partners.

24.     From its first meetings with G.L.M., LoJack, through Abely and Ron Rossi (past Chairman of LoJack), asked G.L.M. to regard itself as LoJack's partner, and assured Tabackman that LoJack would regard G.L.M. as its partner.

25.     Accordingly, immediately following execution of the Agreement, Abely announced a "partnership" with G.L.M. and introduced G.L.M. as its "partner" in a letter to the approximately 120 automobile dealers in Queens, Suffolk, Nassau and Bronx Counties in New York.

26.     The concept of being a partner with LoJack was at the root of the discussions that led to the Agreement, and was how LoJack and G.L.M. behaved (as evidenced by correspondence, marketing materials and documents created by and sent to G.L.M. from LoJack) through the years of their relationship until the events complained of in this First Amended Complaint came to light.

27.     Consistent with its partnership with LoJack, G.L.M. has held itself out to the public as the face of LoJack in Queens, Suffolk, Nassau and Bronx Counties.

28.     As part of their partnership, G.L.M. and LoJack employees worked very closely together.  LoJack employees were frequently (almost daily) on G.L.M.'s business premises and

G.L.M. employees wore LoJack work clothing and carried LoJack identification that identified them as LoJack employees.

## IV. Consistent With Their Relationship as Partners, G.L.M. and LoJack Freely Traded Direct Customers and Jointly Serviced Customers in the New York/Long Island Area.

29.  Over the years, G.L.M. and LoJack swapped auto dealers back and forth in the New York City and Long Island area, with LoJack or G.L.M. taking over a dealer account depending on the ability of either to sell or service that dealer.

30.  LoJack sales representatives regularly assisted G.L.M in selling LoJack product to G.L.M. dealers, while at the same time, the same LoJack sales representatives sold LoJack products directly to LoJack direct dealers in the New York and Long Island area; accordingly, the LoJack sales representatives knew what prices LoJack and G.L.M. were charging for the same items.

31.  G.L.M. sold to its dealers at the prices set by LoJack, and LoJack told G.L.M. that LoJack was selling to LoJack direct dealers in the area at the same price.

32.  LoJack and G.L.M. discussed before and after the Agreement was executed that the pricing to the dealers would be consistent between G.L.M. and LoJack, with G.L.M. getting LoJack's lowest prices.

## V. G.L.M. and LoJack Satisfy all the Conditions for a Franchise Relationship Except Payment of a Fee.

33.  With LoJack's cooperation and at LoJack's direction and acquiescence, G.L.M. used the LoJack trademark in and around its business premises, including on the exterior of its business premises, on uniforms, business cards and invoices, and on numerous marketing items given to the G.L.M. dealers.  G.L.M. also answered telephones as "G.L.M. LoJack" and G.L.M. used the name LoJack on the G.L.M. website.

34.     As a result of such authorized and directed use, including use of the LoJack logo and trademark, G.L.M. became identified with LoJack.

35.     At LoJack's direction, G.L.M. also followed LoJack's marketing and sales plan, invested in specialized tools, expended significant funds to train employees to install and work on LoJack products, was subject to LoJack's quality control, and was required to upgrade security, computer systems, programs and data sharing at its business premises to conform to LoJack's specifications.

36.     Through the requirements imposed on G.L.M. by LoJack, LoJack exercised a significant degree of control over G.L.M.'s operations and rendered G.L.M. significant assistance in its business operations.

## VI.     G.L.M. and LoJack Continue Their Relationship Under Their Agreements and Pursuant to Their Partnership.

37.     Pursuant to the Agreement, LoJack was to "initially sell Stolen Vehicle Recovery Units ("SVRUs") to [G.L.M.] at a fixed price, initially at $200 each."

38.     LoJack's executive in charge of its business arrangement with G.L.M. was Anthony Del Guercio.

39.     Del Guercio was LoJack's National Director of Agent Expeditor Relationships from 2002 to 2005, and then became Director of Sales in New York and New Jersey from 2005 to 2008.

40.     When Del Guercio resigned his position with LoJack, he was replaced by Joe Melso.

41.     G.L.M. worked closely with LoJack throughout the relationship to improve processes, sales and the reputation of LoJack between and among the dealers that G.L.M. and LoJack worked with on a daily basis.

- 7 -

42.   G.L.M. regularly met with LoJack representatives to discuss what was happening in the business.

43.   For example, on September 19, 2005, Tabackman and Abely discussed potential cost savings in LoJack's price to G.L.M. due to the moving of LoJack production facilities overseas.

44.   At all times, LoJack represented to G.L.M. that its price to G.L.M. for LoJack product was LoJack's lowest price.

45.   G.L.M. sold thousands of LoJack products in each year from 2002 to 2010.

46.   In order to build its business as LoJack's exclusive dealer to its network of customers, and with the knowledge and approval of LoJack, beginning in 2002, G.L.M. refocused its sales to LoJack and greatly limited or reduced sales of competing auto security systems.

47.   In or about 2006, Abely resigned his position at LoJack (he had earlier been replaced as president by Richard Riley), and Riley became Chairman and Chief Executive Officer.

48.   In or about March 2008, LoJack reduced the price of the product it was selling to G.L.M. to $180 per unit.  This reduction was consistent with the parties' agreement that $200 was the "initial" price, and would be decreased (or increased) if LoJack's costs of production decreased (or increased).

49.   G.L.M. believed LoJack's reduction in price resulted from its cost savings realized by moving production of SVRU units overseas.

## VII.   LoJack Secretly Begins Charging G.L.M. a Fee, Becomes a Franchisor and Breaches its Fiduciary Duty to G.L.M.

50.      At various times beginning in 2008, G.L.M. heard from both automobile dealers and a LoJack sales representative that LoJack was directly offering to sell its products to automobile dealers at prices that were substantially lower than LoJack's price to G.L.M.

51.      When G.L.M. informed LoJack of what it had heard, LoJack employees (in Massachusetts and elsewhere) assured G.L.M. that the information was untrue, that LoJack's price to G.L.M. represented LoJack's lowest price, and that LoJack was not selling to LoJack direct dealers in the New York and Long Island area at a lower price than it was selling to G.L.M.

52.      In response, G.L.M. assured its dealers (based on LoJack's representations) that they were paying the same price as dealers buying directly from LoJack.

53.      G.L.M.'s dealers did not believe G.L.M. because they knew other car dealers in the same market (sometimes, on the same street) who were buying LoJack products directly from LoJack at much lower prices than the prices at which LoJack was selling the LoJack products to G.L.M.

54.      In fact, LoJack sold its products to its direct dealers at prices substantially lower than LoJack's prices to G.L.M.  As a consequence, G.L.M.'s automobile customers stopped or reduced purchasing LoJack and other products from G.L.M. because they believed that G.L.M. was overcharging them, and lying about doing so.

55.      LoJack misrepresented its direct sales pricing to G.L.M. in spite of LoJack's published code of business conduct and ethics and its cornerstone of "uncompromising integrity and honesty."

56.     As G.L.M. later learned in 2010, in direct contravention of LoJack's representations to G.L.M., in or about 2008, LoJack began selling its products directly to automobile dealers in G.L.M.'s geographic market at $150 *installed*, which was $30 less than the uninstalled price at which it was selling product to G.L.M. for resale and installation.

57.     On information and belief, subsequent to April 2008, a LoJack employee who was at all pertinent times a sales representative authorized by LoJack to speak on its behalf to third-parties, including G.L.M., at various times complained to Joe Melso about LoJack's unfair treatment of G.L.M. and the injury to G.L.M.'s sales that LoJack's direct sales lower-pricing was having on G.L.M.

58.     This LoJack sales person was someone that was, at the time, selling to LoJack direct dealers at a lower price than the price at which G.L.M. was required to sell the same product to G.L.M. dealers in the same market territory (in some cases on the same street or block).

59.     This sales person clearly understood the potential for harm to G.L.M. and that G.L.M. was completely unaware of LoJack's new pricing scheme.

60.     Joe Melso's response was reported as "F*ck G.L.M.."

61.     On information and belief, Melso's statement represented the view of LoJack senior management which was then principally motivated to increase sales at virtually any price.

62.     At the time these statements were made, Melso was LoJack's Director of Sales in New York and New Jersey, and was directed by LoJack senior management located in Massachusetts.

63.     In or about October 2008, without G.L.M.'s knowledge, LoJack introduced a Lease Pilot Program to automobile dealers in G.L.M.'s geographic market.

64.     The Lease Pilot Program effectively further reduced the price at which LoJack was selling its product to LoJack's direct sales customers.  LoJack did not offer this program or its pricing to G.L.M. or its customers.

65.     In or about March 2009, in response to pressure and complaints from G.L.M., LoJack lowered its pricing to G.L.M. to $175 uninstalled but still continued to sell LoJack units to other automobile dealers in G.L.M.'s geographic market for $150 *installed*.

66.     LoJack knew or should have known that offering and selling installed LoJack product in G.L.M.'s market for significantly less than the price at which it was selling the same product to G.L.M. would drive G.L.M. out of business.

67.     Notwithstanding this knowledge, or in callous disregard of it, LoJack continued on its course of price discrimination, to G.L.M.'s great detriment.

68.     In early 2010, G.L.M. brought its complaints to Melso.  Melso again lied to G.L.M. and denied offering $150 pricing to LoJack direct dealers in G.L.M.'s geographic market, and claimed that LoJack was only offering "special" pricing to large national chains of automobile dealers.

69.     On information and belief, on the same day that Melso made that representation to G.L.M., he also visited a local automobile dealer (not a large national chain dealer) in G.L.M.'s geographic market and offered to sell it LoJack product at $150 installed.

## VIII.   LoJack's Material Breaches of its Agreements with G.L.M. Lead to G.L.M.'s Termination of the Relationship.

70.     G.L.M. had demanded that LoJack compensate it for the difference between the price LoJack charged G.L.M. and the price LoJack charged automobile dealers to which it sold directly, plus labor for installation.

71.     To date, LoJack has refused to provide such compensation.

72.    In response to G.L.M.'s demand, LoJack has informed G.L.M. that it would no longer sell any LoJack product to it, except on a pre-paid basis, and then only if G.L.M. paid in full its account which had previously been payable on 120 days terms.

73.    LoJack has steadfastly refused to meet its agreement to give G.L.M. its lowest prices.

74.    By selling directly to automobile dealers in and around G.L.M.'s market at prices substantially less than its prices to G.L.M., LoJack has intentionally, recklessly and/or negligently undermined and injured G.L.M.'s business, and interfered with G.L.M.'s relationships with its customers.

75.    By refusing to supply product to G.L.M., except on a pre-paid basis, LoJack has breached the terms of September 2002 Agreement as amended and supplemented by the parties' oral modifications and other agreements.

76.    As a result of LoJack's breaches, G.L.M. has terminated the September 2002 Agreement and the partnership.

## IX.    LoJack Breaches Its Post-Agreement Obligations.

77.    By the terms of the September 2002 Agreement, upon termination by G.L.M., LoJack owes G.L.M., in addition to other damages, a credit for all LoJack units to be shipped back to LoJack by G.L.M. and a fee of $50 for each LoJack unit sold to any dealer within G.L.M.'s exclusive territory for six months following termination.

78.    Despite G.L.M.'s demand and LoJack's liability under the Agreement for credits and a $50 fee for all units sold, LoJack has refused to meet its obligations to G.L.M.

79.    By misrepresenting in 2008 and through 2010 that its was selling LoJack SVRUs to G.L.M. as its lowest price, and by further misrepresenting the price to G.L.M. as its best price

when specifically questioned about it, LoJack fraudulently induced G.L.M. to continue in a business relationship with LoJack.

80.    G.L.M. was unable to determine LoJack's fraud until 2008, when customers and others informed it of LoJack's direct pricing.   Even then LoJack attempted to conceal the truth of its conduct from G.L.M. by misrepresenting its pricing to G.L.M. upon G.L.M.'s direct inquiry.

### FIRST CAUSE OF ACTION
### (Breach of Contract)

81.    G.L.M. incorporates by reference the preceding allegations.

82.    In September 2002, LoJack and G.L.M. entered into the Agreement.

83.    Pursuant to the Agreement, LoJack agreed to sell products to G.L.M. 'initially" at $200 per SVRU, which price LoJack represented as its then "best wholesale price" for the product.

84.    LoJack agreed and represented on numerous occasions to G.L.M., both during the negotiations of the Agreement and after its execution, that its price to G.L.M. was, and would remain, its "best price."

85.    In exchange for among other things, G.L.M. not exercising its right to terminate the Agreement, the parties amended the Agreement to provide for payment terms of no less than 90 days.  Accordingly, LoJack provided for such in every invoice from 2004 through 2010.

86.    LoJack later agreed, through its credit manager, to extend the payment terms to 120 days, and LoJack and G.L.M. developed a course of conduct and practice from 2006 to 2010, where payment would and could be as much as 120 days.

87.    LoJack has breached the Agreement by failing to provide its "best price" to G.L.M., in refusing to provide G.L.M. with product unless it paid in advance, by not crediting its

account for returned product and by not paying it $50 per unit for each unit sold for 6 months in G.L.M.'s former territory.

88.     As a result of LoJack's breaches of its agreements with G.L.M., including but not limited to the September 2002 Agreement, G.L.M. has suffered damage, including damage to its good will, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing)

89.     G.L.M. incorporates by reference the preceding allegations.

90.     G.L.M. at all times performed all conditions, covenants and promises required by it under its various agreements with LoJack, including but not limited to the September 2002 Agreement.

91.     LoJack's agreement to sell G.L.M. its SVRU products at its "best price" required LoJack to be honest in fact, and to take no action that would undermine its promises to G.L.M. or deny G.L.M. the fruits of its bargains with LoJack.

92.     Despite its agreement, and contrary to its express representations to G.L.M., LoJack did not honor its word, was not honest in fact, and made a mockery of its own code of business conduct by selling its products to LoJack direct dealers at prices better than prices offered to G.L.M., and then lying about it when asked.

93.     As a result of LoJack's breaches of its implied and express obligations to be honest in fact and fairly deal with G.L.M., including but not limited to those obligations implied into the September 2002 Agreement, G.L.M. has suffered damage, including damage to its good will, in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Tortious Interference With Business Relations)

94.    G.L.M. incorporates by reference the preceding allegations.

95.    At all pertinent times, LoJack knew that G.L.M. had developed business relationships with certain car dealer customers in Queens, Suffolk, Nassau and Bronx Counties in New York that were based on G.L.M.'s history of dealing honestly with its customers.

96.    Since 1973, G.L.M. had been successfully selling after-market car stereos, car security systems and other amenities to these car dealers.

97.    Despite knowing that G.L.M.'s customer relationships were based upon its reputation for honest dealing, LoJack misrepresented its pricing practices to G.L.M. knowing that G.L.M. would be put in the position of unknowingly lying to its customers.

98.    As G.L.M. customers realized that its competitors who did not purchase from G.L.M. were getting better prices directly from LoJack than the prices at which LoJack was selling to G.L.M., these customers stopped purchasing LoJack, as well as other products, from G.L.M.

99.    G.L.M. lost substantial business and customers as a result of LoJack's actions.

100.    As a direct and proximate result of LoJack's intentional and wrongful interference with G.L.M.'s business relationships with its customers,  G.L.M. suffered and continues to suffer damage, including damage to its good will and business relations, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Misrepresentation)

101.    G.L.M. incorporates by reference the preceding allegations.

102.    By its misrepresentations that it would charge and was charging G.L.M. its "best price" for SVRU units, LoJack fraudulently induced G.L.M. to enter and continue a business

relationship with it and caused G.L.M. to greatly reduce its business relationships with other manufacturers of security systems.

103.    During the course of the relationship with LoJack, G.L.M. was assured that it was getting the best pricing on the product.

104.    When G.L.M asked LoJack whether it was selling product in its geographic area at prices lower than LoJack was selling to G.L.M., LoJack misrepresented that it was not.

105.    Based on the representations from LoJack, G.L.M. made certain representations to its car dealers, telling them that LoJack was not selling its product at lower prices to LoJack direct dealers.

106.    G.L.M. continued its arrangement with LoJack and continued to make certain representations to its customers based on the misrepresentation as to pricing by LoJack.

107.    By LoJack's acts, omissions to act, and misrepresentations of the price LoJack was charging G.L.M., LoJack caused injury to G.L.M.'s business reputation and relationships, in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Violation of the New York Franchise Law)

108.    G.L.M. incorporates by reference the preceding allegations.

109.    Beginning in 2008 when LoJack began to charge G.L.M. a "super-price" above "best price" for its SVRU units, *i.e.*, a price other than an actual bona fide wholesale price, the relationship between LoJack and G.L.M. became a franchise within the meaning of the New York State Franchise Sales Act.

110.    In violation of that Act, LoJack failed to register to sell G.L.M. a business franchise, failed to provide G.L.M. with all disclosures required of a franchisor and made untrue

statements of material fact by telling G.L.M. that its price for LoJack product was its "best price" when, in fact, it was not.

111.    Those persons who were LoJack's principal executive officers or directors, or key employees with responsibility for LoJack's relationship with G.L.M. at the time of LoJack's 2008 material misstatements to G.L.M. are individually liable to G.L.M., and G.L.M. reserves its right to name such persons as defendants as their identities become known through discovery.

112.    By charging G.L.M. a price for LoJack products greater than a bona fide wholesale price, LoJack charged G.L.M. a hidden franchise fee.

113.    As a direct and proximate result of LoJack's violation of the New York Franchise Act, G.L.M. suffered and continues to suffer damage, including damage to its good will and business relations, in an amount to be determined at trial.

114.    By its violations of New York Franchise Law, LoJack and its individual executive officers, directors and key executives are liable for counsel fees, expenses and other damages permitted by law.

## SIXTH CAUSE OF ACTION
### (Violation of Massachusetts G.L. c. 93A)

115.    G.L.M. incorporates by reference the preceding allegations.

116.    LoJack's conduct in its relationship with G.L.M. is also subject to the law of the Commonwealth of Massachusetts.

117.    LoJack is engaged in trade and/or commerce in the Commonwealth of Massachusetts.

118.    The center of gravity of LoJack's misrepresentations and pricing scheme that harmed G.L.M.  was at is its headquarters in Massachusetts.

119.     There, LoJack executives hatched their plans to misrepresent its price to G.L.M. as its best price, formulated business strategy to carry out those plans, disregarded its obligations to be truthful to G.L.M., voiced through Melso LoJack's disdain for its obligations to G.L.M., demonstrated its indifference to G.L.M.'s interests under its agreements with LoJack, including but not limited to the September 2002 Agreement, and knowingly violated its own code of business conduct and ethics.

120.     At multiple times before and after March 2008, G.L.M. and LoJack communicated from, within and to Massachusetts, both in writing and orally. These communications were in furtherance of LoJack's unfair and deceptive acts or practices.

121.     Based on the conduct described above, LoJack has engaged in unfair and/or deceptive acts and/or practices in violation of Section 11 of Massachusetts General Laws Chapter 93A.

122.     The unfair and/or deceptive acts and/or practices of LoJack occurred substantially within the Commonwealth of Massachusetts.

123.     The unfair and/or deceptive acts and/or practices of LoJack were intentional, willful and/or knowingly done, or done with reckless indifference to the interests of G.L.M.

124.     G.L.M. has suffered a loss of money and/or property as a result of LoJack's unfair and/or deceptive acts and/or practices in an amount to be determined at trial, including treble damages and counsel fees as authorized by Chapter 93A.

## SEVENTH CAUSE OF ACTION
### (Price Discrimination)

125.     G.L.M. incorporates by reference the preceding allegations.

- 18 -

126.     Section 2(a) of the Robinson-Patman Act, 15 U.S.C. Section 13(a), prohibits a seller from discriminating in price between two competing buyers, where the discriminatory prices result in injury to competition.

127.     LoJack sold LoJack-branded automobile security systems in interstate commerce to G.L.M. and to LoJack direct dealers.

128.     LoJack's sales to G.L.M. and LoJack direct dealers were made contemporaneously, between early 2008 and late 2010.

129.     The products that LoJack sold to G.L.M and to LoJack direct dealers were of like grade and quality.

130.     LoJack's prices to G.L.M. were significantly higher (more than 15% higher) than the prices at which LoJack sold the products to LoJack direct dealers.

131.     G.L.M. repeatedly asked LoJack to sell the products to G.L.M. at the same prices at which LoJack sold the products to the LoJack direct dealers, but LoJack refused to do so.

132.     LoJack's sales of security systems to G.L.M. at significantly higher prices than the sales prices to LoJack direct dealers occurred over a substantial period of time -- from early 2008 until late 2010.

133.     LoJack appointed G.L.M. to exclusively sell the LoJack security systems to approximately 120 automobile dealers located in Queens, Suffolk, Nassau and Bronx Counties in New York (the "G.L.M. dealers").

134.     LoJack directly sold the LoJack security systems to other automobile dealers located in Queens, Suffolk, Nassau and Bronx Counties in New York (the "LoJack direct dealers").

135.    The G.L.M. dealers and LoJack direct dealers were in keen competition with one another for the sale of LoJack security systems to end users.

136.    As a result of LoJack's price discrimination, G.L.M.'s sales to the G.L.M. dealers decreased and G.L.M.'s profits decreased.

137.    Even if G.L.M. sold the LoJack security systems at its cost to the G.L.M. dealers, the price at which the G.L.M. dealers were able to buy the LoJack security systems was significantly higher than the price at which the LoJack direct dealers were able to buy the same products.

138.    As a result of LoJack's price discrimination, G.L.M. dealers were unable to successfully compete with LoJack direct dealers; and the G.L.M. dealers lost sales to the LoJack direct dealers because of the substantially higher prices the G.L.M. dealers were required to pay for the LoJack security systems.

139.    The difference in LoJack's prices for sales to G.L.M. and LoJack direct dealers was not attributable to any cost savings that LoJack realized by its sales to LoJack direct dealers.

140.    The difference in LoJack's prices for sales to G.L.M. and LoJack direct dealers was not based on any difference in the level of services that G.L.M. and LoJack provided to the dealers.

141.    The difference in LoJack's prices for sales to G.L.M. and LoJack direct dealers was not based on offers of lower prices from competitors of LoJack to the LoJack direct dealers.

142.    The lower prices that LoJack offered to the LoJack direct dealers were not functionally available to G.L.M. or to the G.L.M. dealers.

143.    LoJack's unjustified price discrimination caused significant injury to G.L.M., in the form of lost sales, lost profits, and loss of goodwill.

144.    LoJack's unjustified price discrimination resulted in harm to competition.

145.    LoJack's unjustified price discrimination resulted in antitrust injury -- that is, the type of injury the antitrust laws were intended to prevent and which flows from that which makes LoJack's conduct unlawful.

146.    LoJack's actions violated Section 2(a) of the Robinson-Patman Act.

## EIGHTH CAUSE OF ACTION
### (In the Alternative, Breach of Fiduciary Duty)

147.    G.L.M. incorporates by reference the preceding allegations.

148.    G.L.M. and LoJack by their words and deeds were or became partners.  LoJack owed G.L.M. the highest degree of loyalty.  LoJack breached its duty to G.L.M. by callous disregard of its promises to G.L.M, including, but not limited to, lying to it about pricing, undercutting its agreed price, disparaging it, disregarding its own code of ethics, and elevating its own interests above the interests of its partner.

**WHEREFORE**, G.L.M. demands judgment against LoJack as follows:

(a)    On the First Cause of Action: compensatory damages in an amount of $10,000,000 and/or an amount to be determined at trial; punitive damages; prejudgment interest; costs; attorneys' fees; and any such further relief as this Court deems appropriate.

(b)    On the Second Cause of Action: compensatory damages in an amount of $10,000,000 and/or an amount to be determined at trial; punitive damages; prejudgment interest; costs; attorneys' fees; and any such further relief as this Court deems appropriate.

(c)    On the Third Cause of Action: compensatory damages in an amount of $10,000,000 and/or an amount to be determined at trial; punitive damages; prejudgment interest; costs; attorneys' fees; and any such further relief as this Court deems appropriate.

(d)   On the Fourth Cause of Action: compensatory damages in an amount of $10,000,000 and/or an amount to be determined at trial; punitive damages; prejudgment interest; costs; attorneys' fees; and any such further relief as this Court deems appropriate.

(e)   On the Fifth Cause of Action: compensatory damages in an amount of $10,000,000 and/or an amount to be determined at trial; punitive damages; prejudgment interest; costs; attorneys' fees; and any such further relief as this Court deems appropriate.

(f)   On the Sixth Cause of Action: treble damages in an amount to be determined at trial, prejudgment interest; costs; attorneys' fees and any such further relief as this Court deems appropriate.

(g)   On the Seventh Cause of Action: treble damages in an amount to be determined at trial, prejudgment interest; costs; attorneys' fees and any such further relief as this Court deems appropriate.

(h)   On the Eighth Cause of Action: compensatory damages in an amount of $10,000,000 and/or an amount to be determined at trial; punitive damages; prejudgment interest; costs; attorneys' fees; and any such further relief as this Court deems appropriate.

An Order awarding plaintiff such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all claims of the First Amended Complaint.

Dated:  February 1, 2011            **NIXON PEABODY LLP**

           _____

Daniel J. Hurteau, Esq. (DH7178)
677 Broadway, 10th Floor
Albany, New York 12207
Phone:  (518) 427-2650
E-mail: dhurteau@nixonpeabody.com

Arthur L. Pressman, Esq. (_pro hac papers pending_)
**NIXON PEABODY LLP**
100 Summer Street
Boston, Massachusetts 02110
Phone: (617) 345-1000
E-mail:apressman@nixonpeabody.com

ATTORNEYS FOR PLAINTIFF
G.L.M. SECURITY & SOUND, INC.

# EXHIBIT A
# To First Amended Complaint

# EXHIBIT A

be set annually thereafter.  In the event of failure to meet Performance Minimums, LoJack may require Distributor to participate in training or marketing programs, authorize others to solicit the dealers listed on Appendix A, take other remedial action or terminate this Agreement as provided in Section 12.2.  Initial order to be 1200 SVRU's

5.      Reporting:  Distributor shall report installations monthly, not later than 5 days after the close of the month, in such format and in such detail as LoJack reasonably shall request.

6.      Beginning of Term (Effective Date) and Duration: Sept 15, 2002 FOR A PERIOD OF ONE YEAR, AUTOMATICALY RENEWED

This Agreement contemplates that Distributor will purchase LoJack Stolen Vehicle Recovery Units ("SVRUs") from LoJack, and resell and install such SVRUs.

IN WITNESS WHEREOF, this Agreement (consisting of this Cover Sheet and the attached LOJACK DISTRIBUTORSHIP AND INSTALLATION AGREEMENT) has been executed as a sealed instrument by LoJack, by its duly authorized officer, and by the Distributor, by its duly authorized officer, as of the Effective Date set forth above.

DISTRIBUTOR:                                    LOJACK CORPORATION:

X _____                       _____
Name:                                           Name:
GARY TABACKMAN                                  Preside
Title:                                          Title:
PRESIDENT

{B0051564; 4}

## LOJACK DISTRIBUTORSHIP AND INSTALLATION AGREEMENT

This Agreement is made and entered into by and between LoJack Corporation, a Massachusetts corporation having a principal place of business at 200 Lowder Brook Road, Suite 1000, Westwood, MA 02090 ("LoJack") and the person or entity signing below as the Distributor (the "Distributor").

1.    Term.  The term of this Agreement shall commence and terminate on the dates set forth on the Cover Sheet hereto, subject to earlier termination as provided herein.

2.    Designation of Authority.  Distributor has been approved to distribute LoJack's products to automobile dealers as specified in Appendix A and, as such, will be authorized to install SVRUs in vehicles of the customers specified on the Cover Sheet, subject to the terms hereof.

3.    General Conditions.

   3.1    Only those employees of Distributor and its Affiliates who have been trained and certified in the LoJack Certified Installation Program are authorized to install LoJack's SVRU.  For purpose of this Agreement, an Affiliate is an entity which controls, is controlled by or is under common control with Distributor.  It shall be the responsibility of Distributor to assure full compliance with this Agreement by employees of Affiliates.

   3.2    LoJack may perform or have performed in its behalf background investigation checks on the employees of Distributor.  LoJack shall be responsible for compliance with the Fair Credit Reporting Act (15 U.S.C. 1681 *et. seq.*) and other applicable law in the performance by LoJack of any such background investigation check.  LoJack may terminate this Agreement at any time if such investigation provides information unsatisfactory, in the sole judgment of LoJack, with respect to Distributor or its employees.

   3.3    Distributor shall follow the policies and installation procedures set forth in the LoJack Certified Installation Manual, in service bulletins and in all other communications from LoJack to Distributor.

   3.4    LoJack shall have no responsibility for any injury to any employee, agent, guest or licensee of Distributor arising out of installation, handling, installing or testing LoJack's product's or equipment by Distributor.

   3.5    LoJack shall have no responsibility for any for any damage to any vehicle or equipment arising in connection with installation, handling, installing or testing LoJack's product's or equipment by Distributor.

   3.6    LoJack will provide initial and ongoing training and technical support to Distributor during the term of this Agreement.

- 3 -

4.    Relationship of the Parties.

    4.1    It is expressly understood and agreed by the parties that the Distributor is an independent contractor in the performance of each and every part' of this Agreement and that nothing contained in this Agreement is intended, or shall be construed, to constitute the Distributor as the employee, agent, partner or joint venturer of LoJack or as constituting the exercise by LoJack of control or direction over the manner or method by which the Distributor performs the services which are the subject of this Agreement.

    4.2    The Distributor shall have no right, power or authority in any way to bind LoJack to the fulfillment of any condition, contract or obligation or to create any liability binding on LoJack.  LoJack is not responsible for any expenses or liabilities incurred by the Distributor.

    4.3    As an independent contractor, the Distributor shall be solely responsible for all incidents of employment for itself and its employees and agents, including without limitation all employee benefits, workers' compensation insurance, unemployment insurance, withholding and payment of all federal and state income taxes and social security and Medicare taxes and other legally-required payments on sums received from LoJack.  In the event any such charges or taxes are levied against LoJack for any reason, then LoJack shall be entitled to be reimbursed by the Distributor for any sums paid in respect thereof or to set off any such sums against any future amounts due to the Distributor pursuant to this Agreement.

5.    Other Services By the Parties.  During the term hereof, LoJack shall assist Distributor in organizational and sales training, development matters and shall work with the Distributor in selling LoJack's products to automobile dealers.  Such services shall be provided during normal business hours, unless otherwise mutually agred in writing.  The Distributor shall:  (i) devote such business time, attention and resources as is necessary or desirable to fully perform hereunder; (ii) act in a business like, professional and lawful manner and in the best interests of LoJack.

6.    Product Cost and Terms.

    6.1    Initially, LoJack shall sell Stolen Vehicle Recovery Units ("SVRU"s) to Distributor at a fixed price, initially $200 each.  Orders shall be in multiples of fifty (50) units.  Distributor shall pay one half of the amount thereof within thirty days of invoice, and the balance within sixty days of invoice.  Late payments shall bear interest at the rate of one and one-half percent (1 1/2%) per month until paid. LoJack may change SVRU prices at any time, on sixty (60) days prior written notice, except that no such price increases shall occur before January 1, 2003.

    6.2    LoJack will provide its standard consumer warranty (as set forth from time to time in the LoJack Owner's Manual provided to consumers in connection with the

- 4 -

purchase of an SVRU) to customers with respect to SVRUs installed by Distributor, effective upon installation and registration, and shall perform its obligations thereunder.

6.3   LoJack warrants that if any SVRU proves to be defective in material or workmanship within six months from the date of shipment to Distributor and prior to installation; LoJack shall, at its option, either replace that SVRU, or provide without charge the labor and the parts necessary to remedy any such defect. LoJack's responsibility is only to replace or repair the LoJack product and not for any additional payment, regardless of the nature.

**EXCEPT AS EXPRESSLY SET FORTH ABOVE, NO OTHER WARRANTIES ARE EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND LOJACK CORPORATION EXPRESSLY DISCLAIMS ALL WARRANTIES NOT EXPRESSLY STATED HEREIN.**

**IN NO EVENT SHALL LOJACK CORPORATION BE LIABLE FOR ANY LOSS, INCONVENIENCE OR DAMAGE WHETHER DIRECT, INCIDENTAL, CONSEQUENTIAL OR OTHERWISE RESULTING FROM BREACH OF ANY EXPRESS WARRANTY OR ANY IMPLIED WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR OTHERWISE, WITH RESPECT TO ANY LOJACK PRODUCT, EXCEPT AS SET FORTH HEREIN.**

6.4   Except as provided in such warranty and as provided in Section 12.4, all SVRU sales are final and SVRUs purchased by Distributor are not returnable to LoJack.

7.   Insurance.

7.1   The Distributor acknowledges that LoJack does not maintain any property, comprehensive general liability, workers' compensation or other insurance on behalf of the Distributor and that it is the sole responsibility of the Distributor to obtain and keep in force such insurance as Distributor determines appropriate. The Distributor assumes all risk in connection with the adequacy of any and all such insurance that it elects to obtain.   LoJack acknowledges that LoJack employees are covered by a LoJack comprehensive general liability policy while LoJack Employees are on the premises of Distributor.

7.2   LoJack will maintain in effect product liability insurance in an amount not less than $2,000,000 during the term of this Agreement.

8.   Confidential Information.   The Distributor agrees that some restrictions on its activities during and after the term of this Agreement are necessary to protect the Confidential Information, good will and other legitimate interests of LoJack, as follows:

- 5 -

{B0051564, 4}

8.1    The Distributor agrees

(i)    That, during the course of performance under this Agreement, the Distributor may learn of Proprietary Information developed or owned by LoJack or entrusted to it by others or may develop Proprietary Information for LoJack Proprietary Information, whether created by Distributor or others, which shall come into Distributor's custody or possession, shall be and is the exclusive property of LoJack to be used only in the performance of Distributor duties for LoJack.  The Distributor shall not at any time, whether during or after the termination of this Agreement, reveal to any person, entity, or association any Proprietary or Confidential Information of LoJack, except as authorized by LoJack (and then with due regard for continued confidentiality) or as may be required by law, and shall keep secret all matters of such nature entrusted to it and shall not use or attempt to use any such information in any manner for its own benefit or the benefit of others, or as may injure or cause loss or damage to LoJack;

(ii)   That all notes, memoranda, drawings, specifications, techniques, data or other materials relating to any Proprietary Information of LoJack or concerning any of its dealings or affairs shall be used only for the benefit of LoJack and that it shall not, after the termination of this Agreement, use or permit to be used any such notes, memoranda, drawings, specifications, techniques, data or other materials, it being agreed that any of the foregoing shall be and remain the sole and exclusive property of LoJack and that immediately upon termination of this Agreement it shall deliver all of the foregoing, and all copies thereof, to LoJack and Distributor agrees to destroy any Proprietary Information that may be in its possession but stored on media (such as computer disks) that themselves are not property of LoJack; and

8.2    Distributor shall require those of its employees, agents and subcontractors who may have access to LoJack Proprietary Information to execute agreements to be bound by the provisions of this Section 8.

8.3    Proprietary or Confidential Information of LoJack includes any document, data, software, technique or other information possessed or used by LoJack and not generally known including, without limiting the foregoing, trade secrets, processes, techniques, machinery, software, marketing plans, unpublished financial statements or projections, budgets, sales records, licenses, prices, costs, and information as to existing and prospective customers and suppliers.

8.4    Neither party, without the consent of the other party, will knowingly hire an employee of such other party during the term of this Agreement and for a period of 180 days thereafter.

9.    Indemnification.

9.1    The Distributor shall indemnify and hold LoJack, its subsidiaries and other affiliates, and all of their respective shareholders, directors, officers, employees, agents, successors and assigns, harmless from any and all injuries, losses, claims

{B0051564; 4}

- 6 -

and damages to any person or property, and all costs and expenses, including without limitation attorneys' fees, and any other liabilities incurred by any of the foregoing as a result of any faulty installation or any negligent or reckless action or omission of the Distributor or of any employee or agent of the Distributor. Without limiting the generality of the foregoing, such indemnity shall include indemnification for warranty claims or other injuries, losses, claims and damages arising out of occurrences between installation and registration of an SVRU or caused, in whole or in part, by delay in registering an installed SVRU.

9.2   LoJack hereby agrees to indemnify and hold Distributor, its subsidiaries and other affiliates, and all of their respective shareholders, directors, officers, employees, agents, successors and assigns, harmless from any and all injuries, losses, claims and damages to any person or property, and all costs and expenses, including without limitation attorneys' fees, and any other liabilities incurred by any of the foregoing as a result of any defect in a LoJack SVRU or any negligent or reckless action or omission of LoJack or of any employee or agent of LoJack.

10.   Trademarks.

10.1   Use of trademarks.   Whenever Distributor and its intermediaries use the LoJack trademarks in advertising or in any other manner in connection with LoJack Products, LoJack's ownership of the LoJack trademarks shall be clearly indicated. When using the LoJack trademarks under this Agreement, Distributor undertakes to comply with all federal and state laws pertaining to trademarks in force at any time, including but not limited to marking requirements.

10.2   Ownership of Rights.   Distributor acknowledges LoJack's exclusive right, title and interest in and to LoJack patents, LoJack trademarks and the Proprietary Information and will not at any time do or cause to be done any act or thing contesting or in any way impairing or tending to impair any part of such right, title and interest.   In connection with the use of the LoJack trademarks, Distributor shall not in any manner represent that it has any ownership in the LoJack trademarks or registration thereof, and Distributor acknowledges that any use of the LoJack trademarks shall not create in Installation Contractor's favor any right, title or interest in or to the LoJack trademarks, but any and all uses of the LoJack trademarks by Distributor shall inure to the benefit of LoJack.

10.3   Trademark Termination Obligations.   Upon any termination of this Agreement in any manner provided herein, Distributor shall forthwith cease and desist from all use of the LoJack trademarks by advertising or in any manner whatsoever. Distributor will deliver to LoJack, or its duly authorized representatives, all selling materials and other business papers upon which the LoJack trademarks appear.

11.   Enforcement of Covenants.   Distributor acknowledges that Distributor has carefully read and considered all the terms and conditions of this Agreement, including the restraints

- 7 -

{B0051564; 4}

imposed on Distributor and Distributor's employees, associates and agents pursuant to Section 8 hereof. Distributor agrees that said restraints are necessary for the reasonable and proper protection of LoJack and its affiliates and that each and every one of the restraints is reasonable in respect to subject matter, length of time and geographic area. Distributor further acknowledges that, were Distributor or any of Distributor's employees, associates or agents to breach any of the covenants contained in such Sections, the damage to LoJack and its affiliates would be irreparable. Distributor therefore agrees that LoJack, in addition to any other remedies available to it, shall be entitled to preliminary and permanent injunctive Distributor relief against any breach or threatened breach by or Distributor any of it's employees, associates and agents of any of said covenants, without having to post bond. The parties further agree that, in the event that any provision of such Sections shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, such provision shall be deemed to be modified to permit its enforcement to the maximum extent permitted by law.

12.  Termination. Notwithstanding the provisions of Section 1 hereof, this Agreement shall terminate under the following circumstances:

12.1  Insolvency. In the event of the insolvency, bankruptcy, liquidation or filing of a petition seeking relief under the laws of insolvency or bankruptcy by either party during the term hereof, this Agreement shall immediately and automatically terminate.

12.2  Termination For Cause. Upon the giving of written notice and with immediate effect, LoJack may terminate this Agreement as provided in Section 3.2 and in the event that Distributor (i) materially breaches any provision of this Agreement, or commits an act of gross misconduct (which shall include but not be limited to, fraud, forgery, theft or any other act in violation of applicable laws, of dishonesty, malfeasance or willful misconduct), (ii) fails to make the Minimum SVRU purchases set forth in the Cover Sheet; (iii) fails to make payment when due as provided in Article 6, (iv) violates the provisions of Section 3.1, Section 3.3, Article 8 or Article 10, or (v) otherwise acts in a manner that is materially harmful to the business interests or reputation of LoJack.

12.3  Termination by either Party. Either LoJack or the Distributor may terminate this Agreement upon two weeks written notice to the other party.

12.4  Effect of Termination. Except as provided in Section 12.5, upon termination of this Agreement in accordance with this Section 12 or by expiration of the term, LoJack shall have no further obligations to the Distributor. Upon any termination, Distributor immediately shall ship to LoJack all uninstalled SVRUs in its possession, and LoJack shall credit Distributor for the price paid to LoJack by Distributor for such SVRUs. In the event of a termination for cause pursuant to Section 12.2 hereof, such termination shall not constitute a waiver by the

{B0051564; 4}

- 8 -

terminating party for any claim or damages it may suffer by virtue of such breach. The parties further agree that the Distributor's obligations under Sections 8 through 12 of this Agreement shall survive any termination of the Distributor's services or this Agreement and shall be binding upon Distributor, its employees, associates and agents.

12.5   In the event that, after any termination of this Agreement other than by LoJack pursuant to section 12.2, LoJack continues to make sales to an dealer listed on the Cover Sheet which became a LoJack customer as a result of efforts by Distributor during the term of this Agreement, LoJack will pay to Distributor a fee of $50 per unit with respect to all SVRUs sold to such dealer within 180 days of the termination of this Agreement, such amount to be paid thirty days after receipt by LoJack of payment for such SVRUs by the dealer.

13.   Enforceability.  If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

14.   Assignment.  Neither LoJack nor the Distributor may make any assignment of this Agreement or any interest herein, without the prior consent of the other party, provided, however, that LoJack may assign its rights and obligations under this Agreement without the consent of the Distributor to any of its subsidiaries or affiliated companies or in the event that LoJack shall hereafter effect a reorganization, consolidate with, or merge into any other person, corporation or other entity or transfer all or substantially all of its properties or assets to any other person or entity.  LoJack shall provide the Distributor with a written notice of any such assignment.

15.   Waiver.  No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving party.  The failure of either party to require the performance of any term or obligation of this Agreement, or the waiver by either party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

16.   Notices.  Except as otherwise expressly provided herein, any notices, requests, demands or other communications provided for by this Agreement shall be in writing and shall be effective when delivered in person or mailed, postage prepaid, and addressed to the Installation Contractor at its last known address on the books of LoJack or, in the case of LoJack, to it at the address first above written, attention of or to such other address as either party may specify to the other by written notice actually received.

17.   Entire Agreement.  This Agreement constitutes the entire agreement between the parties and supersedes all prior agreements, whether written or oral, with respect to the services to be provided by the Distributor to LoJack and all matters related thereto.

- 9 -

{30051564; 4}

18.    <u>Amendment</u>.  This Agreement may be amended or modified only by a written instrument signed by the Distributor and by a duly authorized Distributor of LoJack.

19.    <u>Captions and Counterparts</u>.   The captions and headings in this Agreement' are for convenience only and in no way define or describe the scope or content of any provision of this Agreement.  This Agreement may be executed in one or more counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument.

<u>Governing Law</u>.  This is a Massachusetts contract and shall be construed and enforced under and be governed in all respects by the laws of The Commonwealth of Massachusetts, without regard to the conflict of laws principles thereof.

O:\wdox\docs\cf\corp\lojack\0216\B0051564.DOC

- 10 -

{B0051564; 4}