**EXHIBIT B**

Daniel J. Hurteau, Esq.
**NIXON PEABODY LLP**
677 Broadway, 10th Floor
Albany, New York  12207
Phone:  (518) 427-2650
Email:  dhurteau@nixonpeabody.com

-*and* -

Arthur L. Pressman, Esq.
**NIXON PEABODY LLP**
100 Summer Street
Boston, Massachusetts 02110
Phone:  (617) 345-1000
Email:  apressman@nixonpeabody.com

~~COUNSEL~~ATTORNEYS FOR PLAINTIFF

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| G.L.M. SECURITY & SOUND, INC.,<br><br>                                        *Plaintiff,*<br><br>                    - *vs* -<br><br>LOJACK CORPORATION,<br><br>                                        *Defendant.* | **FIRST AMENDED**<br>**COMPLAINT WITH**<br><br>**JURY DEMAND**<br><br>Civil Action No.<del>.</del>**:**<br>**10-cv-4701** |

        Plaintiff<del>,</del> G.L.M. Security & Sound, Inc.<del>, (hereinafter,</del> "G.L.M." or "Plaintiff<del>"</del>**"**), by and

through its attorneys NIXON PEABODY LLP, <del>as and</del> for its First Amended Complaint against

<del>Defendant,</del>**defendant** LoJack Corporation ("LoJack")<del>, respectfully allege, upon information and</del>

<del>belief,</del> **alleges** as follows:

## NATURE OF ACTION

1.      This action seeks damages for the unfair, deceptive and wrongful acts of LoJack in relation to ~~a distributorship and franchise relationship~~the business arrangements that it had with G.L.M.

## JURISDICTION AND VENUE

2.      Jurisdiction is based on 28 U.S.C. § 1332, as the parties are of diverse citizenship and the matter in controversy exceeds $75,000, exclusive of interest and costs.

3.      Venue is proper within this District as a substantial part, but not the entirety, of ~~the~~certain acts and transactions or occurrences complained of took place within this District.

## THE PARTIES

4.      G.L.M. is a New York business corporation with a principal place of business in the County of Nassau, Town of Lynbrook, New York.

5.      Since 1973, G.L.M. has been in the business of selling and installing a wide variety of after-market automobile products, such as car security systems, car sound systems and other amenities, to automobile dealers in and around the New York City and Long Island metropolitan area.

6.      LoJack is a Delaware corporation with a principal place of business at 200 Lowder Brook Road, Suite 1000, Westwood, Massachusetts ~~02090.~~

7.      LoJack manufactures, ~~distributes~~ and sells car security systems in the after-market automobile industry.

## THE FACTS

### I.      The Parties Negotiate and Execute a Distributorship and Installation Agreement.

8.      In June ~~of~~ 2002, the President of ~~the~~ Vehicle Manufacturers, Inc. ("VMI"), George Wafer, introduced LoJack to G.L.M. ~~for the purpose of having G.L.M. be a~~

- 2 -

13327460.1

distributor/agent or representative of LoJack (LoJack referred to such agents as Agent Expeditors) and at LoJack's request.  LoJack requested the introduction to facilitate entering into a business relationship with G.L.M. relating to the sale and installation of LoJack products in the New York City and Long Island metropolitan area.  LoJack wanted to use G.L.M.'s almost thirty-year relationships with many of its dealers to increase LoJack's previously low sales in this market.

9.      Over the course of the next few months, there were numerous phone conversations between  LoJack's President, Joseph Abely, and CEO/Chairman, Ron Rossi, and G.L.M.'s President, Gary Tabackman, and VMI's president, George Wafer, to structure an arrangement between the companies.  At all relevant times, Abely was located in Massachusetts and Tabackman and Wafer were in New York.

10.      During those their discussions, LoJack represented to G.L.M., on several occasions, that the price to G.L.M. for it would sell LoJack products would be LoJack's best wholesale price.

11.      During that same time LoJack, G.L.M., and George Wafer worked together to identify other companies, in other parts of the country, that could also be Agent Expeditor for LoJack to G.L.M. at LoJack's best prices.

11.      12. On September 15, 2002, LoJack and G.L.M. entered into the a LoJack Distributorship and Installation Agreement ("Agreement"), which had the purpose of setting set out the terms of the relationship a business arrangement between LoJack and G.L.M. "with respect to the services to be provided by [G.L.M.] to LoJack and all other matters related thereto."  The Agreement is attached hereto as Exhibit A.

- 3 -

12.     Once the arrangement was structured, Tabackman met Abely and other LoJack sales executives in Massachusetts (where LoJack has its corporate offices) to discuss various business issues.

**II.     The Parties Amend the Agreement and Enter Into New Agreements.**

13.     Under the Agreement, G.L.M. became ~~an~~the exclusive ~~dealer~~re-seller and installer of LoJack brand security systems, parts and related products to approximately 120 automobile dealers in Queens, Suffolk, Nassau and Bronx Counties in New York.

14.     Among other things, the Agreement provided that it would be "construed and enforced under and be governed in all respects by the laws of the Commonwealth of Massachusetts~~.~~, without regard to the conflict of law principles thereof."

15.     Subsequent to entering into the Agreement, LoJack and G.L.M. entered into other agreements, including oral agreements, that amended the terms of the Agreement, and established other agreements between them that did not relate to "the services to be provided by [G.L.M.] to LoJack and … other matters related thereto."

16.     For example, not long after entering the Agreement, Tabackman asked LoJack to modify the "Net 60 Days" payment term in the Agreement.  LoJack agreed to do so and in June 2004 began sending its invoices to G.L.M marked "Terms: Net 90 Days."

17.     G.L.M.'s payment term stayed at 90 days throughout the years 2004 – 2010.

18.     Over the same period of time, Tabackman requested even better terms and the LoJack credit manager, Steve Manning, from the corporate office in Massachusetts, allowed its "valued partner" G.L.M. extended terms to 120 days – as long as G.L.M. paid up to 90 days at the end of certain quarters.

- 4 -

19.     From time to time, beginning in mid-2006, G.L.M. would take LoJack up on its offer to extend terms to 120 days – and whenever LoJack would ask G.L.M. to get back to 90 days – G.L.M. would do so.

20.     Thus, over the years there developed a practice and agreement between G.L.M. and LoJack that G.L.M.'s payment term would be around 120 days, and no less than 90 days.

21.     Another example of the parties amending the Agreement relates to the number of sales set out in it, which was always viewed by both parties as a goal that they hoped to reach together.

22.     The performance requirements set out were never reached – not even in the first three months – and they were thereafter never reset – with no objection or other action taken by LoJack.

23.     Throughout the term of the Agreement, performance requirements were not discussed or even mentioned by LoJack at any time after the signing of the Agreement, and the parties' relationship reflected that performance goals were not an issue.

**III.    G.L.M. and LoJack Become Partners.**

24.     From its first meetings with G.L.M., LoJack, through Abely and Ron Rossi (past Chairman of LoJack), asked G.L.M. to regard itself as LoJack's partner, and assured Tabackman that LoJack would regard G.L.M. as its partner.

25.     15. Within days ofAccordingly, immediately following execution of the Agreement, LoJack's President and CEOAbely announced a "partnership" with G.L.M. and introduced G.L.M. as its "partner" toin a letter to the approximately 120 automobile dealers in Queens, Suffolk, Nassau and Bronx Counties in New York.

- 5 -

13327460.1

26. The concept of being a partner with LoJack was at the root of the discussions that led to the Agreement, and was how LoJack and G.L.M. behaved (as evidenced by correspondence, marketing materials and documents created by and sent to G.L.M. from LoJack) through the years of their relationship until the events complained of in this First Amended Complaint came to light.

27. 16. Consistent with its "partnership" with LoJack, G.L.M. has held itself out to the public as the face of LoJack in Queens, Suffolk, Nassau and Bronx Counties in New York.

28. As part of their partnership, G.L.M. and LoJack employees worked very closely together. LoJack employees were frequently (almost daily) on G.L.M.'s business premises and G.L.M. employees wore LoJack work clothing and carried LoJack identification that identified them as LoJack employees.

**IV.** **Consistent With Their Relationship as Partners, G.L.M. and LoJack Freely Traded Direct Customers and Jointly Serviced Customers in the New York/Long Island Area.**

29. Over the years, G.L.M. and LoJack swapped auto dealers back and forth in the New York City and Long Island area, with LoJack or G.L.M. taking over a dealer account depending on the ability of either to sell or service that dealer.

30. LoJack sales representatives regularly assisted G.L.M in selling LoJack product to G.L.M. dealers, while at the same time, the same LoJack sales representatives sold LoJack products directly to LoJack direct dealers in the New York and Long Island area; accordingly, the LoJack sales representatives knew what prices LoJack and G.L.M. were charging for the same items.

31. G.L.M. sold to its dealers at the prices set by LoJack, and LoJack told G.L.M. that LoJack was selling to LoJack direct dealers in the area at the same price.

- 6 -

32.   LoJack and G.L.M. discussed before and after the Agreement was executed that the pricing to the dealers would be consistent between G.L.M. and LoJack, with G.L.M. getting LoJack's lowest prices.

**V.   G.L.M. and LoJack Satisfy all the Conditions for a Franchise Relationship Except Payment of a Fee.**

33.   17. With LoJack's cooperation and at LoJack's direction and acquiescence, G.L.M. used the LoJack trademark in and around its business premises, including on the exterior of its business premises, on uniforms, business cards and invoices, and on numerous marketing items given to the G.L.M. dealers. G.L.M. also answered telephones as "G.L.M. LoJack" and G.L.M. used the name LoJack on its the G.L.M. website.

34.   18. As a result of such authorized and directed use, G.L.M. became identified with LoJack, including use of the LoJack logo and trademark. G.L.M. became identified with LoJack.

35.   19. At LoJack's direction, G.L.M. also followed LoJack's marketing and sales plan, invested in specialized tools, expended significant funds to train employees to install and work on LoJack products, was subject to LoJack's quality control, and was required to upgrade security, computer systems, programs and data sharing at its business premises to conform to LoJack's specifications.

20.   Pursuant to its "partnership" with LoJack, G.L.M. was to purchase LoJack products at special dealer pricing initially starting at $200 per unit, including installation.

36.   Through the requirements imposed on G.L.M. by LoJack, LoJack exercised a significant degree of control over G.L.M.'s operations and rendered G.L.M. significant assistance in its business operations.

**VI.   G.L.M. and LoJack Continue Their Relationship Under Their Agreements and Pursuant to Their Partnership.**

- 7 -

37.     Pursuant to the Agreement, LoJack was to "initially sell Stolen Vehicle Recovery Units ("SVRUs") to [G.L.M.] at a fixed price, initially at $200 each."

38.     LoJack's executive in charge of its business arrangement with G.L.M. was Anthony Del Guercio.

39.     ~~21.~~ ~~LoJack's executive in charge of the Agent Expeditor Program was Anthony Del Guercio.~~ Del Guercio was LoJack's National Director of Agent Expeditor Relationships from 2002 to 2005, and then became ~~Direct~~Director of Sales in New York and New Jersey from 2005 to 2008. ~~When Del Guercio resigned his position with LoJack, he was replaced by Joe Melso.~~

40.     When Del Guercio resigned his position with LoJack, he was replaced by Joe Melso.

41.     ~~22.~~ G.L.M. worked closely with LoJack throughout the relationship to improve processes, sales and the reputation of LoJack between and among the dealers that G.L.M. and LoJack worked with on a daily basis.

42.     ~~23.~~ G.L.M. regularly met with LoJack representatives to discuss what was happening in the business.

43.     ~~24.~~ For example, on September 19, 2005, ~~Gary~~ Tabackman ~~had dinner with then President and CEO of LoJack, Joseph~~and Abely~~, to discuss~~ discussed potential cost savings in LoJack's price to G.L.M. due to the moving of LoJack production facilities overseas.

44.     ~~25.~~ At all times, LoJack represented to G.L.M. that its price to G.L.M. for LoJack product was ~~its best wholesale~~LoJack's lowest price.

45.     ~~26.~~ ~~As LoJack's exclusive dealer and "partner,"~~ G.L.M. sold thousands of LoJack products in each year from 2002 to 2010.

- 8 -

46. 27. In order to build its business as LoJack's exclusive dealer to its network of customers, and with the knowledge and approval of LoJack, beginning in 2002, G.L.M. refocused its sales to LoJack and greatly limited or reduced sales of competing auto security systems.

47. 28. In or about 2006, Joseph Abely resigned his position at LoJack (he had earlier been replaced as president by Richard Riley), and Richard Riley became Chairman and Chief Executive Officer.

48. 29. In or about 2007, G.L.M. was one of only 3 remaining members of the Agent Expeditor Program, and Wafer had ended his association with LoJack.

30. By March 2008, besides G.L.M., there was only one other remaining reseller in the Agent Expeditor Program.

31. Around that same time, LoJack reduced the price of the product it was selling to G.L.M. to $180 per unit. This reduction was consistent with the parties' agreement that $200 was the "initial" price, and would be decreased (or increased) if LoJack's costs of production decreased (or increased).

49. 32. There was no explanation for this reduction, but G.L.M. believed it to be as a result of LoJack's reduction in price resulted from its cost savings from LoJack having moved realized by moving production of the SVRU units overseas.

**VII.   LoJack Secretly Begins Charging G.L.M. a Fee, Becomes a Franchisor and Breaches its Fiduciary Duty to G.L.M.**

50. 33. At various times beginning in 2008 and 2009, 2008, G.L.M. heard from both automobile dealers and various a LoJack sales representatives in Queens, Suffolk, Nassau and Bronx Counties in New York representative that LoJack was directly selling offering to sell its

- 9 -

security products to automobile dealers at prices ~~that were~~ substantially ~~less~~lower than ~~it was selling them~~LoJack's price to G.L.M. ~~for re-sale (even less than $180 per unit).~~

51. ~~34.~~ When G.L.M. informed LoJack of what it had heard ~~from automobile dealers, and was~~, LoJack employees (in Massachusetts and elsewhere) assured G.L.M. that the information was untrue, ~~and~~ that LoJack's price to G.L.M. represented LoJack's lowest price~~.~~, and that LoJack was not selling to LoJack direct dealers in the New York and Long Island area at a lower price than it was selling to G.L.M.

~~35.   At pertinent times, LoJack publicized a code of business conduct and ethics which it claimed governed its business relations with third parties, including G.L.M. The cornerstone of its code was "uncompromising integrity and honesty."~~

~~36.   Despite LoJack's assurances, G.L.M.'s automobile dealer customers continued to advise it that other dealers~~

52. In response, G.L.M. assured its dealers (based on LoJack's representations) that they were paying the same price as dealers buying directly from LoJack.

53. G.L.M.'s dealers did not believe G.L.M. because they knew other car dealers in the same market (sometimes, on the same street) who were buying LoJack ~~product~~products directly from LoJack at ~~a lower price than the price G.L.M. was able to purchase the product from LoJack (and substantially less than G.L.M. was able to sell to its dealers).~~much lower prices than the prices at which LoJack was selling the LoJack products to G.L.M.

54. ~~37. Despite G.L.M.'s assurances that LoJack was not selling its product to other automobile dealers at prices less than G.L.M. was able to buy them, some of~~In fact, LoJack sold its products to its direct dealers at prices substantially lower than LoJack's prices to G.L.M. As a consequence, G.L.M.'s automobile customers stopped or reduced purchasing LoJack and other

- 10 -

products from G.L.M. because they believed that G.L.M. was overcharging them, and lying about doing so.

55.     LoJack misrepresented its direct sales pricing to G.L.M. in spite of LoJack's published code of business conduct and ethics and its cornerstone of "uncompromising integrity and honesty."

56.     38. Unbeknownst to As G.L.M., and later learned in 2010, in direct contravention of LoJack's representations to G.L.M., in or about 2008, LoJack began selling its products directly to automobile dealers in G.L.M.'s geographic market at $150 *installed* or, which was $2530 less than the "wholesale" (*not installed*)uninstalled price at which it was selling product to G.L.M. for resale and installation.

57.     39. On information and belief, subsequent to April 2008, a LoJack employee who was at all pertinent times a sales representative authorized by LoJack to speak on its behalf to third-parties, including G.L.M., at various times complained to Joe Melso about LoJack's unfair treatment of G.L.M. and the injury to itsG.L.M.'s sales that LoJack's direct sales lowlower-pricing was having on G.L.M.

58.     This LoJack sales person was someone that was, at the time, selling to LoJack direct dealers at a lower price than the price at which G.L.M. was required to sell the same product to G.L.M. dealers in the same market territory (in some cases on the same street or block).

59.     This sales person clearly understood the potential for harm to G.L.M. and that G.L.M. was completely unaware of LoJack's new pricing scheme.

60.     40. Joe Melso's response, on information and belief, was reported as "F*ck G.L.M.."

61.     On information and belief, Melso's statement represented the view of LoJack senior management which was then principally motivated to increase sales at virtually any price.

62.     41. At the time these statements were made, Melso was LoJack's Director of Sales in New York and New Jersey, and was directed by LoJack senior management located in Massachusetts.

63.     42. In or about October 2008, without G.L.M.'s knowledge, LoJack introduced a Lease Pilot Program to automobile dealers in G.L.M.'s geographic market.

64.     43. The Lease Pilot Program effectively further reduced the price that at which LoJack was selling its product to LoJack's direct sales customers. LoJack did not offer this program or its pricing to G.L.M. or its customers.

65.     44. In or about March 2009, in response to pressure and complaints from G.L.M., LoJack lowered its "wholesale" pricing to G.L.M. to $175 uninstalled but still continued to sell LoJack units to other automobile dealers in G.L.M.'s geographic market for $150 *installed*.

45.     In June 2009, LoJack demanded that G.L.M. fire a service technician who worked on LoJack product, and G.L.M. agreed to its demand.

46.     Throughout 2008 and 2009, on information and belief, LoJack exerted considerable pressure on its direct sales staff to sell product at $150 per unit *installed* in order to drive its sales numbers to levels acceptable to its senior management and shareholders.

66.     47. LoJack knew or should have known that offering and selling installed LoJack product in G.L.M.'s market for significantly less than the price at which it was selling the same product to G.L.M., its "partner," would drive G.L.M. out of business, or at least, out of the LoJack business.

67. Notwithstanding this knowledge, or in callous disregard of it, LoJack continued on its course of price discrimination, to G.L.M.'s great detriment.

68. 48. In early 2010, when G.L.M. brought its complaints to Joe Melso, the then LoJack executive in charge of LoJack's relationship with G.L.M., MelsoMelso. Melso again lied to G.L.M. and denied that LoJack was offering $150 pricing to automobileLoJack direct dealers in G.L.M.'s geographic market, and claimed that LoJack was only offering such "special" pricing to large national chains of automobile dealers.

69. 49. On information and belief, on the same day that Melso made that claimrepresentation to G.L.M., he also visited a local automobile dealer (not a large national chain dealer) in G.L.M.'s geographic market and offered to sell it LoJack product at $150 installed.

50. In 2010, G.L.M. was advised, by individuals not associated with LoJack, that LoJack had, in fact, sold its security systems directly to automobile dealers at prices far less than its price to G.L.M.

**VIII. LoJack's Material Breaches of its Agreements with G.L.M. Lead to G.L.M.'s Termination of the Relationship.**

70. 51. G.L.M. hashad demanded that LoJack compensate it for the difference between the price LoJack charged G.L.M. and the price LoJack charged automobile dealers to which it sold directly., plus labor for installation.

71. 52. To date, LoJack has refused to do soprovide such compensation.

72. 53. In response to G.L.M.'s demand, LoJack has informed G.L.M. that it would no longer sell any LoJack product to it, except on a pre-paid basis, and then only if G.L.M. paid in full an openits account which had previously been payable on 120 days terms.

- 13 -

73. ~~54.~~ LoJack has steadfastly refused to ~~lower the special dealer pricing to~~ meet its agreement to give G.L.M. its lowest prices.

74. ~~55.~~ By selling directly to automobile dealers in and around G.L.M.'s market ~~territory~~ at prices substantially less than its prices to G.L.M. ~~could resell LoJack equipment to its customers~~, LoJack has intentionally, recklessly and/or negligently undermined and injured G.L.M.'s business, and interfered with G.L.M.'s relationships with its customers.

75. ~~56.~~ By refusing to supply product to G.L.M., except on a pre-paid basis, LoJack has breached the terms of ~~the~~ September 2002 Agreement~~, and by notice~~ as amended and supplemented by the parties' oral modifications and other agreements.

76. As a result of LoJack's breaches, G.L.M. has terminated the ~~Distributorship and Installation Agreement~~ September 2002 Agreement and the partnership.

## IX.  LoJack Breaches Its Post-Agreement Obligations.

77. ~~57.~~ By the terms of the September 2002 Agreement, upon termination by G.L.M., LoJack owes G.L.M., in addition to other damages, a credit for all LoJack units to be shipped back to LoJack by G.L.M. and a fee of $50 for each LoJack unit sold to any dealer within G.L.M.'s exclusive territory for six months~~.~~ following termination.

78. Despite G.L.M.'s demand and LoJack's liability under the Agreement for credits and a $50 fee for all units sold, LoJack has refused to meet its obligations to G.L.M.

79. ~~58.~~ By misrepresenting ~~the price of~~ in 2008 and through 2010 that its was selling LoJack ~~units~~ SVRUs to G.L.M. as its ~~best wholesale price, LoJack fraudulently induced G.L.M. to enter a business relationship with it~~ lowest price, and by further misrepresenting the price to G.L.M. as its best price when specifically questioned about it, LoJack fraudulently induced G.L.M. to continue in a business relationship with LoJack.

- 14 -

80.    G.L.M. was unable to determine LoJack's fraud until 2008, when customers and others informed it of LoJack's direct pricing.   Even then LoJack attempted to conceal the truth of its conduct from G.L.M. by misrepresenting its pricing to G.L.M. upon G.L.M.'s direct inquiry.

### FIRST CAUSE OF ACTION
**(Breach of Contract)**

81.    ~~59.~~ G.L.M. incorporates by reference the preceding allegations.

82.    ~~60.~~ In September 2002, LoJack and G.L.M. entered into ~~an~~the Agreement~~, by which G.L.M. would be a distributor of LoJack products~~.

83.    ~~61.~~ Pursuant to the Agreement, LoJack ~~was~~agreed to sell products to G.L.M. ~~at a fixed price~~"initially" at $200 per SVRU, which price ~~was to be the~~LoJack represented as its then "~~best~~ wholesale price~~"~~ for the product.

~~62.    LoJack was to supply G.L.M. with product during the course of the relationship, and, in turn, G.L.M. was to be the exclusive distributor of LoJack product to a list of approximately 120 car dealers in Queens, Suffolk, Nassau and Bronx Counties in New York.~~

~~63.    G.L.M. has at all times complied with the terms of the Agreement.~~

84.    LoJack agreed and represented on numerous occasions to G.L.M., both during the negotiations of the Agreement and after its execution, that its price to G.L.M. was, and would remain, its "best price."

85.    In exchange for among other things, G.L.M. not exercising its right to terminate the Agreement, the parties amended the Agreement to provide for payment terms of no less than 90 days.  Accordingly, LoJack provided for such in every invoice from 2004 through 2010.

- 15 -

13327460.1

86.    LoJack later agreed, through its credit manager, to extend the payment terms to 120 days, and LoJack and G.L.M. developed a course of conduct and practice from 2006 to 2010, where payment would and could be as much as 120 days.

87.    64. LoJack has breached the Agreement in by failing to provide the its "best wholesale price of the product" to G.L.M. and, in refusing to provide G.L.M. with product unless it paid in advance, by not crediting its account for returned product and by not paying it $50 per unit for each unit sold for 6 months in G.L.M.'s former territory.

88.    65. As a direct and proximate cause of LoJack's breach of the result of LoJack's breaches of its agreements with G.L.M., including but not limited to the September 2002 Agreement, G.L.M. has suffered damage, including damage to its good will, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing)

89.    66. G.L.M. incorporates by reference the preceding allegations.

90.    67. G.L.M. at all times performed all conditions, covenants and promises required by it under the its various agreements with LoJack, including but not limited to the September 2002 Agreement.

68.    It was clearly understood by the parties that G.L.M. and LoJack were entering into a relationship of trust and mutual cooperation to sell LoJack products to certain identified G.L.M. car dealers in Queens, Suffolk, Nassau and Bronx Counties in New York.

69.    It was discussed by the parties and clearly understood that LoJack was to sell its product to G.L.M. at the lowest available "wholesale" price, such that G.L.M. could and would

- 16 -

~~be able to offer its car dealers the same or better pricing as other, non-G.L.M., car dealers in the same geographic area.~~

~~70. In selling its products, *installed*, at a lower price to non-G.L.M. car dealers in the same geographic area as G.L.M. dealers (a price that was significantly lower than the price it was selling its product to G.L.M., *un-installed*), LoJack clearly breached the covenant of good fair and fair dealing that is implied in all contracts.~~

91. <u>LoJack's agreement to sell G.L.M. its SVRU products at its "best price" required LoJack to be honest in fact, and to take no action that would undermine its promises to G.L.M. or deny G.L.M. the fruits of its bargains with LoJack.</u>

92. <u>Despite its agreement, and contrary to its express representations to G.L.M., LoJack did not honor its word, was not honest in fact, and made a mockery of its own code of business conduct by selling its products to LoJack direct dealers at prices better than prices offered to G.L.M., and then lying about it when asked.</u>

9<u>3</u>. ~~71.~~ As a ~~direct and proximate cause of LoJack's breach of covenant of good faith and fair dealing~~<u>result of LoJack's breaches of its implied and express obligations to be honest in fact and fairly deal with G.L.M., including but not limited to those obligations implied into the September 2002 Agreement</u>, G.L.M. has suffered damage, including damage to its good will, in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### (Tortious Interference With Business Relations)

9<u>4</u>. ~~72.~~ G.L.M. incorporates by reference the preceding allegations.

9<u>5</u>. ~~73.~~ <u>At all pertinent times,</u> LoJack knew that G.L.M. had developed business ~~relationship~~<u>relationships</u> with certain car ~~dealers~~<u>dealer customers</u> in Queens, Suffolk, Nassau and

Bronx Counties in New York that were based on G.L.M.'s history of dealing honestly with its customers.

96. ~~74.~~ Since 1973, G.L.M. had been successfully selling after-market car stereos, car security systems and other amenities to these car dealers.

~~75. In fact, it was these relationships with the car dealers that LoJack wanted G.L.M. to leverage in selling LoJack product in the New York and Long Island metropolitan area.~~

~~76. Despite knowing of the relationships that G.L.M. had developed with these car dealers, LoJack began selling its products to non-G.L.M. car dealers in Queens, Suffolk, Nassau and Bronx Counties in New York, at a price, *installed*, that was significantly lower than the price it was selling the same products to G.L.M., *un-installed*.~~

~~77. Thus, G.L.M. was selling the LoJack products to its dealers at an installed price that was higher than non-G.L.M. dealers in that same market – a fact that LoJack was certainly well aware of.~~

~~78. LoJack then refused to acknowledge that it was selling product at a lower price in the market, and G.L.M., in turn, relying on the denials of LoJack, told its car dealers that LoJack was not selling at a better price.~~

97. Despite knowing that G.L.M.'s customer relationships were based upon its reputation for honest dealing, LoJack misrepresented its pricing practices to G.L.M. knowing that G.L.M. would be put in the position of unknowingly lying to its customers.

98. ~~79.~~ As G.L.M. ~~dealers began to realize that non-G.L.M. dealers could, in fact, get a lower price from LoJack, G.L.M. dealers began to accuse G.L.M. of lying to them and refused to purchase~~ customers realized that its competitors who did not purchase from G.L.M. were

- 18 -

getting better prices directly from LoJack than the prices at which LoJack was selling to G.L.M., these customers stopped purchasing LoJack, as well as other products, from G.L.M.

99.   80. G.L.M. lost ~~several of its dealers~~ substantial business and customers as a result of LoJack's actions.

100.   81. As a direct and proximate result of LoJack's intentional and wrongful interference with G.L.M.'s business relationships with ~~the car dealers,~~ its customers, G.L.M. suffered and continues to suffer damage, including damage to its good will and business relations, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Misrepresentation)

101.   82. G.L.M. incorporates by reference the preceding allegations.

102.   83. By its ~~acts, omissions to act, and~~ misrepresentations ~~of the price G.L.M. was to pay for LoJack products as~~ that it would charge and was charging G.L.M. its "best ~~wholesale~~ price" for SVRU units, LoJack fraudulently induced G.L.M. to enter and continue a business relationship with it and caused G.L.M. to greatly ~~reduced~~ reduce its business relationships with other manufacturers of security systems.

103.   84. During the course of the relationship with LoJack, G.L.M. was assured that it was getting the best pricing on the product.

104.   85. When G.L.M. asked LoJack whether it was selling product in its geographic area at prices lower than LoJack was selling to G.L.M., LoJack misrepresented that it was not.

105.   86. Based on the representations from LoJack, G.L.M. made certain representations to its car dealers, telling them that LoJack was not selling its product at lower prices to LoJack direct dealers.

- 19 -

13327460.1

106. 87. G.L.M. continued its arrangement with LoJack and continued to make certain representations to its customers based on the misrepresentation as to pricing by LoJack.

107. 88. By LoJack's acts, omissions to act, and misrepresentations of the price LoJack was charging G.L.M. was to pay for LoJack products as its best wholesale price, LoJack caused injury to G.L.M.'s business reputation and relationships, in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION
### (Violation of the New York Franchise Law)

108. 89. G.L.M. incorporates by reference the preceding allegations.

109. 90. The Beginning in 2008 when LoJack began to charge G.L.M. a "super-price" above "best price" for its SVRU units, *i.e.*, a price other than an actual bona fide wholesale price, the relationship between LoJack and G.L.M. was became a franchise within the meaning of the New York State Franchise Sales Act.

110. 91. In violation of that Act, LoJack failed to register to sell G.L.M. a business franchise, failed to provide G.L.M. with all disclosures required of a franchisor and made untrue statements of material fact by telling G.L.M. that its price for LoJack product was a bona fide wholesale its "best" price" when, in fact, it was not.

111. 92. Those persons who were LoJack's principal executive officers or directors, or key employees with responsibility for LoJack's relationship with G.L.M. at the time of LoJack's 2008 material misstatements to G.L.M. are individually liable to G.L.M., and G.L.M. reserves its right to name such persons as defendants as their identities become known through discovery.

112. 93. By charging G.L.M. a price for LoJack products greater than a bona fide wholesale price, LoJack charged G.L.M. a hidden franchise fee.

1332746011

113. ~~94.~~ As a direct and proximate result of LoJack's violation of the New York Franchise Act, G.L.M. suffered and continues to suffer damage, including damage to its good will and business relations, in an amount to be determined at trial.

114. <u>By its violations of New York Franchise Law, LoJack and its individual executive officers, directors and key executives are liable for counsel fees, expenses and other damages permitted by law.</u>

## SIXTH CAUSE OF ACTION
### (Violation of <u>Massachusetts</u> G.L. c. 93A)

115. ~~95.~~ G.L.M. incorporates by reference the preceding allegations.

116. ~~96.~~ LoJack's conduct in its relationship with G.L.M. is also subject to the law of the Commonwealth of Massachusetts.

117. ~~97.~~ LoJack is engaged in trade and/or commerce in the Commonwealth of Massachusetts.

118. <u>The center of gravity of LoJack's misrepresentations and pricing scheme that harmed G.L.M. was at is its headquarters in Massachusetts.</u>

119. ~~98. LoJack's misrepresentations of~~<u>There, LoJack executives hatched their plans to misrepresent</u> its price to G.L.M. as its best ~~wholesale price, its disregard of~~<u>price, formulated business strategy to carry out those plans, disregarded</u> its obligations to be truthful to G.L.M., ~~its~~<u>voiced through Melso LoJack's</u> disdain for its obligations to G.L.M., <u>demonstrated</u> its indifference to G.L.M.'s interests under its ~~agreement~~<u>agreements</u> with LoJack ~~and its conduct in violation of LoJack's~~<u>, including but not limited to the September 2002 Agreement, and knowingly violated its</u> own code of business conduct and ethics ~~were willful and knowing, and unfair and deceptive acts or practices.~~<u>.</u>

- 21 -

120.    At multiple times before and after March 2008, G.L.M. and LoJack communicated from, within and to Massachusetts, both in writing and orally. These communications were in furtherance of LoJack's unfair and deceptive acts or practices.

121.    99. Based on the conduct described at length above, LoJack has engaged in unfair and/or deceptive acts and/or practices in violation of Section 11 of Massachusetts General Laws Chapter 93A.

122.    100. The unfair and/or deceptive acts and/or practices of LoJack occurred substantially within the Commonwealth of Massachusetts.

123.    101. The unfair and/or deceptive acts and/or practices of LoJack were intentional, willful and/or knowingly done, or done with reckless indifference to the interests of G.L.M.

124.    102. G.L.M. has suffered a loss of money and/or property as a result of LoJack's unfair and deceptive acts and/or practices in an amount to be determined at trial, including treble damages and counsel fees as authorized by Chapter 93A.

## SEVENTH CAUSE OF ACTION
### (Price Discrimination)

125.    103. G.L.M. incorporates by reference the preceding allegations.

126.    104. Section 2(a) of the Robinson-Patman Act, 15 U.S.C. Section 13(a), prohibits a seller from discriminating in price between two competing buyers, where the discriminatory prices result in injury to competition.

105.    LoJack violated Section 2(a) of the Robinson-Patman Act by making contemporaneous sales of commodities

127.    LoJack sold LoJack-branded automobile security systems in interstate commerce to G.L.M. and to LoJack direct dealers.

- 22 -

128.   LoJack's sales to G.L.M. and LoJack direct dealers were made contemporaneously, between early 2008 and late 2010.

129.   The products that LoJack sold to G.L.M and to LoJack direct dealers were of like grade and quality, the LoJack security systems, to G.L.M. at higher prices than its prices to.

130.   LoJack's prices to G.L.M. were significantly higher (more than 15% higher) than the prices at which LoJack sold the products to LoJack direct dealers.

131.   G.L.M. repeatedly asked LoJack to sell the products to G.L.M. at the same prices at which LoJack sold the products to the LoJack direct dealers, but LoJack refused to do so.

132.   LoJack's sales of security systems to G.L.M. at significantly higher prices than the sales prices to LoJack direct dealers occurred over a substantial period of time -- from early 2008 until late 2010.

133.   LoJack appointed G.L.M. to exclusively sell the LoJack security systems to approximately 120 automobile dealers located in Queens, Suffolk, Nassau and Bronx Counties in New York (the "G.L.M. dealers").

134.   LoJack directly sold the LoJack security systems to other automobile dealers located in Queens, Suffolk, Nassau and Bronx Counties in New York (the "LoJack direct dealers").

135.   106. The G.L.M. and the non-G.L.M. automobile dealers located in Queens, Suffolk, Nassau and Bronx Counties in New York competed dealers and LoJack direct dealers were in keen competition with one another for the sale of LoJack security systems to end users.

136.   107. LoJack As a result of LoJack's price discrimination, G.L.M.'s sales to G.L.M. and the automobile dealers were made in interstate commerce. the G.L.M. dealers decreased and G.L.M.'s profits decreased.

- 23 -

13327460.1

~~108.    LoJack's price discriminations injured competition by weakening G.L.M. and preventing G.L.M. from competing with the favored purchasers.~~

~~109.~~

137.    Even if G.L.M. sold the LoJack security systems at its cost to the G.L.M. dealers, the price at which the G.L.M. dealers were able to buy the LoJack security systems was significantly higher than the price at which the LoJack direct dealers were able to buy the same products.

138.    As a result of LoJack's price ~~discriminations, G.L.M. lost sales and profits~~discrimination, G.L.M. dealers were unable to successfully compete with LoJack direct dealers; and the G.L.M. dealers lost sales to the LoJack direct dealers because of the substantially higher prices the G.L.M. dealers were required to pay for the LoJack security systems.

139.    The difference in LoJack's prices for sales to G.L.M. and LoJack direct dealers was not attributable to any cost savings that LoJack realized by its sales to LoJack direct dealers.

140.    The difference in LoJack's prices for sales to G.L.M. and LoJack direct dealers was not based on any difference in the level of services that G.L.M. and LoJack provided to the dealers.

141.    The difference in LoJack's prices for sales to G.L.M. and LoJack direct dealers was not based on offers of lower prices from competitors of LoJack to the LoJack direct dealers.

142.    The lower prices that LoJack offered to the LoJack direct dealers were not functionally available to G.L.M. or to the G.L.M. dealers.

143.    LoJack's unjustified price discrimination caused significant injury to G.L.M., in the form of lost sales, lost profits, and loss of goodwill.

144.    LoJack's unjustified price discrimination resulted in harm to competition.

- 24 -

145. ~~110. G.L.M.'s damages and injury constitute~~ LoJack's unjustified price discrimination resulted in antitrust injury -- that is, the type of injury the antitrust laws were intended to prevent and which flows from that which ~~make's~~ makes LoJack's conduct unlawful.

146. LoJack's actions violated Section 2(a) of the Robinson-Patman Act.

### EIGHTH CAUSE OF ACTION
### (In the Alternative, Breach of Fiduciary Duty)

147. G.L.M. incorporates by reference the preceding allegations.

148. G.L.M. and LoJack by their words and deeds were or became partners. LoJack owed G.L.M. the highest degree of loyalty. LoJack breached its duty to G.L.M. by callous disregard of its promises to G.L.M. including, but not limited to, lying to it about pricing, undercutting its agreed price, disparaging it, disregarding its own code of ethics, and elevating its own interests above the interests of its partner.

**WHEREFORE**, G.L.M. demands judgment against LoJack as follows:

(a) ~~(a)~~On the First Cause of Action ~~against the Defendant~~: compensatory damages in an amount of $10,000,000 and/or an amount to be determined at trial; punitive damages; prejudgment interest; costs; attorneys' fees; and any such further relief as this Court deems appropriate.

(b) ~~(b)~~On the Second Cause of Action ~~against the Defendant~~: compensatory damages in an amount of $10,000,000 and/or an amount to be determined at trial; punitive damages; prejudgment interest; costs; attorneys' fees; and any such further relief as this Court deems appropriate.

(c) ~~(c)~~On the Third Cause of Action ~~against the Defendant~~: compensatory damages in an amount of $10,000,000 and/or an amount to be determined at trial; punitive damages; prejudgment interest; costs; attorneys' fees; and any such further relief as this Court deems appropriate.

(d) ~~(d)~~On the Fourth Cause of Action ~~against the Defendant~~: compensatory damages in an amount of $10,000,000 and/or an amount to be determined at trial; punitive damages; prejudgment interest; costs; attorneys' fees; and any such further relief as this Court deems appropriate.

13327460.1

(e)  (e)On the Fifth Cause of Action against the Defendant: compensatory damages in an amount of $10,000,000 and/or an amount to be determined at trial; punitive damages; prejudgment interest; costs; attorneys' fees; and any such further relief as this Court deems appropriate.

(f)  (f)On the Sixth Cause of Action against the Defendant: treble damages in an amount to be determined at trial, prejudgment interest; costs; attorneys' fees and any such further relief as this Court deems appropriate.

(g)  (g)On the Seventh Cause of Action against the Defendant: treble damages in an amount to be determined at trial, prejudgment interest; costs; attorneys' fees and any such further relief as this Court deems appropriate.

(h)  On the Eighth Cause of Action: compensatory damages in an amount of $10,000,000 and/or an amount to be determined at trial; punitive damages; prejudgment interest; costs; attorneys' fees; and any such further relief as this Court deems appropriate.

An Order awarding plaintiff such other and further relief as the Court deems just and proper.

13327460.1

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all claims of the <u>First Amended</u> Complaint.


Dated: ~~October 13, 2010~~<u>February 1, 2011</u>          **NIXON PEABODY LLP**


_____

Daniel J. Hurteau, Esq. (DH7178)
677 Broadway, 10th Floor
Albany, New York 12207
Phone: (518) 427-2650
E-mail: ~~dhurteaunixonpeabody~~<u>dhurteau@nixonpeabody.c</u>

Arthur L. Pressman, Esq. (*pro hac papers pending*)
**NIXON PEABODY LLP**
100 Summer Street
Boston, Massachusetts 02110
Phone: (617) 345-1000
E-mail: <u>apressman@nixonpeabody.com</u>

<u>ATTORNEYS FOR PLAINTIFF</u>

G.L.M. SECURITY & SOUND, INC.

13327460.1

Document comparison by Workshare Professional on Tuesday, February 01, 2011
12:04:44 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://FIRM_DM/13327460/1 |
| Description | FIRM_DM-#13327460-v1-Original_Complaint_filed_in_October_2010 |
| Document 2 ID | PowerDocs://FIRM_DM/13184474/4 |
| Description | FIRM_DM-#13184474-v4-First_Amended_Complaint_with_Jury_Demand_(USE_THIS_ONE) |
| Rendering set | standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 311 |
| Deletions | 245 |
| Moved from | 11 |
| Moved to | 11 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 578 |