UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
G.L.M. SECURITY & SOUND, INC.,

                  Plaintiff,          <u>MEMORANDUM & ORDER</u>
                                     10-CV-04701(JS)(ARL)

      -against-

LOJACK CORP.,

                  Defendant.
----------------------------------------X
APPEARANCES:
For Plaintiff:       Arthur L. Pressman, Esq.
                    Nixon Peabody LLP
                    100 Summer Street
                    Boston, MA 02110

                    Daniel J. Hurteau, Esq.
                    Nixon Peabody LLP
                    677 Broadway, 10th Floor
                    Albany, NY 12207

For Defendant:       James C. Rubinger, Esq.
                    Plave Koch PLC
                    12355 Sunrise Valley Drive, Suite 230
                    Reston, VA 20191

                    Rachel H. Prindle, Esq.
                    Robert J. Harrington, Esq.
                    Law Offices of Robert W. Harrington, P.C.
                    1 Washington Mall
                    Boston, MA 02108

SEYBERT, District Judge:

        Plaintiff GLM Security & Sound, Inc. ("Plaintiff") sued Defendant LoJack Corp. ("Defendant") in a case arising out of a dispute over an agreement to distribute automobile security systems. Pending before the Court is Plaintiff's motion for leave to amend its Complaint. For the reasons that follow, Plaintiff's motion is GRANTED IN PART AND DENIED IN PART.

<u>BACKGROUND</u>

The following facts are taken from Plaintiff's Proposed Amended Complaint (in citations, the "PAC"). Plaintiff is a Lynbrook, New York corporation that sells, among other things, car security systems to car dealers in New York City and the suburbs. (PAC ¶ 5.) Defendant is a Delaware corporation that manufactures and distributes car security systems. Its principal place of business is Massachusetts. (<u>Id.</u> ¶¶ 6-7.)

In 2002, Plaintiff and Defendant entered into a "Distributorship and Installation Agreement" (the "Agreement"), which provided, in general terms, that Defendant would sell its security systems to Plaintiff. (<u>Id.</u> ¶¶ 8-12.) Plaintiff and Defendant eventually negotiated additional deals, including oral modifications of the Agreement and contracts concerning items outside the Agreement's scope. (<u>Id.</u> ¶ 15.) For example, the parties agreed to extend the Agreement's "Net 60 Days" payment term, extending it first to 90 days and then to 120, "as long as [Plaintiff] paid up to 90 days at the end of certain quarters." (PAC ¶¶ 18, 19.) The parties also developed a practice of disregarding the Agreement's sales expectations term. "The performance requirements in the Agreement were never reached-- not even in the first three months--and they were thereafter never reset--with no objection or other action taken by [Defendant]." (<u>Id.</u> ¶ 22.)

According to Plaintiff, its relationship with Defendant was really a partnership. Defendant announced the supposed partnership in a letter to approximately 120 car dealers in the New York area, and the partnership was further manifested in correspondence, marketing materials, and Defendant's representatives' consistent presence on Plaintiff's premises. Further, Plaintiff's employees wore work clothing with Defendant's logo and carried identification cards with Defendant's insignia. (PAC ¶¶ 28-30, 33-34.) In furtherance of this "partnership," Defendant exercised significant control over Plaintiff's operations. (Id. ¶ 36.)

During the course of their relationship, Defendant and Plaintiff freely traded customers, and jointly serviced customers in the New York area. (Id. ¶ 29.) Defendant both helped Plaintiff sell Defendant's products to Plaintiff's car dealership-clients and sold its security systems directly to car dealers. Defendant knew the prices that both it and Plaintiff were charging for its security systems and, under the Agreement, dealer pricing should have been consistent "with [Plaintiff] getting [Defendant's] lowest prices." (Id. ¶¶ 30-32.) Instead, Plaintiff claims, Defendant sold its security systems to car dealers more cheaply than it sold them to Plaintiff. (Id. ¶ 31.)

Plaintiff confronted Defendant about the pricing discrepancy, but Defendant assured Plaintiff that it was not

offering its direct-sales customers a better price than what Plaintiff was receiving. (PAC ¶¶ 51.) Plaintiff, in turn, reassured its dealership customers that they were getting the same price as those dealerships who bought straight from Defendant. (Id. ¶¶ 52-54.) At some point, however, an unnamed employee of Defendant sought out Joe Melso, Defendant's Director of Sales for New York and New Jersey. (Id. ¶¶ 57-59, 62.) The employee, who had been selling security systems directly to car dealers for a lower price than what Plaintiff was required to charge to dealers in the same geographic area, complained to Melso that Defendant's business tactics were injuring Plaintiff. "F*ck [Plaintiff]," Melso replied. (Id. ¶¶ 57-60.)

Defendant's business strategy, calculated "to increase sales at virtually any price," continued with its October 2008 roll-out of the Lease Pilot Program. (Id. ¶ 61.) Under this initiative, Defendant lowered the price it charged its direct dealerships. (Id. ¶ 64.) Neither Plaintiff nor Plaintiff's dealership customers were offered participation in the new program. (Id.) Plaintiff eventually secured a price reduction, but the new price was still $25 per unit more than Defendant charged its direct-sales customers. (Id. ¶ 65.) Defendant was selling units to direct-sales customers for $150, installation included. Plaintiff, on the other hand, was paying $175 for uninstalled units. (Id.)

In early 2010, Plaintiff again complained to Defendant about the pricing discrepancies. Melso denied that Defendant was selling its security systems directly to dealerships for $150, but it admitted that it offered "special" pricing to large national chains of automobile dealers. (Id. ¶ 68.) The very same day, however, Melso offered the $150 price to a local car dealer who was not part of a national chain. (Id. ¶ 69.)

Plaintiff and Defendant's business relationship fell apart after that. Plaintiff demanded that Defendant compensate Plaintiff for the difference between the price it charged Plaintiff and the price it charged its direct dealership customers, plus extra to reimburse the labor cost of installing the security systems. (Id. ¶ 70.) Defendant refused and informed Plaintiff that it would not sell Plaintiff any security systems except on a "pre-paid" basis and only after Plaintiff's account, which had previously been payable on 120-day terms, had been paid in full. (Id. ¶¶ 71-72.) Plaintiff interpreted this as a material breach, and it terminated the Agreement. (Id. ¶¶ 75-76.)

Plaintiff also alleges that Defendant breached its post-termination obligations under the Agreement. Specifically, Plaintiff claims that Defendant was required to pay Plaintiff for each of Defendant's security systems that Plaintiff returned to Defendant, plus a $50 fee for each unit that Defendant sold

to a car dealer within Plaintiff's exclusive territory for six months after the Agreement's end.  (Id. ¶¶ 75-77.)

In its Proposed Amended Complaint, Plaintiff asserts the following eight claims: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) misrepresentation; (4) tortious interference with business relations; (5) violation of the New York Franchise Sales Act; (6) violation of the Massachusetts General Law Chapter 93A; (7) price discrimination under the federal Robinson-Patman Act; and (8) breach of fiduciary duty.

<u>DISCUSSION</u>

Under Federal Rule of Civil Procedure 15(a), the Court should freely grant parties leave to amend their pleadings "when justice so requires." FED. R. CIV. P. 15(a)(2).  Defendant argues that Plaintiff should not be permitted to amend its Complaint because the Proposed Amended Complaint is futile.  Futility, of course, is one circumstance under which courts may deny plaintiffs leave to amend their complaints.  E.g., <u>Silverman Partners, L.P. v. First Bank</u>, 687 F. Supp. 2d 269, 277-78 (E.D.N.Y. 2010).

I. <u>Legal Standard</u>

To determine whether an amended claim is futile, courts analyze whether the proposed pleading would withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  E.g., <u>Steel Institute of N.Y. v. City of N.Y.</u>, No.

6

09-CV-6539, 2010 WL 5060682, at *6 (S.D.N.Y. Dec. 2, 2010).  To survive a Rule 12(b)(6) motion, a plaintiff must plead sufficient factual allegations in the complaint to "state a claim [for] relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929, 949 (2007).  The complaint does not need "detailed factual allegations," but it demands "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 555.  In addition, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level."  Id. Determining whether a plaintiff has met his burden is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009).  On a motion to dismiss, a plaintiff gets the benefit of all reasonable inferences, see, e.g., Litwin v. Blackstone Group, L.P., 634 F.3d 706, 711 n.5 (2d Cir. 2011), but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

As will become relevant later, when evaluating whether a complaint states a plausible claim, courts may consider "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."

<u>Int'l. Audiotex Network, Inc. v. Am. Tel. & Tel. Co.</u>, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) (quoting <u>Cortec Indus., Inc. v. Sum Holding L.P.</u>, 949 F.2d 42, 47 (2d Cir. 1991)).  Further, "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint."  <u>Int'l Audiotex</u>, 62 F.3d at 72.

II. <u>Application to Plaintiff's Proposed Amended Compliant</u>

   After briefly addressing the governing law and a threshold issue concerning certain of Plaintiff's allegations that are contradicted by the Agreement, the Court considers each claim in Plaintiff's Proposed Amended Complaint.

   A. <u>Governing Law</u>

   Massachusetts law governs Plaintiff's breach of contract and breach of the covenant of good faith and fair dealing claims because the Agreement expressly provides that Massachusetts law governs.  (Agreement 10.)  Absent allegations of fraud related to that choice-of-law provision or a violation of public policy, the Court will honor that clause.  <u>See</u> <u>Fieger v. Pitney Bowes Credit Corp.</u>, 251 F.3d 386, 393 (2d Cir. 2001). Massachusetts law also governs Plaintiff's claim under Massachusetts General Law Chapter 93A.

   Whether New York or Massachusetts law governs Plaintiff's tort claims requires further discussion.  "Under New York law . . . tort claims are outside the scope of contractual

8

choice-of-law provisions that specify what law governs construction of the terms of the contract." Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 335 (2d Cir. 2005). A federal court exercising diversity jurisdiction must apply the choice of law analysis of the forum state. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S. Ct. 1020, 1021, 85 L. Ed. 1477 (1941); Dargahi v. Honda Lease Trust, 370 Fed. Appx. 172, 174 (2d Cir. 2010). The first step in New York's conflict of laws approach is determining "whether there is an actual conflict between the laws of the jurisdictions involved." In re All State Ins. Co., 613 N.E.2d 936, 937 (N.Y. 1993). If no actual conflict of laws exists, New York "dispenses with the choice of law analysis." Intellivision v. Microsoft Corp., No. 07-CV-4079, 2008 U.S. Dist. LEXIS 63564 at *10 (S.D.N.Y. Aug. 20, 2008) (citing Curley v. AMR Corp., 153 F.3d 5, 12 (2d Cir. 1998). Where a conflict exists, New York employs two "choice of law analyses, one for contract claims, another for tort claims." Fieger, 251 F.3d at 394. If there is no conflict, and "if New York law is among the relevant choices, New York courts are free to apply [New York law]." Int'l Bus. Mach. Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir. 2004).

New York courts implement the "interest analysis" to choice of law in tort claims. Globalnet Financial.com, Inc. v. Frank Crystal & Co., 449 F.3d 377, 384 (2d Cir. 2006) (citing

Schultz v. Boy Scouts of Am., Inc., 480 N.E.2d 679 (N.Y. 1985)).
New York's torts choice of law analysis distinguishes torts that
regulate conduct from those that involve loss allocation. "If
conflicting conduct-regulating laws are at issue, the law of the
jurisdiction where the tort occurred will generally apply
because that jurisdiction has the greatest interest in
regulating behavior within its borders." Cooney v. Osgood
Mach., Inc., 612 N.E.2d 277, 280 (N.Y. 1993). For conflict
involving the "allocation of losses, the site of the tort is
less important, and the parties' domiciles are more important."
Globalnet Financial.com, Inc., 449 F.3d at 384-85. The
applicable law for the misrepresentation, tortious interference
with business relations, and breach of fiduciary duty claims
will be each discussed, in turn.

    1.  Misrepresenation

      As to the misrepresentation claim, there is an actual
conflict between New York and Massachusetts law. New York law
recognizes the torts of fraudulent inducement and fraudulent
misrepresentation. As Plaintiff's misrepresentation claim
sounds in both fraudulent inducement and fraudulent
misrepresentation, each claim is subject to conflict of laws
analysis. Under New York law, fraudulent inducement has four
elements: "(i) the defendant made a material false
representation, (ii) the defendant intended to defraud the
plaintiff thereby, (iii) the plaintiff reasonably relied upon

10

the representation, and (iv) the plaintiff suffered damage as a result of such reliance." Maxim Group LLC v. Life Partners Holdings, Inc., 690 F. Supp. 2d 293, 306 (S.D.N.Y. 2010) (internal citation omitted). New York law also requires that a fraud claim raised in a case stemming from breach of contract be "sufficiently distinct from the breach of contract claim." Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996) (quoting Papa's-June Music, Inc. v. McLean, 921 F. Supp. 1154, 1162 (S.D.N.Y. 1996)). More specifically, under New York law, "where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." See Sudul v. Computing Outsourcing Servs., 868 F. Supp. 59, 62 (S.D.N.Y. 1994) (discussing a line of New York cases). In order to preserve its claim of fraud in such a situation, a plaintiff must either: "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." Bridgestone/Firestone, 98 F.3d at 20 (internal citations omitted).

Massachusetts' equivalent tort, deceit, has similar elements.   There, a plaintiff must plead:   "(1) that the allegedly fraudulent statement was knowingly false; (2) that defendant made the false statement with intent to deceive; (3) that the statement was material to plaintiff's decision to sign the contract; (4) that plaintiff reasonably relied on the statement; and (5) that plaintiff was injured as a result of its reliance." Cheng v. Sunoco, Inc., No. 09-40041-FDS, 2010 U.S. Dist. LEXIS 135576, at *9 (D. Mass. Dec. 22, 2010) (citing Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 216, 225 (1st Cir. 2003)).   However, a survey of Massachusetts law does not turn up a similar bar of fraudulent inducement claims where a breach of contract claim is asserted.   Therefore, as to a fraudulent inducement claim, New York and Massachusetts law have an actual conflict.

Under New York law, a plaintiff asserting fraudulent misrepresentation must plead five elements: "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." Gladstone Bus. Loan, LLC v. Randa Corp., No. 09-CV-4225, 2009 U.S. Dist. LEXIS 72575, at *9 (S.D.N.Y. Aug. 17, 2009) (quoting Schlaifer Nance & Co. v. Estate of Andy Warhol, 119 F.3d 91, 98 (2d Cir. 1997)).   This claim is considered intentional misrepresentation in

Massachusetts, which requires: "1) the defendants knowingly made a false statement of material fact, 2) the defendants intended that it be relied on by [plaintiff] and 3) [plaintiff] actually and reasonably relied on the statement."  United Air Lines, Inc. v. Gregory, 716 F. Supp. 2d 79, 84 (D. Mass. 2010) (referencing Zimmerman v. Kent, 575 N.E.2d 70, 74 (Mass. App. Ct. 1991)). While titled differently, New York and Massachusetts law for fraudulent misrepresentation have common elements and present no actual conflict of law.

No matter the flavor, Plaintiff's misrepresentation claim is a conduct-regulating tort. See Mark Andrew of the Palm Beaches, Ltd. v. GMAC Commercial Mortg. Corp., 265 F. Supp. 2d 366, 378 (S.D.N.Y. 2003) (noting fraud rules are conduct regulating), aff'd, 96 Fed. Appx. 750 (2d Cir. 2004); La Luna Enterp., Inc. v. CBS Corp., 74 F. Supp. 2d 384, 389 (S.D.N.Y. 1999) (same).  As such, "[a] cause of action for fraud arises where the loss is sustained and that loss from fraud is deemed to be suffered where its economic impact is felt, normally, the plaintiff's residence."  Intellivision, 2008 U.S. Dist. LEXIS 63664, at *16 (quoting Sack v. V.T. Low, 478 F.2d 360, 366 (2d Cir. 1973).  So, even if Defendant made any of the alleged misrepresentations from its Massachusetts offices, because their economic impact was suffered by Plaintiff in New York, if Plaintiff's misrepresentation claim is construed as one for "fraudulent inducement," New York law controls the analysis.

13

Cantor Fitzgerald v. Lutnick, 313 F.3d 704, 710 (2d Cir. 2002).
Because there is no actual conflict of law if Plaintiff's
misrepresentation claim is considered as one for "fraudulent" or
"intentional" misrepresentation, and New York is a relevant
jurisdiction, the Court will apply New York law to that claim.
Int'l Bus. Mach. Corp., 363 F.3d at 143.

        2.   Tortious Interference

        As to the tortious interference with business
relations claim, no actual conflict between the laws of New York
and Massachusetts exists.   Under New York law, a claim for
tortious interference with business relations requires: (1) "[A]
business relationship between the plaintiff and a third party;
(2) the defendant, knowing of that relationship, intentionally
interferes with it[;] (3) the defendant acts with the sole
purpose of harming the plaintiff, or, failing that level of
malice, uses dishonest, unfair, or improper means; and (4) the
relationship is injured."   Discover Group, Inc. v. Lexmark
Int'l, Inc., 333 F. Supp. 2d 78, 86 (E.D.N.Y. 2004) (citing
Goldhirsh Grp. v. Alpert, 107 F.3d 105, 108-09 (2d Cir. 1997)).
Improper means include "physical violence, fraud or
misrepresentation, civil suits and criminal prosecutions, and
some degrees of economic pressure; they do not, however, include
persuasion alone although it is knowingly directed at
interference with the contract."   NBT Bancorp, Inc. v.
Fleet/Norstar Fin. Group, 664 N.E.2d 492, 497 (N.Y. 1996)

(quoting <u>Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.</u>, 406 N.E.2d 445, 449 (N.Y. 1980)). Massachusetts' equivalent tort, tortious interference with advantageous business relationships, has four elements: "(1) the plaintiff was involved in a business relationship or anticipated involvement in one, (2) the defendant knew about the relationship, (3) the defendant intentionally interfered with the relationship for an improper purpose or by an improper means and (4) the plaintiff suffered damages as a result." <u>Int'l Floor Crafts, Inc. v. Adams</u>, 477 F. Supp. 2d 336, 339 (D. Mass. 2007) (citing <u>Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B.</u>, 815 N.E.2d 241, 245 (Mass. App. Ct. 2004)). The elements for the tort are virtually identical in both states. As there is no actual conflict of law, and given that Plaintiff is a New York business and filed suit here, the Court will apply New York law. <u>See</u> <u>Int'l Bus. Mach. Corp.</u>, 363 F.3d at 143.

       3.  <u>Breach of Fiduciary Duty</u>

As to breach of fiduciary duty, there is no conflict between New York and Massachusetts law. Under New York law, to prevail on a breach of fiduciary duty claim, "a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct." <u>Guarino v. No. Country Mortg. Banking Corp.</u>, 79 A.D.3d 805, 807, 915 N.Y.S.2d 84 (2d Dep't 2010). Similarly, under Massachusetts law, a claim for breach of

15

fiduciary duty requires "1) existence of a fiduciary duty arising from a relationship between the parties, 2) breach of that duty, 3) damages and 4) a causal relationship between the breach and the damages." Qestec, Inc. v. Krummenacker, 367 F. Supp. 2d 89, 97 (D. Mass. 2005) (citing Hanover Ins. Co. v. Sutton, 705 N.E.2d 279, 288-89 (Mass. App. Ct. 1999)). The elements are identical. Thus, consistent with the tortious interference with business relations claim, the Court will apply New York law. See Int'l Bus. Mach. Corp., 363 F.3d at 143. So, to summarize, the torts evaluated by conflict of laws analysis: misrepresentation, tortious interference with business relations, and breach of fiduciary duty will be evaluated under New York law, which also controls Plaintiff's Franchise Sales Act claim.

Federal law applies to Plaintiff's Robinson-Patman Act claim.

### B. Contradictory Allegations

At the outset, the Court addresses Defendant's argument that certain of Plaintiff's allegations contradict the plain language of the Agreement and must therefore be disregarded. (Def. Opp. 4-7.) Defendant advances five arguments under this theory.

First, Defendant maintains that Plaintiff's allegations concerning oral modifications to the Agreement must be ignored because they are expressly contradicted by the

16

Agreement, which provides that the "Agreement may be amended or modified only by written instrument signed by the Distributor and by a duly authorized Distributor of [Defendant]." (Agreement 10.)   Massachusetts law, however, permits oral modifications to contracts notwithstanding contractual provisions purporting to prohibit such changes.   See Cambridgeport Sav. Bank v. Boersner, 597 N.E.2d 1017, 1022 (Mass. 1992) ("[A] provision that an agreement may not be amended orally but only by a written instrument does not necessarily bar oral modification of the contract."); accord Josef Gartner USA LP v. Consigli Constr. Co., Civ. No. 10-40072-FDS, 2011 U.S. Dist. LEXIS 62492, at *21-22 (D. Mass. 2011) (citing Cambridgeport Sav. Bank).   "The evidence of a subsequent oral modification must be of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties." Cambridgeport Sav. Bank, 597 N.E.2d at 1022, n.10; see also Wells Fargo Bus. Credit v. Environamics Corp., 934 N.E.2d 283, 287 (Mass. App. Ct. 2010).   In light of Cambridgeport, the Court also rejects Defendant's argument that the Agreement's waiver provision prohibits Plaintiff's oral modification allegations.   That clause provides that "[n]o waiver of any provision shall be effective unless made in writing and signed by the waiving party." (Agreement § 15.)

Second, Defendant argues that the Court must reject Plaintiff's "partnership" contentions, (PAC ¶¶ 24-29, 148), because the Agreement provides that "[i]t is expressly understood and agreed by the parties that the Distributor is an independent contractor . . . and nothing contained in this Agreement is intended, or shall be construed, to constitute the Distributor as the . . . partner . . . of LoJack" (Agreement § 4.1). (Def. Opp. 6.)   "If the documents referenced in the complaint contradict the facts alleged by the plaintiff, the documents control and the court need not accept as true the plaintiff's allegations." Mazza Consulting Grp., Inc. v. Canam Steel Corp., No. 08-CV-0038 (NGG), 2008 U.S. Dist. LEXIS 32670, at *3 (E.D.N.Y. Apr. 21, 2008); see also Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir. 1991).   Since allegations of a partnership are expressly precluded in the Agreement, the Court will ignore that allegation.

Third, Defendant argues that Plaintiff's claims regarding "best price" (PAC ¶¶ 10, 79, 83-84, 87, 91, 102-03, 109, and 119), "lowest price" (PAC ¶¶ 32, 44, 51, 73, and 79), or its explaining changes in price (PAC ¶ 148) should all be disregarded as contradictory of Section 6.1 of the Agreement. This section states the initial price for each unit ($200), size of each order, and payment terms, and it grants Defendant the right to change the price after a certain time period with written notice.   The Agreement in its entirety is silent as to

18

qualitative aspects of the price term.  Therefore, the Court will consider GLM's allegations as to contract modification as it relates to the quality of the price.

      Fourth, Defendant argues that allegations concerning oral statements that were made prior to the execution of the Agreement, (PAC ¶¶ 24, 26), must be ignored in light of the Agreement's integration clause (Def. Opp. 7).  Section 17 provides that the Agreement "constitute[d] the entire agreement between the parties and supersedes all prior agreements, whether written or oral," and the Court here agrees that Plaintiff cannot now rely on statements allegedly made prior to signing the Agreement.  In Massachusetts, "[w]here the writing shows on its face that it is the entire agreement of the parties and 'comprises all that is necessary to constitute a contract, it is presumed that they have placed the terms of their bargain in this form to prevent misunderstanding and dispute, intending it to be a complete and final statement of the whole transaction.'" Bendetson v. Coolidge, 390 N.E.2d 1124, 1127 (Mass. App. Ct. 1979) (quoting Glackin v. Bennett, 115 N.E. 490, 491 (Mass. 1917)); Agri-Mark, Inc. v. Niro, Inc., 233 F. Supp. 2d 200, 208 (D. Mass. 2002) (quoting Elias Bros. Rests., Inc. v. Acorn Enterp., Inc., 831 F. Supp. 920, 927 (D. Mass. 1993)).  As Massachusetts enforces integration clauses, all references to discussions prior to the execution of the Agreement must be disregarded.  See Agri-Mark, 233 F. Supp. 2d at 208.

<u>Fifth</u>, Defendant argues that Plaintiff's allegations that Defendant controlled Plaintiff's business operations, (PAC ¶¶ 33-36) must be discounted (Def. Opp. 7). The Court agrees. Section 4.1 of the Agreement states that "nothing in this Agreement is intended, or shall be construed . . . as constituting the exercise by LoJack of control or direction over the manner or method by which Distributor performs the services which are the subject of this Agreement." Further, Section 5 of the Agreement provides that LoJack would give GLM organizational and sales training, and assist GLM in selling its product to dealers. This category of statements is different from the first category of contradictory statements in that Plaintiff makes no allegations in the PAC of after-the-fact discussions, written or oral, that demonstrate that Defendant would control Plaintiff. Those provisions that Plaintiff characterizes as Defendant's control over it are merely obligations Defendant had undertaken already as part of the Agreement.

To summarize, the Court will ignore allegations concerning (i) Plaintiff's partnership with Defendant; (ii) pre-Agreement statements relating to that alleged partnership; and (iii) Defendant's purported control over Plaintiff's business operations. It will consider, and assume to be true for the purposes of this motion, Plaintiff's allegations concerning oral modifications to the Agreement and the qualitative price aspects.

C. <u>Plaintiff's Claims</u>

Below, the Court addresses each of Plaintiff's eight claims.

1. <u>Breach of Contract</u>

Plaintiff has stated a breach of contract claim. Under Massachusetts law, plaintiffs must allege (1) the existence of a valid and binding agreement; (2) the defendant's breach; and (3) damages resulting from the breach. <u>Coll v. PB Diagnostic Sys., Inc.</u>, 50 F.3d 1115, 1122 (1st Cir. 1995). The parties do not contest the existence of the Agreement, but they dispute whether the oral modifications that comprise the grounds for breach were made. Here, Plaintiff asserts that Defendant breached the Agreement by failing to provide its "best price" to GLM; refusing to provide GLM with product unless it paid in advance; and, after the Agreement was terminated, not crediting its account for returned product and failing to pay it $50 per unit sold to dealers in Plaintiff's territory for six months post termination. And, although they are not quantified in the Proposed Amended Compliant, Plaintiff's damages include harm to Plaintiff's goodwill.

Defendant argues that the proposed amendment is futile for two reasons. <u>First</u>, it rejects the notion that it had any post-termination obligations to Plaintiff. Defendant claims that it, by a October 22, 2010 letter, validly terminated the Agreement for cause because Plaintiff's substantial overdue

balance was a material breach. (Def. Opp. 8.) Defendant maintains that, because it terminated the Agreement for cause, it had no post-termination obligations under Section 12.5 of the contract. (Id.) In light of Plaintiff's allegations that the parties had extended Plaintiff's credit terms to 120 days, however, it is not clear whether Plaintiff had an outstanding balance and thus whether Defendant validly terminated the Agreement for cause. Accordingly, Defendant's October 22 letter did not necessarily absolve it of its post-termination obligations, and Plaintiff's breach of contract claim cannot be called futile on this ground.

Second, Defendant relies on the arguments it made in its motion to dismiss Plaintiff's original Complaint. (Def. Opp. 9.) These arguments principally concern those allegations that supposedly contradict the Agreement and should be ignored. The Court addressed the thrust of this argument, supra at 11, and need not do so again. Suffice it to say here that Plaintiff alleges that Defendant orally agreed to lower its pricing and extend Plaintiff's credit terms, and that Defendant accepted payments that reflected these modifications. (See supra at 3-4.)

### 2. Breach of Covenant of Good Faith and Fair Dealing

Plaintiff has also stated a claim for breach of the covenant of good faith and fair dealing. "The covenant of good faith and fair dealing is implied in every contract." Uno

Restaurants, Inc. v. Boston Kenmore Realty Corp., 805 N.E.2d 957, 964 (Mass. 2004). The covenant requires that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to the fruits of the contract." Anthony's Pier Four, Inc. v. HBC Assocs., 583 N.E.2d 806, 820 (Mass. 1991) (quoting Drucker v. Roland Wm. Jutras Assocs., 348 N.E.2d 763, 765 (Mass. 1976)). There is no requirement that bad faith be shown; instead, plaintiffs have the burden of proving a lack of good faith. Nile v. Nile, 734 N.E.2d 1153, 1160 (Mass. 2000). The Court looks to the party's manner of performance and can infer a lack of good faith from the totality of the circumstances. See Ayash v. Dana-Farber Cancer Inst., 822 N.E.2d 667, 684 (Mass. 2005), cert. denied sub nom. Globe Newspaper Co. v. Ayash, 546 U.S. 927, 126 S. Ct 397, 163 L. Ed. 2d 275 (2005).

Here, Plaintiff claims that Defendant did not sell Plaintiff its SVRU product at its "best price," was dishonest in telling Plaintiff that it was, and sold their SVRUs at cheaper prices to other dealers. (PAC ¶ 91.) Plaintiff further alleges that upon hearing that its tactics may be hurting Plaintiff's business, Defendant's Director of Sales for New York and New Jersey commented, "F*ck GLM." (PAC ¶ 60.) Defendant argues that the proposed amendment is futile for the same reasons discussed and rejected already: that the plain language of the

Agreement forecloses allegations of oral modifications. (Def. Opp. 11-12.)

3. <u>Misrepresentation</u>

Plaintiff alleges that Defendant knowingly misrepresented that it would charge and was charging Plaintiff its "best price" for the SVRU products and that Plaintiff relied on those representations, reducing its business relationships with other manufacturers and assuring its customers that Defendant was not undercutting Plaintiff's prices. The cumulative effect of Defendant's alleged behavior injured Plaintiff's business reputation and relationships. (PAC ¶¶ 104-107.) Whether characterized as one for fraudulent inducement or fraudulent misrepresentation, Plaintiff's claim fails as a matter of law.

a. <u>Fraudulent Inducement</u>

"Under New York law, in order to prove fraudulent inducement, a plaintiff must show that: '(i) the defendant made a material false representation, (ii) the defendant intended to defraud the plaintiff thereby, (iii) the plaintiff reasonably relied upon the representation, and (iv) the plaintiff suffered damage as a result of such reliance.'" <u>Xcellence, Inc. v. Arkin Kaplan Rice LLP</u>, No. 10-CV-3304, 2011 U.S. Dist. LEXIS 26533, at *10-11 (S.D.N.Y. Mar. 15, 2011) (quoting <u>Maxim Grp. LLC v. Life Partners Holdings, Inc.</u>, 690 F. Supp. 2d 293, 306 (S.D.N.Y. 2010)). Additionally, Rule 9(b) requires that when "alleging

24

fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). Under the heightened pleading standard of Rule 9(b), a plaintiff "'must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Watral v. Silvernails Farm LLC, 51 Fed. Appx. 62, 65 (2d Cir. 2002) (quoting Anatian v. Coutts Bank (Switz.) Ltd., 193 F.3d 85, 88 (2d Cir. 1999)).

New York law distinguishes between "a claim based on fraudulent inducement of a contract" and a breach of contract claim. Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 184 (2d Cir. 2007). "Merely falsely indicating an intent to perform under a contract [in the future] 'is not sufficient to support a claim of fraud under New York law.'" AXA Versicherung AG v. N.H. Ins. Co., 708 F. Supp. 2d 423, 429 (S.D.N.Y. 2010) (quoting Bridgestone/Firestone, 98 F.3d at 19.

Plaintiff cannot state a claim for fraudulent inducement because, to the extent it claims that Defendant's assurance that it would enjoy Defendant's "best price" was reason it entered into the Agreement, Plaintiff's theory is precluded by the Agreement's integration clause. That clause forecloses Plaintiff's reliance on statements outside the

Agreement that were made prior to the Agreement.   Defendant's alleged statements, then, were representations of a future intent to perform.[1]

### b. Fraudulent Misrepresentation

Even if Plaintiff's claim were construed as a fraudulent misrepresentation claim, its proposed amendment is still futile.   As discussed earlier, in New York, fraudulent misrepresentation has five elements: "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." Gladstone Bus. Loan, LLC, 2009 U.S. Dist. LEXIS 72575, at *9 (citation omitted).

The Second Circuit has noted that, under New York law, allegations of breach of contract and their related implied covenants do not sound in fraud. Rodriguez v. It's Just Lunch, No. 07-CV-9927, 2010 U.S. Dist. LEXIS 16622, at *13 (S.D.N.Y. Feb. 23, 2010) (referencing Telecom Int'l Am., Ltd. v. AT&T Corp., 280 F.3d 175, 196 (2d Cir. 2001), adding "the fraud claim is redundant and plaintiff's sole remedy is for breach of contract."); see also J.M. Bldrs. & Assocs., Inc. v. Lindner, 67 A.D.3d 738, 741-742, 889 N.Y.S.2d 60 (N.Y. App. Div. 2d Dep't

---

[1] Nor do any of the allegations in the PAC suggest that Defendant represented to Plaintiff that it would receive its "best price" when the alleged oral modifications to the Agreement (starting in 2008) took place.

2009).  To state a fraud claim apart from the parties' contract, a plaintiff must either "(i) demonstrate a legal duty separate from the duty to perform under the contract, . . . or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract."  Bridgestone/Firestone, 98 F.3d at 20; see also TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 91 (2d Cir. 2005).

Plaintiff meets neither of these requirements.  First, Plaintiff pegs its hopes on an external fiduciary duty resulting from a partnership as alleged in the PAC, but for reasons discussed infra, Defendant owed Plaintiff no duties separate from the contract.  Nor does Plaintiff allege any fraudulent misrepresentation collateral or extraneous to the contract. Second, one of the central claims of Plaintiff's breach of contract case is that Defendant, under an amendment to the Agreement, failed to charge Plaintiff its "best price."  Under New York law, "[a] cause of action alleging fraud does not lie where the only fraud claim relates to a breach of contract." J.M. Bldrs. & Assoc., 67 A.D.3d 738 at 741-742 (quoting WIT Holding Corp. v. Klein, 282 A.D.2d 527, 528, 724 N.Y.S.2d 66 (1st Dep't 2001)); see also Bridgestone/Firestone, 98 F.3d at 19-20.

Plaintiff cannot morph its breach of contract allegations into a tort.  Contemporary Mission, Inc. v. Bonded Mailings, Inc., 671 F.2d 81, 85 (2d Cir. 1982) ("If the only

interest involved, however, is holding a party to a promise, a plaintiff will not be permitted to transform the contract claim into one for tort.") Thus, the misrepresentation claim is redundant of the breach of contract claim, and amendment is denied as futile.

### 4. Tortious Interference with Business Relations

Plaintiff also fails to state a claim for tortious interference with business relations. Plaintiff's theory is that Defendant interefered with Plaintiff's relationships with its dealership customers by, among other things, misrepresenting its pricing policies to Plaintiff knowing that Plaintiff would in turn misrepresent those policies to Plaintiff's customers. (See PAC ¶¶ 94-100.) Stated earlier, tortious interference with business relations has four elements: "(1) . . . a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured." Discover Group, Inc., 333 F. Supp. 2d at 86. Examples of improper means are: "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." NBT Bancorp, 664 N.E.2d at 497

(quoting <u>Guard-Life</u>, 406 N.E.2d at 449.) "Even if the interference was intended, if defendant acted in part to advance his own interests the claim must fail." <u>H & R Indus. v. Kirshner</u>, 899 F. Supp. 995, 1009 (E.D.N.Y. 1995); <u>see also</u>, <u>RFP, LLC v. SCVNGR, Inc.</u>, No. 10-CV-8159, 2011 U.S. Dist. LEXIS 50730 (S.D.N.Y. May 12, 2011). The Court agrees with Defendnat that Plaintiff has not adequately alleged that its customers would have continued to do business with it but for Defendant's alleged misrepresentation. <u>See</u> <u>M.J. & K. Co., Inc. v. Matthew Bender and Co., Inc.</u>, 220 A.D.2d 488, 490, 631 N.Y.S.2d 938 (2d Dep't 1995). Plaintiff will be permitted to replead this claim.

   5. <u>Violation of the New York Franchise Sales Act</u>

   Plaintiff's proposed amended New York Franchise Sales Act (the "FSA") claim is futile, because claims under this statute are subject to a three-year statute of limitations. N.Y. GEN. BUS. L. § 691(4). A franchise is an agreement "either expressed or implied, whether oral or written . . ." that grants the franchisee the right to offer, sell, or distribute goods or services "under a marketing plan" or "substantially associated with the franchisor's trademark . . . trade name . . . logotype, advertising, or other commercial symbol designating the franchisor . . . and the franchise is required to pay, directly or indirectly, a franchise fee." <u>Id.</u> § 681(3)(a)-(b). In connection with the sale of any franchise, the FSA prohibits employing any "device, scheme or artifice to defraud," making

29

"any untrue statement of" or failing to state "a material fact," and engaging "in any [fraudulent or deceitful] act, practice, or course of business." Id. § 687(2)(a)-(c).

In an attempt to characterize its FSA claim as timely, Plaintiff argues that the 2002 Agreement blossomed into a franchise in 2008 when Plaintiff discovered that Defendant was charging Plaintiff a higher price than what it was charging Defendant's direct dealer customers. (Pl. Reply 8.) The price differential, according to Plaintiff, was a "hidden franchise fee." (Id.) Plaintiff offers no authority in support of this novel theory and the Court has found none. The alleged "hidden fee" without more--e.g., a franchise agreement or registration-- is insufficient to state a claim under the FSA. Accordingly, leave to amend is denied as to this claim. See United Magazine Co. v. Murdoch Magazines Distrib., Inc., 146 F. Supp. 2d 385, 407 (S.D.N.Y. 2001) ("The Court concludes, consistent with the majority of the cases . . . ., that the statute of limitations begins to run at the time that the parties first enter into the franchise agreement.") aff'd 279 Fed. Appx. 14 (2d Cir. 2008).

6.   Massachusetts Geneneral Law Ch. 93A

Plaintiff's sixth claim is for unfair trade practices under Massachusetts General Law Chapter 93A ("Chapter 93A"). This statute provides in relevant part that "[n]o action shall be . . . maintained . . . unless the actions and transactions constituting the alleged . . . unfair or deceptive act or

practice occurred primarily and substantially within [Massachusetts]." (Chapter 93A § 11.) Defendant argues that Plaintiff cannot satisfy this requirement.

Three elements comprise a Chapter 93A unfair competition claim. "[A] plaintiff must establish that the alleged offending act was (1) within at least the penumbra of common law, statutory law or other established concepts of unfairness, (2) is immoral or otherwise unscrupulous, and (3) inflicted injury on another business.'" Rohm & Haas Elec. Materials, LLC v. Elec. Circuits Supplies, Inc., 759 F. Supp. 2d 110, 123 (D. Mass. 2010) (quoting Franklin v. Ciroli, 865 F. Supp. 940, 947 n.18 (D. Mass. 1994)); see also PMP Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975). Unfairness is determined by Massachusetts' "rascality" test: "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." St.-Gobain Indus. Ceramics, Inc. v. Wellons, Inc., 246 F.3d 64, 73 (1st Cir. 2001) (quoting Cambridge Plating Co. v. Napco, Inc., 85 F.3d 752, 769 (1st Cir. 1996)).

Plaintiff's claim under Chapter 93A is derivative of the breach of contract and misrepresentation claims. Plaintiffs do not identify a single fact critical to their Chapter 93A claim that is not also central to the breach of contract, its implied covenant of good faith and fair dealing, and

misrepresentation claims.   Breach of a contract alone (and its implied covenant of good faith and fair dealing) is insufficient to maintain a claim under section 2 of Chapter 93A of the Massachusetts General Laws.   Rohm & Haas Elec. Materials, LLC, 759 F. Supp. 2d at 123.   The misrepresentation claim fails as a matter of law.   See supra at 28.   "To the extent a party's Chapter 93A claims are based only on failed common law or statutory grounds, several courts have refused to find Chapter 93A liability."   Prof'l Servs. Grp., Inc. v. Town of Rockland, 515 F. Supp. 2d 179, 194 (D. Mass. 2007).   Absent a baseline offending act within "at least the penumbra of common law, statutory law or other established concepts of unfairness," the Chapter 93A claim fails, as well.   Plaintiff's proposed amended claim is denied as futile.

### 7.   The Robinson-Patman Act

Plaintiff's proposed allegations do not suffice to state a claim for a price discrimination claim under the Robinson-Patman act.   To survive a motion to dismiss, a plaintiff must allege that (i) a "commodity" was sold in interstate commerce to at least two buyers; (ii) the commodity sold to the disfavored purchaser was of "like grade and quality" to that sold to the favored purchaser; (iii) the seller "discriminate[d] in price between" the favored and disfavored purchaser; and (iv) that discrimination had a prohibited effect

on competition. 15 U.S.C. § 13(a); Texaco v. Hasbrouck, 496 U.S. 543, 556, 110 S. Ct. 2535, 110 L. Ed. 2d 492 (1990).

"Price discrimination claims brought pursuant to Section 2(a) 'generally fall into three categories.'" Dayton Superior Corp. v. Marjam Supply Co., No. 07-CV-5215, 2011 U.S. Dist. LEXIS 17221, at *13-*14 (E.D.N.Y. Feb. 22, 2011) (quoting George Haug Co., Inc. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 141 n.2 (2d Cir. 1998)). Primary-line discrimination claims arise "when a seller's price discrimination harms competition with the seller's competitors." George Haug, 148 F.3d at 141 n.2; (citing Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 220, 113 S. Ct. 2578, 125 L. Ed. 2d 168 (1993). Secondary-line discrimination claims arise when a seller's discrimination impacts competition among the seller's customers--i.e., the favored purchasers and disfavored purchasers. Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc., 546 U.S. 164, 176, 126 S. Ct. 860, 163 L. Ed. 2d 663 (2006). Tertiary-line claims arise "when the seller's price discrimination harms competition between customers of the favored and disfavored purchasers, even though the favored and disfavored purchasers do not compete directly against another." George Haug, 148 F.3d at 141 n.2 (citing Falls City Indus., Inc. v. Vanco Beverage, Inc., 460 U.S. 428, 436, 103 S. Ct. 1282, 75 L. Ed. 2d 174 (1983)).

Here, Plaintiff's allegations sound in secondary- and tertiary-line price discrimination, but it has not adequately alleged a discriminatory effect on competition.  Plaintiff's theory is seemingly that Defendant favored its direct dealership customers with lower prices for its security systems, and that the higher prices Defendant charged Plaintiff in turn inhibited Plaintiff's re-sales to Plaintiff's dealership customers.  Plaintiff's tertiary-line theory appears to be that as a result of the price discrepancies Defendant put Plaintiff's dealer customers at a disadvantage vis-a-vis Defendant's direct dealer customers.  Plaintiff's customers lost automobile sales due to the substantially higher price they had to pay for Defendant's security systems.  (See PAC ¶ 138.)  Plaintiff contends that it, in turn, lost business.  (PAC ¶ 136.)

"A hallmark of the requisite competitive injury . . . is the diversion of sales or profits from a disfavored purchaser to a favored purchaser." Volvo, 546 U.S. at 175 (citing FTC v. Sun Oil Co., 371 U.S. 505, 518-19, 83 S. Ct. 358, 9 L. Ed. 2d 466 (1963)).  Plaintiff's allegations of discriminatory effect come up short.  For example, there are no facts suggesting that (1) Plaintiff tried to sell to any of Defendant's direct dealers; (2) Plaintiff's dealers and Defendant's direct dealers were in competition for the same customers; (3) automobile dealers charge different prices for Defendant's security systems based on the prices the dealers must pay; or (4) the different

prices paid by the dealerships had a meaningful impact on automobile sales.

As set forth in its Proposed Amended Complaint, Plaintiff's Robinson-Patman claim would not survive a motion to dismiss. The Court will afford Plaintiff one more chance to re-plead it.

8. <u>Breach of Fiduciary Duty</u>

Plaintiff's Proposed Amended Complaint adds a claim for breach of fiduciary duty. Specifically, Plaintiff alleges that it and Defendant "by their words and deeds were or became partners" and that Defendant breached its duty of loyalty under that partnership by lying about its pricing, undercutting its agreed price, disparaging Plaintiff, disregarding its own code of ethics, and elevating its own interests above the interest of GLM. (PAC ¶¶ 148.) Leave to amend to add this claim is denied.

To state a claim for breach of fiduciary duty, a plaintiff must allege 1) the existence of a fiduciary duty arising from a relationship between the parties, 2) a breach of that duty, 3) damages, and 4) causation. <u>See</u> <u>Regan v. Conway</u>, 768 F. Supp. 2d 401, 410 (E.D.N.Y. 2010) (citing <u>Ozelkan v. Tyree Bros. Envtl. Servs. Inc.</u>, 29 A.D.3d 877, 879, 815 N.Y.S.2d 265 (2d Dep't 2006) and <u>Fitzpatrick House III L.L.C. v. Neighborhood Youth & Family Services</u>, 55 A.D.3d 664, 664, 868 N.Y.S.2d 212 (2d Dep't 2008)). Plaintiff contends that "by their words and deeds were or became partners." (PAC ¶ 148.)

Any suggestion that the Agreement created a partnership obligation is foreclosed by language of the Agreement itself. See supra at 18. Nor can Plaintiff assert a "partnership by estoppel" claim. Under New York law, partnerships by estoppel arise where (1) a defendant presents "sufficient indicia of partnership . . . to constitute a representation that the partnership exists" and (2) "injured party must have relied on this representation to his or her detriment." First Am. Corp. v. Price Waterhouse LLP, 988 F. Supp. 353, 358 (S.D.N.Y. 1997). Here, the "words and deeds" Plaintiff relies on to claim a partnership were, for the most part, required under the Agreement, which explicitly disavowed a partnership. (E.g., Agreement §§ 3.1 (stating that "[o]nly those employees of the Distributor [Plaintiff] and its Affiliates who have been trained . . . are authorized to install [Defendant's] SVRU), 3.2 (providing that Defendant "may perform or have performed in its behalf background investigation checks on the employees of the Distributor [Plaintiff]); 3.6 ("[Defendant] will provide initial and ongoing training and technical support to Distributor during the term of this Agreement"); 5 ("[Defendant] shall assist Distributor in organizational and sales training, development matters and shall work with the Distributor in selling [Defendant's] products to automobile dealers"), and 10 (permitting, generally, the use of Defendant's trademarks in advertising, while clearly delineating ownership of such as

36

Defendant's and requiring distributors to return to Defendant all sales materials and business papers bearing Defendant's trademark upon Agreement termination)).  To the extent Plaintiff relies on Defendant's announcing a new "partnership" in a letter to car dealers in the New York area, this allegation does not raise a plausible claim of justifiable reliance because the letter was sent "immediately" after the parties executed the Agreement, which included explicit "no partnership" language. (PAC ¶ 25.)[2]

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiff's motion for leave to file an Amended Complaint is GRANTED AND PART AND DENIED IN PART.  Within twenty-one (21) days from the date of this Order, Plaintiff shall file its Amended Complaint, which may assert the breach of contract and breach of the covenant of good faith and fair dealing claims that were part of its Proposed Amended Complaint.  In addition, the Amended Complaint may re-plead Plaintiff's tortious interference with business relations and Robinson-Patman Act claims.  Leave to amend Plaintiff's misrepresentation, New York Franchise Sales Act, Massachusetts General Law Chapter 93A claims and breach of fiduciary duty claims is denied as futile.  Defendant's pending

---

[2] The Court would reach the same result under Massachusetts law. <u>See</u> <u>Andrews v. Elwell</u>, 367 F. Supp. 2d 35, 39-42 (D. Mass. 2005) (listing elements to a partnership-by-estoppel).

motion to dismiss Plaintiff's original Complaint (Docket Entry 14) is DENIED as moot.

                                SO ORDERED.

                                /s/ JOANNA SEYBERT_____
                                Joanna Seybert, U.S.D.J.

Dated:      September __30__, 2011
              Central Islip, New York