UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
G.L.M. SECURITY & SOUND, INC.,

                        Plaintiff,

                                          MEMORANDUM & ORDER
        -against-                         10-CV-4701 (JS)(ARL)

LOJACK CORP.,

                        Defendant.
----------------------------------X
APPEARANCES:
For Plaintiff:      Arthur L. Pressman, Esq.
                    Nixon Peabody LLP
                    100 Summer Street
                    Boston, MA 02110

                    Daniel J. Hurteau, Esq.
                    Nixon Peabody LLP
                    677 Broadway, 10th Fl.
                    Albany, NY 12207

For Defendant:      James C. Rubinger, Esq.
                    Plave Koch PLC
                    12355 Sunrise Valley Drive
                    Reston, VA 20191

                    Rachel H. Prindle, Esq.
                    Robert J. Harrington, Esq.
                    Law Office of Robert W. Harrington, P.C.
                    1 Washington Mall
                    Boston, MA 02108


SEYBERT, District Judge:

        Plaintiff GLM Security & Sound, Inc. ("GLM") sued

Defendant LoJack Corp. ("LoJack") alleging violations of New

York, Massachusetts, and Federal law in relation to an agreement

between the parties for GLM to distribute LoJack's automobile

security systems.  Pending before the Court are (1) GLM's motion

to reconsider this Court's September 30, 2011 Order dismissing some of GLM's claims and allowing GLM to re-plead others, (2) GLM's First Amended Complaint ("FAC"), (3) LoJack's motion to strike certain portions of the FAC, and (4) LoJack's motion to dismiss the FAC in its entirety.

BACKGROUND

The following section discusses both this case's factual background and its procedural history.

## I. Factual Background

The following facts are taken from GLM's FAC and are presumed to be true for the purposes of this decision.

GLM is a Lynbrook, New York corporation that sells after-market automobile products, including car security systems, to car dealers in New York City and the Long Island metropolitan area. (FAC ¶¶ 4-5.) LoJack is a Delaware corporation that manufactures and distributes car security systems. (FAC ¶¶ 6-7.)

GLM and LoJack's relationship began in June 2002 when George Wafer ("President" or "Wafer"), President of Vehicle Manufacturer's Services ("VMS"), introduced LoJack to GLM. Wafer is alleged to have been acting as LoJack's agent at all relevant times. (FAC ¶¶ 8-9.) After a few months of negotiations, GLM and LoJack entered into a written "Distributorship and Installation Agreement" (the "Distribution

2

Agreement"). (FAC ¶¶ 11, 13.) In relevant part, the Distribution Agreement provided that (1) GLM would "purchase LoJack Stolen Vehicle Recovery Units ("SVRUs") from LoJack and resell and install" the SVRUs; (2) the initial price of the SVRUs would be fixed at $200 each; (3) GLM would pay any balance within 60 days; and (4) in the event that either party terminated the agreement, LoJack would credit GLM the price paid for any uninstalled SVRUs and would pay a fee of $50 for any unit sold by LoJack within 180 days of the termination of the agreement to a dealer in GLM's market who became a LoJack customer as a result of GLM's efforts. The Distribution Agreement was effective on September 15, 2002. (Ex. A, the Distribution Agreement.)

Shortly thereafter, on October 1, 2002, VMS formalized its agency relationship with LoJack by entering into an "Agency Agreement." The Agency Agreement provided that VMS would represent LoJack and help find distributors for the sale and installation of LoJack products. (FAC ¶ 15.) In furtherance of its duties under the Agency Agreement, VMS' President asked GLM for its help in recruiting other after-market sellers to become LoJack distributors, and GLM agreed. In exchange, Wafer--as LoJack's agent--promised that GLM would (1) always receive LoJack's best price for its security systems and (2) receive two dollars for each LoJack unit sold to any distributor that GLM

helped recruit.  (FAC ¶¶ 16-18.)  GLM alleges that LoJack knew of and ratified Wafer's "best-price" promise but does not explain how.  (FAC ¶¶ 19.)

GLM alleges that GLM and LoJack's responsibilities under the Distribution Agreement changed over time.  (FAC ¶ 23.) For example, the parties had a practice of disregarding certain of the Distribution Agreement's performance requirements.  GLM alleges that it never hit its performance goals but LoJack never complained.  (FAC ¶¶ 30-32.)  Also, GLM asserts that the parties agreed to extend the "net 60 day" payment term; LoJack's invoices were marked "Terms: Net 90 Days," and LoJack permitted GLM--who it characterized as its "valued partner" (see FAC ¶ 27) --up to 120 days as long as GLM "paid up to 90 days at the end of certain quarters."  (FAC ¶¶ 24-29.)

As hinted at in the preceding paragraph, one thrust of GLM's case is that its relationship with LoJack was akin to a partnership.  According to GLM, the idea that this was a partnership was evidenced by correspondence, marketing materials, and documents created by LoJack and sent to GLM, and, in a letter to approximately 120 car dealers in the New York area, in which LoJack introduced GLM as its "partner."  (FAC ¶ 35.)  LoJack's employees maintained a consistent presence on GLM's premises, and GLM employees wore LoJack clothing and carried badges that identified them as LoJack technicians.  (FAC

¶ 38.)  GLM also used the LoJack trademark on its business cards and invoices, its uniforms, its website, and on the exterior of its building.  (FAC ¶ 45.)

The FAC also describes how GLM and LoJack had intertwined relationships vis-à-vis other car dealers in the New York area.  LoJack had appointed GLM as the exclusive seller of its security systems to approximately 120 automobile dealers (the "GLM Dealers") in Queens, Suffolk, Nassau, and Bronx counties, while LoJack sold its product directly to other dealers.  (FAC ¶¶ 39-40.)[1]  Over the years GLM and LoJack swapped auto dealers back and forth in the New York City and Long Island areas, with either GLM or LoJack taking over a dealer account depending on the ability of either to sell or service that dealer.  (FAC ¶ 42.)  Also, LoJack sales representatives regularly assisted GLM in its sales to the GLM dealers; thus LoJack knew what prices it and GLM were charging for the same items.  (FAC ¶ 42.)

In furtherance of these overlapping relationships, LoJack assured GLM that dealers would pay the same price for the

---

[1] The FAC is not clear as to how or when this appointment was made.  The Distribution Agreement says that GLM was "approved to distribute LoJack's products to automobile dealers as specified in Appendix A," and the cover sheet to the agreement describes "vehicles sold by the automobile dealerships designated in Appendix A located in NY."  (Ex. A, Distribution Agreement.)  However, while GLM did attach the Distribution Agreement as an exhibit to the FAC, Appendix A was not included.

security systems regardless of whether they bought them from GLM or directly from LoJack. (FAC ¶ 44.) As described above, the Distribution Agreement provided that LoJack would sell to GLM security systems at $200 each. (FAC ¶ 49.) Although the parties discussed a possible price reduction in September 2005 in the context of LoJack's potentially reducing its cost of production, the reduction never happened. (See FAC ¶¶ 59-60.) At all times LoJack represented to GLM that its price to GLM for its product was its best price. (FAC ¶ 57.)

However, as early as 2005, LoJack was offering better prices to its direct dealers in markets outside of the New York City and Long Island areas, and despite GLM's asking for a lower price LoJack never even informed GLM that it had reduced its price in other markets. (FAC ¶¶ 60-61.) In March 2008, LoJack reduced its price to GLM to $180 per unit uninstalled. GLM believed that this reduction resulted from cost savings to LoJack from moving its production overseas and that it represented LoJack's new "best price." (FAC ¶¶ 66-67.) However, in 2008 GLM began to hear from both automobile dealers and a LoJack sales representative that LoJack was offering dealers in its market installed LoJack security systems for prices substantially lower than LoJack's price to GLM for uninstalled product. (FAC ¶ 68.) When GLM asked LoJack about what it had heard, LoJack employees in Massachusetts and

elsewhere assured GLM that it was not true; that LoJack's price to GLM was its best price, and that LoJack was not selling to LoJack direct dealers in the New York and Long Island areas at a lower price than it was selling to GLM. (FAC ¶ 69.)

Based on LoJack's reassurances, GLM in turn assured its dealers that they were paying the same price for LoJack units bought from GLM as dealers buying directly from LoJack. (FAC ¶ 71.) However, the GLM dealers did not believe GLM because they knew other dealers in the same market, sometimes on the same street, who were buying installed LoJack products directly from LoJack at much lower prices than the prices at which LoJack was selling uninstalled product to GLM for resale. GLM's customers stopped or reduced their purchases from GLM because they believed GLM was overcharging them, and lying about doing so. (FAC ¶ 74.)

GLM later learned that despite its agreement to give GLM its best price, LoJack began selling security systems to its direct dealers for $150 installed--thirty dollars less than what it was charging GLM for the uninstalled product. (FAC ¶¶ 70, 75-76.) In GLM's view, the price reduction was designed to knock GLM out of the market so that LoJack could take over GLM's customer relationships. (FAC ¶¶ 83-84.) As evidence of that strategy, GLM alleges that when a LoJack salesman expressed concern to Joe Melso, LoJack's sales director for New York and

New Jersey, that LoJack's conduct might harm GLM, Melso replied: "F*ck GLM." (FAC ¶ 89.)

LoJack's alleged strategy continued with its 2008 rollout of its "Lease Pilot Program" to dealers in GLM's market. As part of this program--which was not offered to GLM--LoJack's Direct Dealers were offered a reduced price for the security systems. (FAC ¶¶ 92-93.)

In March 2009, in response to pressure and complaints from GLM, LoJack lowered its pricing to GLM to $175 uninstalled. It continued to sell its security systems to other dealers in GLM's market for $150 installed, however. (FAC ¶ 94.)

In 2010, GLM again complained about LoJack's pricing, this time directly to Melso. Melso denied that LoJack was selling its security systems to its direct customer for $150, and he told GLM that LoJack was only offering special pricing to certain large national car dealership chains. That same day, however, Melso visited a local dealer (that was not part of a national chain) and offered to sell it LoJack security systems for $150 installed. (FAC ¶¶ 98-99.)

Eventually, GLM demanded that LoJack compensate it for the price difference between what LoJack charged GLM and what it charged its direct dealers, plus the price of installation. LoJack refused, and it told GLM that it would no longer provide its security systems except on a pre-paid basis, and then only

if GLM paid in full its account (which had previously been payable on 120 day terms, according to the parties' practice). (FAC ¶¶ 100-103.) Believing that LoJack had breached several aspects of the Distribution Agreement, as well as the Agency Agreement, GLM notified LoJack on October 12, 2010 that it was terminating the agreement. (FAC ¶ 103-106.)

GLM further alleges that LoJack breached its post-termination obligations under the Distribution Agreement to credit GLM for any returned SVRUs and to pay the fifty-dollar fee for any unit sold to a dealer in GLM's exclusive market for six months after termination. (FAC ¶ 108.) GLM also alleges that LoJack wrongfully refused to reimburse GLM for certain sales incentives. (FAC ¶¶ 111-114.)[2] This lawsuit followed.

II. Procedural Background

GLM filed this action in October 2010, and LoJack moved to dismiss. While that motion was pending, GLM moved to amend its Complaint and filed a Proposed Amended Complaint ("PAC") that asserted the following eight claims: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) misrepresentation; (4) tortious interference with business relations; (5) violation of the New York Franchise

---

[2] Apart from a credit in January 2011, LoJack has refused to provide these monies, and told GLM that it had deposited the incentive monies with Massachusetts state treasury officials, a claim GLM alleges is untrue. (FAC ¶¶ 109, 115-116.)

Sales Act; (6) violation of Massachusetts General Law Chapter 93A ("93A"); (7) price discrimination under the federal Robinson-Patman Act ("RPA"); and (8) breach of fiduciary duty. (Docket Entry 17.) On September 30, 2011, the Court dismissed GLM's misrepresentation and fiduciary duty claims and its claims under New York's Franchise Sales Act and Massachusetts' General Law Chapter 93A, and it dismissed with leave to re-plead its RPA and tortious interference claims. (Docket Entry 24 (the "September Order").)

On October 17, 2011, GLM moved for reconsideration of the Court's decision on its Franchise Sales Act and 93A claims. (Docket Entry No. 26.) While that motion was pending, GLM also filed its First Amended Complaint, which attempted to cure the deficiencies in GLM's RPA and tortious interference allegations. Because its reconsideration motion was pending at the time it filed the FAC, GLM included causes of action under the Franchise Sales Act and 93A in the FAC under the heading: "SUBJECT TO PENDING MOTION FOR RECONSIDERATION."

<u>DISCUSSION</u>

In the following discussion, the Court addresses (1) GLM's motion to reconsider portions of the September Order; (2) LoJack's motion to strike certain portions of the FAC; and (3) LoJack's motion to dismiss the FAC in its entirety.

I. <u>GLM's Motion for Reconsideration</u>

To prevail on a motion for reconsideration a movant must show that the Court overlooked important matters or controlling decisions that would have influenced the prior decision. <u>E.g.</u>, <u>Callon Petroleum Co. v. National Indem. Co.</u>, No. 06-CV-0573, 2011 WL4962220, at *1 (E.D.N.Y. Oct. 11, 2011) (internal citations omitted). The motion must be denied "where the movant fails to show that any controlling authority or facts have been overlooked, and merely offers substantially the same arguments he offered on the original motion or attempts to advance new facts." <u>Mikol v. Barnhart</u>, 554 F. Supp. 2d 498, 499 (S.D.N.Y. 2008) (citing <u>Shrader v. CSX Transp., Inc.</u>, 70 F.3d 255, 257 (2d Cir. 1995)).

GLM moves to reconsider the Court's decision to reject its claims under New York's Franchise Sales Act and Massachusetts' General Law Chapter 93A.

A. <u>The New York Franchise Sales Act Claim</u>

In its September Order, the Court ruled that because the parties' agreement was finalized in 2002, GLM's Franchise Sales Act claim, which was first brought in 2010, was barred by that statute's three-year statute of limitations. N.Y. Gen. Bus. L § 691(4). The Court cited <u>United Magazine Co. v. Murdoch Magazines Distribution, Inc.</u>, 146 F. Supp. 2d 385, 407 (S.D.N.Y. 2001), <u>aff'd</u> 279 F. App'x 14 (2d Cir. 2008), for the rule that

11

the statute of limitations begins to run when the parties first enter into the franchise agreement, and dismissed GLM's argument that the 2002 agreement "blossomed" into a franchise in 2008 when GLM discovered that it was paying a higher price than LoJack's direct customers and that that price difference constituted a "hidden franchise fee."

GLM's motion only re-iterates its prior arguments on this point. (See Mot. for Reconsid. 4.) Assuming arguendo that the extra cost to GLM beyond what other customers were paying LoJack did in fact transform their relationship into a franchise, regardless of the parties' intention, GLM's Franchise Sales Act claim would still be untimely. This is because if there was a franchise relationship, it was created in 2002, when the relationship began, not in 2008 when GLM discovered the extra fee. GLM's claim that the relationship blossomed into a franchise "when it learned" of the extra fee is in truth a request for a discovery based toll on the statute of limitations, a toll which is not available under New York law. 4B N.Y. PRAC. COMM., LIT. IN N.Y. STATE COURTS § 88:22, ("[C]laims under the anti-fraud provisions of the [Franchise Sales] Act are not subject to the discovery rule (which tolls the limitations period until the fraud is discovered) that typically applies to fraud claims under New York Law."); see generally Fantastic Enterprises, Inc. v. S.M.R. Enterprises, Inc., 143 Misc. 2d 124,

129, 540 N.Y.S. 2d 131 (Sup. Ct. Onondaga Cnty. 1988) (statute of limitations begins to run on date that parties entered into franchise agreements, notwithstanding franchisor's alleged continuing obligation to correct alleged misrepresentations.). Accordingly, this portion of GLM's reconsideration motion is denied.

B. Massachusetts General Law Chapter 93A

Under Massachusetts law, a plaintiff alleging a violation of 93A must establish that it was injured by a baseline offending act that is "(1) within at least the penumbra of common law, statutory law, or other established concepts of unfairness, [and] (2) is immoral or otherwise unscrupulous." Rohm & Haas Elec. Materials, LLC v. Elec. Circuits Supplies, Inc., 759 F. Supp. 2d 110, 113 (D. Mass. 2010) (quoting Franklin v. Ciroli, 865 F. Supp. 940, 947 n.18 (D. Mass. 1994)).

In asking the Court to reconsider its ruling, GLM puts forth two separate and alternative bases for reinstating its 93A claim: (1) that an RPA violation can be a baseline offending act underlying a 93A claim and that the Court's permitting GLM to re-plead its RPA claim means that the Court should defer dismissing the 93A claim; and (2) that LoJack's 2008 misrepresentation that GLM was receiving LoJack's best price is the type of deceptive and immoral or unscrupulous behavior that 93A prohibits. The Court will address each of these arguments

in turn.

### 1. An RPA Violation as the Basis for GLM's 93A Claim

GLM's PAC did not identify its RPA allegations as the basis for a 93A claim. The PAC puts forth GLM's allegations about LoJack's misrepresentations, business strategy of lying to GLM, and its breaches of their agreement, (PAC ¶ 119), and then says that "based on the conduct described above, LoJack has" violated 93A, (PAC ¶ 121).[3] GLM identified RPA violations as the basis for its 93A claim for the first time in its motion for reconsideration. Because "a party may not advance a new argument in a motion to reconsider; that argument is waived." PAB Aviation, Inc. v. United States, No. 98-CV-5952, 2000 WL 1240196, at *1 (E.D.N.Y. Aug. 24, 2000) (citing Eisemann v. Greene, 204 F.3d 393, 395 n.2 (2d Cir. 2000) ("To be entitled to reargument, a party must demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion." (internal quotation marks omitted) (emphasis in PAB)). Therefore, GLM's motion for reconsideration on this theory is denied, and in any event, GLM has still not sufficiently pleaded an RPA violation.

### 2. The Alleged Lie as the Basis for a 93A Claim

In its PAC, GLM alleged that:

---

[3] The FAC, in contrast, does plead an RPA violation as the basis of GLM's 93A claim. (FAC ¶ 154.) As discussed below, however, GLM has still not sufficiently alleged an RPA claim.

> LoJack executives hatched their plan to
> misrepresent its price to GLM as its best
> price, formulated business strategy to carry
> out those plans, disregarded its obligations
> to be truthful to GLM, voiced through Melso
> its disdain for its obligations to GLM,
> demonstrated its indifference to GLM's
> interests under its agreements with LoJack,
> including but not limited to the September
> 2002 agreement, and knowingly violated its
> own code of business conduct and ethics.

(PAC ¶ 119.)  In its September Order, the Court found that this alleged malfeasance was either derivative of GLM's contract claims (and insufficient to state a 93A claim, <u>Rohm</u>, 759 F. Supp. 2d at 123) or dependent on its misrepresentation claim, which the Court dismissed for failure to state a claim.  Finding that GLM had thus not alleged a baseline offending act, the Court dismissed its 93A claim.

Now, GLM clarifies that its 93A theory is predicated on its allegations that LoJack induced GLM to continue the relationship by falsely stating that GLM was receiving LoJack's best price.  93A forbids "unfair or deceptive acts . . . in the conduct of any trade or commerce." MASS. GEN. L. 93A §2(a).  The statute thus imposes an obligation on Massachusetts businesses not to act in an "immoral or otherwise unscrupulous" manner. <u>Rohm</u>, 759 F. Supp. 2d at 123.  Courts have explained that whether an act is unfair or deceptive is best discerned from the circumstances of the case.  <u>Metro. Prop. and Cas. Ins. Co. v. Boston Regional Physical Therapy, Inc.</u>, 538 F. Supp. 2d 338 (D.

Mass. 2008). The standard for deceptive or unfair behavior under 93A is "notably imprecise," and encompasses actions that reach a "level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce, have an extortionate quality that gives it the rancid flavor of unfairness, or fall within at least the penumbra of some common-law, statutory, or other established concept of unfairness." St. Paul Fire and Marine Ins. Co. v. Ellis & Ellis, 262 F.3d 53, 67 (1st Cir. 2001) (emphasis added) (internal citations and quotations marks omitted). Upon further reflection, the Court concludes here that LoJack's alleged lie, and the effect of that lie on GLM's business, state a claim under 93A. See generally Ruiz v. Bally Total Fitness Holding Corp., 447 F. Supp. 2d 23, 30 (D. Mass. 2006) (practice may be deceptive under 93A where it could reasonably be found to have caused a person to act differently from how he would otherwise have acted), aff'd 496 F.3d 1 (1st Cir. 2007). Accordingly, this aspect of GLM's motion to reconsider is granted in the interests of justice. Cf. Jackson v. Post Univ., No. 08-CV-1810, 2012 WL 1189075, at *4 (D. Conn. April 9, 2012) (granting motion for reconsideration to prevent injustice).

II. LoJack's Motion to Strike and Motion to Dismiss the FAC

The Court now turns to LoJack's motion to strike and motion to dismiss the FAC. (Docket Entry 34.) It will address

the two branches of the motion separately.

A. <u>Motion to Strike</u>

Rule 12(f) allows a court, either on its own initiative or on a party's motion, to strike from a pleading "immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). While Courts "possess considerable discretion in weighing 12(f) motions," <u>Rochester-Genesee Regional Transp.</u> <u>Authority v. Hynes-Cherin</u>, 531 F. Supp. 2d 494, 519 (W.D.N.Y. 2008), "motions to strike are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation," <u>Colabufo v. Continental Cas. Co.</u>, No. 04-CV-1863, 2006 WL 1210919, at *6 (E.D.N.Y. April 27, 2006) (internal quotations omitted); <u>see</u> <u>also</u> Charles A. Wright & Arthur R. Miller, FED. PRAC. & PROC. CIV. § 1382 (3d ed. 2004) (motions to strike are disfavored and should be denied unless there is no possible logical connection to the subject matter and may cause some significant prejudice) (collecting cases).

LoJack's motion to strike can be broken into two parts. <u>First</u>, it argues that the Court should strike all claims and allegations already addressed by September Order. Specifically, LoJack objects to the Franchise Sales Act and 93A claims, which are included in the FAC with the qualification that they are subject to the pending motion for reconsideration.

Although GLM's better course would probably have been to ask to defer filing an Amended Complaint until the Court had resolved the motion for reconsideration, the Court is not aware of authority holding that GLM's conduct was per se improper. Nevertheless, because GLM's motion for reconsideration is denied as to its Franchise Sales Act claim, the Court grants LoJack's motion to strike this portion of the FAC. Conversely, the motion is denied as to the portion of the FAC purporting to assert a 93A claim.

Relatedly, LoJack also requests that any mention of a partnership between LoJack and GLM, as well as any reference to LoJack's control over GLM and its business operations, be stricken because the September Order has already determined that GLM and LoJack were not legally partners, and dismissed the breach of fiduciary claim that depended on such a relationship. (LoJack Mot. to Dismiss 6.) This background information provides context for and is logically connected to both the state of mind and motivation of the parties as well as the nature of their relationship. The motion to strike is denied as to these allegations. See Lynch v. Southampton Animal Shelter Foundation Inc., 278 F.R.D. 55, 67-68 (E.D.N.Y. 2011) ("[A]llegations that supply background or historical material or other matter of an evidentiary nature normally will not be stricken" (internal quotations omitted)).

Second, LoJack objects to new factual allegations and claims related to GLM's breach of contract and good faith and fair dealing claims. Specifically, LoJack identifies details in the FAC about the relationship between LoJack, VMS and GLM that support GLM's claim that it was promised LoJack's best price. LoJack argues that any amplification of the contract and good faith/fair dealing claims is precluded by the September Order, which permitted GLM to file "the breach of contract and breach of covenant of good faith and fair dealing claims that were part of its Proposed Amended Complaint." (LoJack Mot. to Dismiss 7 (quoting the September Order at 37) (emphasis LoJack's).) This aspect of LoJack's motion to strike is denied. Leave to amend is freely given, FED. R. CIV. P. 15; moreover, LoJack moved to dismiss the contract and good faith/fair dealing claims--as alleged in the FAC--on substantive grounds, and the Court will consider the sufficiency of GLM's allegations against those arguments, cf. Vitale v. Marlborough Gallery, No. 93-CV-6276, 1994 WL 654494, at *1 (S.D.N.Y. July 5, 1994) (considering a procedurally-improper amended complaint where the defendants addressed the amended complaint in their reply).

Finally, LoJack requests that the Court strike GLM's requests for punitive damages and attorneys' fees with respect to the contract and covenant of good faith and fair dealing claims. (LoJack Mot. to Dismiss 9-10.) GLM has not opposed

this requested relief, and this aspect of LoJack's motion is accordingly granted.  See Anwar v. Fairfield Greenwich Ltd., 826 F. Supp. 2d 578, 583 (S.D.N.Y. 2011).

B. Motion to Dismiss

The Court now turns to LoJack's motion to dismiss the FAC for failure to state a claim.  To survive a Rule 12(b)(6) motion a plaintiff must plead sufficient factual allegations in the complaint to "state a claim [for] relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929, 949 (2007).  The complaint does not need "detailed factual allegations," but it demands "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555.  In addition, the facts pleaded in the complaint "must be enough to raise a right to relief above the speculative level."  Id.  Determining whether a plaintiff has met his burden is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009).  On a motion to dismiss, a plaintiff gets the benefit of all reasonable inferences, see, e.g., Litwin v. Blackstone Group, L.P., 634 F.3d 706, 711 n.5 (2d Cir. 2011), but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678129 S. Ct. 1937,

1949, 173 L. Ed. 2d 868 (2009).  The Court will analyze GLM's claims in order.

      1.   <u>Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing</u>

The Court previously found that GLM's breach of contract and breach of the covenant of good faith and fair dealing are sufficient to withstand a motion to dismiss. (September Order 21-24.)  The Court will not reiterate its analysis here except to address one item that LoJack makes in response to new allegations in the FAC.  LoJack asserts that allegations concerning the agency relationship between VMS and LoJack and the October 2002 best price agreement stand in stark contradiction to the allegations in the PAC and thus should be disregarded as implausible.

Some background is required to put this argument into context.  The September Order disregarded allegations in the PAC concerning discussions between VMS, GLM, and LoJack that occurred <u>prior</u> to the Distribution Agreement, reasoning that this evidence was foreclosed by the Distribution Agreement's integration clause.  (September Order 18.)  LoJack argues here that allegations about a "best price" promise that was made <u>after</u> the Distribution Agreement is contradicted by GLM's earlier allegation that the parties negotiated before, not after, the Distribution Agreement was signed.  LoJack states

21

that the October best price agreement is so implausible that it must have been "recently concocted" by GLM solely in an effort to avoid the Court's September Order foreclosing reference to pre-contract discussions. (LoJack Mot. to Dismiss 12.)

LoJack's motion to dismiss as to these allegations is denied. The Court is not convinced that the allegations are as contradictory as LoJack would have it seem; one can imagine a scenario where the parties would continue to negotiate after their initial relationship was first formalized in the Distribution Agreement. In any event, the purported inconsistency is not grounds to dismiss. "There are valid reasons why a plaintiff would amend a complaint in a contradictory fashion. For example, a plaintiff may acquire new information through discovery, or its own investigation, that fundamentally alters its theory of the case." Palm Beach Strategic Income, LP v. Salzman, No. 10-CV-0261, 2011 WL 1655575, at *6 (E.D.N.Y. May 2, 2011). GLM avers that this is what happened in this case. (GLM's Cross-Mot. to Amend 8-10.)

LoJack also argues that the two other alleged breaches (1) that LoJack failed to meet its post-termination obligations and (2) that it wrongfully required pre-payment should be dismissed because, respectively, GLM did not allege that it met its own obligations under the Distribution Agreement or that it suffered damages as a result of LoJack's insistence on being

pre-paid. GLM counters that these arguments were not set forth in LoJack's prior briefing and that LoJack is therefore foreclosed from raising them now. (GLM's Cross-Mot. to Amend 10-11.) LoJack counters that it did, in fact, raise these arguments both in its first motion to dismiss (Docket Entry 14 at 12-13) and in its opposition to GLM's PAC (Docket Entry 19 at 7-8). (See LoJack Reply in Support of Mot. to Dismiss 6.)

Having re-examined the portions of the papers that LoJack cites, the Court concludes that the arguments raised here are not the same as the arguments LoJack made previously. In its first motion to amend, (Docket Entry 14), LoJack argued that its insistence on GLM's pre-paying could not be a breach because GLM had already materially breached by not paying within the 60 days provided for in the September Agreement. This argument-- which the Court addressed in its September Order--is different than the present claim that GLM has failed to plead the damages flowing from its having to pre-pay. Similarly, LoJack's argument in its opposition to GLM's PAC, that "[b]ecause LoJack terminated the Agreement with GLM for cause, it has no post-termination obligations to GLM as asserted in the proposed Amended Complaint, thereby extinguishing GLM's claim for post termination breach," (Docket Entry 19 at 8.), is not the same argument that LoJack puts forth presently--namely that GLM has failed to allege that it "made all required payments to LoJack."

(LoJack Mot. to Dismiss 12.)

Because an "amended complaint does not automatically revive all the defenses and objections the defendant may have waived in a first motion to dismiss," and because LoJack may not "advance arguments that could have been made in the first motion to dismiss" but were not, Sears Petroleum & Transport Corp. v. Ica Ban America, Inc., 217 F.R.D. 305, 307 (N.D.N.Y. 2003), the Court declines to consider LoJack's new arguments. See also Key Items, Inc. v. Ultima Diamonds, Inc., No. 09-CV-3729, 2011 WL 4526148, at *4 (S.D.N.Y. Sept. 29, 2011).

## 2. Tortious Interference

A claim for tortious interference with a business relationship has four elements: "(1) a business relationship between the plaintiff and third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured." Discover Grp., Inc., v. Lexmark Int'l, Inc., 333 F. Supp. 2d 78, 86 (E.D.N.Y. 2004).[4] The Court previously dismissed this claim with leave to re-plead because GLM did not allege that its customers would have continued to do business with it but for LoJack's misrepresentations. (September Order 29.)

---

[4] New York law applies to this claim. (September Order 14.)

LoJack moves to dismiss, arguing among other things
that (1) GLM has still not identified a single specific customer
or business relationship that was harmed by LoJack's conduct;
(2) GLM has not plausibly alleged that LoJack acted purely out
of malice; and (3) that GLM has not plausibly alleged any
wrongful conduct directed at any GLM customers. The Court is
persuaded by the third point and does not reach the others.

Under New York law "conduct constituting interference
with business relations is, by definition, conduct directed not
at the plaintiff itself, but at the party with which the
plaintiff has or seeks to have a relationship." Carvel Corp. v.
Noonan, 3 N.Y.3d 182, 192, 818 N.E.2d 1100 (2004) (citing G.K.A.
Beverage Corp v. Honickman, 55 F.3d 762, 768 (2d Cir. 1995)
(claim dismissed because alleged conduct was not directed at
plaintiffs' customers)); Ho Myung Moolsan Co., Ltd v. Manitou
Mineral Water, Inc., 665 F. Supp. 2d 239, 255-56 (S.D.N.Y. 2009)
(granting motion to dismiss where plaintiffs "did not allege
that defendants directed any action toward these third
parties"); Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F.
Supp. 2d 157, 167-168 (S.D.N.Y. 1998) (tortious interference
claim failed where "the defendants' alleged conduct concededly
was not directed towards any third party with whom [plaintiff]
had an existing or prospective business relationship"). GLM
does not allege that LoJack's wrongful conduct was directed at

GLM's customers; accordingly, its tortious interference is dismissed.

### 3. Violation of New York Franchise Sales Act

As discussed already, the Court declines to reconsider its earlier ruling as to GLM's Franchise Sales Act claim.

### 4. Massachusetts Chapter 93A Claim

In accordance with the Court's ruling on GLM's motion for reconsideration, GLM's 93A claim may go forward to the extent discussed above.

### 5. Robinson-Patman Act

The RPA provides that in selling commodities of "like grade and quality" to "different purchasers" it is "unlawful" for a seller "to discriminate in price" such that "the effect of such discrimination may be substantially to lessen competition. . . or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." 15 U.S.C. § 13(a). The Supreme Court has explained that the there are three types "of competitive injury that may give rise to a Robinson-Patman Act Claim:" primary, secondary, and tertiary line injuries. Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc., 546 U.S. 164, 176, 126 S. Ct. 860, 163 L. Ed. 2d 663 (2006). Primary-line injury is not relevant to the case at bar, as GLM only claims to have alleged secondary-line and

tertiary-line injuries. (GLM's Cross-Mot. to Amend 19.)

GLM's secondary-line RPA theory fails to state a claim. Secondary-line cases "involve price discrimination that injures competition among the discriminating seller's customers"; the cases "typically refer to 'favored' and 'disfavored' purchasers." Volvo, 546 U.S. 176. To make out a claim for a secondary-line injury, the disfavored purchaser must be in actual competition with the favored purchaser. "Absent actual competition with a favored [] dealer, however, [a plaintiff] cannot establish the competitive injury required under the Act." Id. at 177; see also United Magazine Co., Inc. v. Curtis Circulation Co., 279 F. App'x 14, 17-18 (2d Cir. 2008) (quoting Volvo, 545 U.S. 164). Here, GLM alleges that its business was harmed when its customers stopped or reduced purchasing from GLM because of the higher price GLM was forced to charge for the security systems. (FAC ¶¶ 72-74.) In its motion papers, GLM clarifies its argument: "LoJack's sales to its direct dealers at significantly lower prices than to GLM caused secondary-line injury to GLM." (LoJack Cross-Mot. to Amend 19.) However, secondary-line discrimination occurs when a seller's price discrimination impacts competition among its favored and disfavored customers. Because GLM has not alleged that it was in direct competition with any LoJack direct dealers, it has not met the requirements of a secondary-line

claim as set forth by the Supreme Court in Volvo, and thus its secondary-line claim is dismissed.

GLM's tertiary-line theory also fails to state a claim. Tertiary-line cases "involve injury to competition at the level of the purchaser's customers." Volvo, 546 U.S. at 176. Unlike a secondary-line claim, a tertiary-line claim can stand even where the "favored and disfavored purchasers do not compete directly against another," provided that the "seller's price discrimination harms competition between customers of the favored and disfavored purchasers." George Haug Co., Inc. v. Rolls-Royce Motor Cars Inc., 148 F.3d 136, 141 n.2 (2d Cir. 1998). Here, GLM alleges that its dealers were in "keen competition" with LoJack's direct dealers (FAC ¶ 173) and that LoJack's price discrimination caused GLM's dealers to lose "substantial sales of automobiles to the LoJack direct dealers" (id. ¶ 175). The Court agrees with LoJack that these allegations do not state a plausible tertiary-line claim. For one thing, GLM does not identify who its dealers were, who LoJack's direct dealers were, the type of automobiles sold, or that the difference in price for the security system caused GLM's dealers to charge more for their cars than LoJack's direct dealers. GLM must allege more facts to push its tertiary-line theory into the realm of plausibility, particularly where its claim rests on the idea that a price differential on a $200

28

security system price affected the market for cars that can cost hundreds of times that amount and whose prices are dependent on a host of variables.[5]  See generally United Magazine Co. v. Murdoch Magazines Distrib., Inc., 146 F. Supp. 2d 385, 396 (S.D.N.Y. 2001) ("Plaintiffs may not state a claim by glossing over these factual requisites with a conclusory allegation of competition.").

Accordingly, GLM's RPA claims are dismissed.

CONCLUSION

For the foregoing reasons, GLM's motion for reconsideration (Docket Entry 26) is GRANTED IN PART and DENIED IN PART.  It is granted to the extent that GLM's 93A claim may proceed on theory that LoJack's allegedly lying to GLM about LoJack's best price was the baseline offending act.  It is denied in all other respects.  LoJack's motion to strike and motion to dismiss (Docket Entry 34) is GRANTED IN PART and DENIED IN PART.  The motion to strike is granted as to the Franchise Sales Act cause of action in GLM's FAC and as to GLM's request for punitive damages and attorneys' fees in connection

---

[5] Plaintiff's reliance on an inference of competitive injury under Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 68 S. Ct. 822, 92 L. Ed. 1196 (1948), is unavailing because this inference speaks to secondary-line, not tertiary-line, cases. See Volvo, 546 U.S. at 177 (explaining that Morton Salt inference is unavailing in cases where plaintiff cannot show actual competition with a favored purchaser); Dayton Superior Corp. v. Marjam Supply Co., Inc., No. 07-CV-5215, 2011 WL 710450, at *9 (E.D.N.Y. Feb. 22, 2011).

with its contract and covenant of good faith and fair dealing claims.  The motion to strike is denied in all other respects. The motion to dismiss is granted insofar as GLM's tortious interference and RPA claims are dismissed.

The Clerk of the Court is respectfully directed to terminate Docket Entries 26, 34, 35, and 36.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:     September __28__, 2012
           Central Islip, New York