UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

G.L.M. SECURITY & SOUNDS INC.,

                Plaintiff,

                                   **MEMORANDUM & ORDER**

      -against-                       10-CV-4701 (PKC) (ARL)

LOJACK CORP.,

                Defendant.

-----------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

Plaintiff GLM Security & Sound, Inc. ("GLM") brings this action against Defendant LoJack Corp. ("LoJack") in a case arising out of a dispute over an agreement to distribute car security systems. Specifically, the parties dispute whether there was an oral modification[1] to the agreement regarding the price GLM was to pay for the car security systems it purchased from LoJack. GLM contends that in discussions subsequent to the execution of the agreement, which was fully integrated and permitted amendment only via written instrument, LoJack nevertheless orally promised GLM that it would receive the "best price" at which LoJack offered its devices to dealers, and that LoJack breached this "best price" agreement. LoJack denies that it ever made such a promise, and thus no breach could have occurred. Many of the issues and facts presented are in dispute, but LoJack's motion for summary judgment ultimately turns on one dispositive question: could a reasonable jury find the evidence sufficient to overcome the

---

[1] Following submission of the parties' papers relating to the instant motion for summary judgment, GLM moved to amend its complaint to allege that the agreement that LoJack breached was a separate, subsequent, and self-contained oral agreement, rather than an oral modification to the existing written agreement. (Dkt. 69.) For purposes of the summary judgment motion, the Court will refer to the GLM's complaint as it currently exists, *i.e.,* as alleging an "oral modification," and discusses GLM's motion to amend separately *infra* at Discussion Section V.

presumption that the completely integrated written agreement, rather than the alleged subsequent oral modification, should govern the conduct of the parties?

Because the Court resolves this question in the negative, it grants summary judgment in favor of LoJack on GLM's breach of contract claim. Further, because the remainder of GLM's claims are derivative of the alleged best price promise, they are likewise dismissed.

LoJack counterclaims that it is owed compensation for unpaid products and services it provided to GLM, and that GLM contrived the complaint in the instant litigation to gain leverage in negotiations over that debt. Having found no breach by LoJack, and it being undisputed that GLM failed to pay for a substantial portion of the products it received from LoJack, LoJack's motion for summary judgment on its breach of contract counterclaim is granted. The remainder of LoJack's motion for summary judgment on its counterclaims are denied.

LoJack's motion to strike is denied as moot. GLM's motion to amend is denied because the motion is unduly belated and would be futile in any event.

## BACKGROUND

### I.    Relevant Facts

The Court includes only those facts necessary to resolve this motion. The following are either undisputed or presented in the light most favorable to GLM. [2]

---

[2] The Court construes any disputed facts in the light most favorable to GLM, as the non-moving party, for purposes of LoJack's summary judgment motion. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970). However, where GLM either (i) admits or (ii) denies without citing to admissible evidence certain of the facts asserted in LoJacks's Local Rule 56.1 Statement (Dkt. 60-2 ("Def. 56.1")), the Court may deem any such facts undisputed. *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)-(d); *see also Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) ("Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (collecting cases). Standalone citations to "Def. 56.1" denote that either the Court has deemed, based on GLM's admission or otherwise, the factual

A. The Actors

GLM is a New York corporation that sells wholesale automobile electronics, including car security systems, to automobile dealerships in New York City and Long Island. (Def. 56. 1 ¶¶ 1-2.) At all times relevant to this litigation, Gary Tabackman ("Tabackman") was GLM's president. (*Id.* ¶ 3.)

Defendant LoJack is a corporation that manufactures, distributes, and sells car security systems in the auto industry. (*Id.* ¶ 7.) LoJack's principal product, and the one at issue in the instant litigation, is the Stolen Vehicle Recovery Unit ("SVRU" or "Unit"). (*Id.* ¶ 8.)

George Wafer ("Wafer"), a non-party to this litigation, was the owner of a company named Vehicle Manufacturer Services ("VMS"). (*Id.* ¶ 10.) Wafer/VMS had a preexisting business relationship with LoJack. (*Id.*)

B. The Distribution and Installation Agreement – Executed September 15, 2002

GLM and LoJack's relationship began in June 2002 when Wafer approached GLM to discuss the possibility of GLM becoming a distributor of LoJack products. (*Id.* ¶ 9.) Over the next few months, GLM had discussions with LoJack regarding a potential deal. (*Id.* ¶ 14.) Tabackman handled the negotiations on behalf of GLM (*Id.* ¶ 16); Joe Abely, then-President, and Anthony DelGuercio, a regional manager, among others, were involved on behalf of LoJack. (*Id.* ¶ 14; Dkt. 63-2 ("Pl. 56. 1") ¶¶ 18, 185.) During the negotiations, Abely told Tabackman that the initial $200 per unit price that GLM would pay for the Units was the best price currently offered by LoJack to any of its distributors. (*Id.* ¶¶ 16-18.) Wafer and VMS provided the draft agreement to GLM and LoJack, and acted as intermediary for the exchange of the parties'

_____

proposition asserted undisputed. Such citations incorporate by reference any documents cited therein. Where relevant, however, the Court may cite directly to such documents.

revisions to the draft. (*Id.* ¶ 15.) On September 15, 2012, LoJack and GLM entered into the LoJack Distributorship and Installation Agreement (the "Distribution Agreement"). (*Id.* ¶ 19.)

Relevant to this litigation, the Distribution Agreement provided as follows:

1)  GLM would "purchase LoJack Stolen Vehicle Recovery Units ("SVRUs") from LoJack and resell and install such SVRUs." (Dkt. 60-3, Att. 4 ("Agr.") p. 2);

2)  the initial price of the SVRUs would be fixed at $200 each (*Id.* ¶ 6.1);

3)  GLM would pay LoJack half of the price of the SVRUs within 30 days of invoice and the balance within 60 days (*Id.*);

4)  LoJack could terminate the Distribution Agreement with immediate effect if GLM breached any provision of the Distribution Agreement (*Id.* ¶ 12.2);

5)  either party could terminate the Distribution Agreement for no cause upon two weeks' written notice (*Id.* ¶ 12.3); and

6)  in the event that either party terminated the Distribution Agreement without cause, LoJack would credit GLM the price paid for any uninstalled SVRUs and would pay a fee of $50 for any unit sold by LoJack within 180 days of the termination of the agreement to a dealer in GLM's market who became a LoJack customer as a result of GLM's efforts (*Id.* ¶ 12.5).

The Distribution Agreement also included the following critical provisions. Section 15 of the Agreement, entitled "Waiver," provided:

No waiver of any provision hereof shall be effective **unless made in writing and signed by the waiving party.** The failure of either party to require the performance or obligation of this Agreement, or the waiver of either party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

(*Id.* ¶ 15 (emphasis added).)

Section 17 of the Distribution Agreement set forth the integration clause:

This Agreement **constitutes the entire agreemen**t between the parties and **supersedes all prior agreements**, whether written or oral, with respect to the services to be provided by the Distributor [*i.e.,* GLM] and all matters related thereto."

(*Id.* ¶ 17 (emphasis added).)

With respect to any future changes to the Distribution Agreement, Section 18 provided:

> This Agreement may be **amended or modified only by written instrument** signed by the Distributor and by a duly authorized Distributor[3] of LoJack.

 (*Id.* ¶ 18 (emphasis added).)

Tabackman understood when he signed the Distribution Agreement, and throughout the length of the parties' contractual relationship, that Section 6.1 of the Distribution Agreement gave LoJack the right to change the price at any time. (Def. 56. 1 ¶ 29.)

### C. The "Best Price" Promise & The Alleged Modification

At some point, GLM and LoJack had discussions about GLM being guaranteed LoJack's "best price" on the SVRUs. (*Id.* ¶ 32.) LoJack contends that any such discussions occurred prior to the execution of the Distribution Agreement and were therefore nullified by the integration clause contained therein. (*Id.* ¶¶ 30-33.) Indeed, LoJack provides persuasive evidence that its account of the events is accurate, especially in light of the equivocal testimony regarding the timeline presented by GLM. However, resolving factual disputes in the light most favorable to the Plaintiff, as the Court must on a motion for summary judgment, the Court assumes these discussions occurred *after* the Agreement was executed. (Pl. 56.1 ¶ 31.)

According to GLM, it was "in early October, *after* GLM had entered the Agreement with LoJack that Mr. Wafer approached Mr. Tabackman to ask that GLM help LoJack to sign up other distributors." (*Id.* ¶ 194.) As GLM put it in its complaint, "[i]n an effort to secure [GLM's] help in signing up other LoJack Distributors throughout the country, George Wafer, President of VMS, promised Gary Tabackman that [GLM] would receive the 'best price' from LoJack. In addition, [sic] to the 'best price,' VMS promised to pay $2.00 of its commission

---

[3] In the context of the Distribution Agreement, the Court takes this to mean "representative" of LoJack.

received from LoJack to GLM for each LoJack unit that was purchased by a [d]istributor which GLM helped to recruit." (Dkt. 30 ("FAC") ¶ 18; Def. 56.1 ¶ 30.) GLM now contends that though Wafer was the one who made the offer, LoJack confirmed to Wafer that this was acceptable. (Pl. 56.1 ¶ 30.) Drew Levy, GLM's vice-president, understood, however, that GLM had an arrangement with Wafer's company, VMS, under which GLM would receive a commission *from VMS* on any units sold by a distributor which GLM helped recruit. (Def. 56. 1 ¶¶ 5, 33.)

The parties agree that there is no document that memorializes any "best price" promise. (Def. 56.1 ¶ 34.)

### D. VMS/LoJack Agreement

On October 1, 2002, Wafer and VMS entered into a separate written agreement with LoJack that set forth the terms and conditions upon which *VMS* was required to recruit distributors of LoJack products in exchange for compensation from LoJack ("VMS/LoJack Agreement"). (Dkt. 60-3, Att. 6 ("VMS/LoJack Agr."); Def. 56.1 ¶¶ 37-42.) The VMS/LoJack Agreement does not refer to any promise by LoJack to compensate GLM in any way for assisting VMS in recruiting distributors. (*Id.*) The VMS/LoJack Agreement contains an integration clause and a provision requiring changes or modifications to be made in writing. (VMS/LoJack Agr. ¶ 9.) The VMS/LoJack Agreement was amended twice in writing, as required by its terms; neither amendment referred to any agreement by LoJack to compensate GLM in any way. (Def. 56.1 ¶ 41.)

### E. 2005 – Correspondence Regarding Price

In or around September 2005, Tabackman began corresponding by electronic mail with Abely about a proposed increase in the price LoJack charged GLM for the Units. (*Id.* ¶ 43.)

Tabackman requested that LoJack not increase GLM's price. (*Id.* ¶ 44.) During approximately six months of correspondence relating to the price increase, Tabackman never mentioned or referred to any promise by LoJack to give GLM the "best price." (*Id.* ¶ 45.) LoJack granted Tabackman's request, and did not increase GLM's price. (*Id.* ¶ 46.)

       F.   Sales Incentive Program

Throughout the course of the GLM/LoJack relationship, there was a sales incentive program, which involved payments to automobile dealerships by LoJack to be used to reward dealership employees for selling LoJack Units to their customers. (*Id.* ¶ 68.) Prior to 2005, GLM paid these incentives to the dealerships for which it was responsible by writing a check directly to those dealerships. (*Id.* ¶ 69; Dkt. 60-3, Att. 1 ("Tabackman Tr.") at 214-215).) In 2005, LoJack instituted a debit card program for paying the sales incentives, the program description of which provided that all incentives not timely claimed by the dealerships ("unclaimed incentives") would be the property of LoJack. (Def. 56.1 ¶¶ 70-71.) There is a dispute as to whether Tabackman understood that this would be the case or was told otherwise,[4] but there is no dispute that LoJack's written program description provides as such. (Pl. 56. 1 ¶¶ 70-72; Dkt. 60-3, Att. 19 ("Rewards Policy") at 1.) The policy specifically states, "[a]ll LoJack Rewards VIN incentives must be claimed within 90 calendar days from the date of LoJack equipment invoicing. All VIN incentives that expire are the property of LoJack Corporation." (Rewards Policy at 1.)

Sometime prior to 2006, GLM requested that LoJack pay GLM for unclaimed incentives. (Def. 56. 1 ¶ 73.) LoJack refused this request as contrary to the Rewards Policy on or before

---

[4] In his affidavit, Tabackman asserts that Elisa Rafaela, a LoJack representative, told him that unclaimed incentive payments would be returned to GLM. (Dkt. 63-7 ("Tabackman Aff") at ¶¶107-111.)

March 9, 2006. (*Id.* ¶ 74.) Thereafter, Tabackman, without protest, signed several documents known as Price Change Notifications, or "PCNs," each of which stated at the bottom that all unclaimed incentives belonged to LoJack. (*Id.* ¶ 75.)

### G. GLM's Delinquent Payments

As previously discussed, pursuant to the Distribution Agreement, GLM was to pay one half of the amount for products received from LoJack within "thirty days of invoice, and the balance within sixty days of invoice." (Agr. ¶ 6.1.) The Distribution Agreement also provided that no waiver of any provision would be effective "unless made in writing and signed by the parties[,]" and that "[t]he failure of either party to require the performance of any term or obligation of [the] Agreement, or the waiver of either party of any breach of [the] Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach." (*Id.* ¶ 15.) LoJack never waived, in writing, GLM's obligation to make timely payments for the products and services it received, and LoJack requested on numerous occasions that GLM bring its delinquent account current. (Def. 56.1 ¶ 81.)

Tabackman believed, however, that the practice GLM and LoJack had established required that he pay outstanding invoices on 90 to 120 days terms. (*Id.* ¶ 82; Tabackman Tr. 96-98.) At his deposition, Tabackman admitted that GLM would be in breach of the Distribution Agreement if it fell more than 120 days behind in payments. (Tabackman Tr. 130.) Subsequently GLM admitted that it failed to pay numerous invoices that, as of October 2010, were more than 120 days past due, and that at the time GLM filed this action on October 13, 2010, it owed LoJack more than $1,000,000. (Def. 56.1 ¶ 84.)

### H. Both Parties Seek to Terminate the Distribution Agreement

On October 6, 2010, LoJack sent GLM a notice which showed that GLM had a balance due of over $1,000,000, of which hundreds of thousands of dollars were more than 120 days past due. (*Id.* ¶ 86.) The letter requested that GLM bring its account up to date. (Dkt. 60-3, Att. 27.) In response, on October 12, 2010, GLM sent a letter to LoJack stating that it was providing two-weeks' notice of termination under Section 12. 3 of the Distribution Agreement (no-cause termination), which would take effect as of October 26, 2010. (Def. 56.1 ¶ 88.) On October 22, 2010, LoJack replied with a letter to Tabackman terminating the Distribution Agreement pursuant to Section 12. 2 (for-cause) due to GLM's material breach, namely GLM's substantial overdue balance for products ordered and received by GLM. (*Id.* ¶ 89.)

### I. Post-Termination Obligations

Pursuant to Section 12. 5 of the Agreement, "[i]n the event that, after any termination of this Agreement, **other than by LoJack pursuant to section 12.2** [for-cause termination], LoJack continues to make sales to [specified dealers that GLM recruited during the term of Agreement], LoJack will pay [GLM] a fee of $50 per unit with respect to all SVRUs sold to such dealer within 18-days of the termination of this Agreement." (Def. 56.1 ¶ 78 (emphasis added).) In other words, these payments were not due if LoJack terminated the Agreement for cause pursuant to Section 12.2. (*Id.* ¶ 80.) GLM confirms that it received 91 invoices from LoJack detailing the sums it owed LoJack and how far behind GLM was on each payment. (*Id.* ¶¶ 90-180.)

## II. **Procedural Posture**

The claims remaining in this case are GLM's claims for (1) breach of contract, (2) breach of the duty of good faith and fair dealing, (3) GLM's Massachusetts General Law 93A ("Chapter

93A") claim; and (4) LoJack's counterclaims, all of which are based on GLM's failure to pay for goods and services received.[5]  Massachusetts law applies to all of these claims.  *G.L.M. Sec. & Sound, Inc. v. LoJack Corp.*, 10-CV-04701 (JS) (ARL), 2011 WL 4594825, at *4 (E.D.N.Y. Sept. 30, 2011) ("Massachusetts law governs Plaintiff's breach of contract and breach of the covenant of good faith and fair dealing claims because the Agreement expressly provides that Massachusetts law governs . . . . [It also applies to] Plaintiff's claim under Massachusetts General Law Chapter 93A.").  Also relevant here, the Court (Seybert, *J*.) previously ruled that allegations concerning oral statements that were made *prior* to the execution of the Distribution Agreement must be disregarded in light of the Distribution Agreement's integration clause.  *Id.* (citing Agr. ¶ 17).  That analysis still holds, and the Court will not revisit it here.

## DISCUSSION

### I.   Summary Judgment Standard of Review

Summary judgment is proper only where, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Redd v. N.Y. Div. of*

---

[5] On October 12, 2010, GLM initiated this action.  LoJack subsequently moved to dismiss.  While that motion was pending, GLM moved to amend its Complaint and filed a Proposed Amended Complaint ("PAC") that asserted the following eight claims: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) misrepresentation; (4) tortious interference with business relations; (5) violation of the New York Franchise Sales Act; (6) violation of Massachusetts General Law 93A; (7) price discrimination under the federal Robinson–Patman Act ("RPA"); and (8) breach of fiduciary duty.  (Dkt. 17.)  On September 30, 2011, the Court (Seybert, *J*., then-presiding) dismissed GLM's misrepresentation and fiduciary duty claims and its claims under New York's Franchise Sales Act and Massachusetts' General Law Chapter 93A, and it dismissed with leave for GLM to re-plead its RPA and tortious interference claims. (Dkt. 24 (full citation *infra* in body text).)  GLM moved for reconsideration, which the Court granted "to the extent that GLM's [Chapter] 93A claim may proceed on the theory that LoJack's allegedly lying to GLM about LoJack's best price was the baseline offending act," and denied in all other respects.  (Dkt. 40).

*Parole,* 678 F.3d 166, 173-74 (2d Cir. 2012). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material where it is legally relevant such that it "might affect the outcome of the suit under the governing law." *Id.* In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003) (citation and quotation omitted).

This standard imposes the initial burden on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial. *Id.* at 324*; see also Anderson*, 477 U.S. at 256-57. The nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [their] version of the events is not wholly fanciful." *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998) (collecting cases). "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.     LoJack's Motion for Summary Judgment

In this case, all of GLM's claims are based directly or derivatively on the contention that it was entitled to the "best price" at which LoJack offered its devices to dealers. There are a number of disputed facts and issues, including the substance of discussions regarding best price;

whether such discussions took place before or after the execution of the Distribution Agreement; whether they took place before or after the VMS/LoJack Agreement; whether there was consideration for the alleged oral modification of the Distribution Agreement; and whether alternate pricing plans that LoJack offered to other distributors did, in fact, result in better prices than GLM received, among others. However, even were the Court to resolve the legal issues in GLM's favor, and in fact accepting GLM's version of the facts relating to the oral modification as true,[6] there is insufficient evidence for the Court to conclude, under relevant Massachusetts law, that *LoJack* agreed to orally modify a completely integrated agreement that specifically precluded oral modification.

A. Breach of Contract

Under Massachusetts law, the elements of a breach of contract claim are (1) a written or oral agreement (2) for valid consideration, (3) performance by the plaintiff and breach by the defendant, and (4) damage to the plaintiff. *Mass. Cash Register, Inc. v. Comtrex Systems Corp.*, 901 F.Supp. 404, 415 (D. Mass. 1995).

1. The Alleged "Best Price" Oral Modification of the Distribution Agreement

According to GLM, in October 2002, in exchange for GLM's assistance in recruiting distributors to sell LoJack products, Wafer offered—with LoJack's approval—that GLM would receive the "best price" on SVRUs and would also receive a $2.00 commission for each SVRU sold by a distributor recruited by GLM. (FAC ¶ 18; (Dkt. 63 ("Op. Br.") at 6).) The parties agree, however, that the plain language of the Distribution Agreement forbids amendment in any

---

[6] As previously discussed, there is a dispute as to whether discussions regarding best price occurred before and/or after the September 2012 Distribution Agreement. However, the Court, viewing, as it must, the evidence in the light most favorable to the Plaintiff, conducts its analysis based on the assumption that at least some discussion regarding best price occurred *after* the Distribution Agreement.

manner other than by "written instrument" duly executed by both GLM and LoJack. (Def. 56.1 ¶ 27.) The parties further agree that no discussions regarding "best price" between GLM and LoJack or Wafer were ever memorialized, formally or informally.[7] (*Id.* ¶ 34.)

Under Massachusetts law, a provision that an agreement may only be amended by a written instrument, like the one in the Distribution Agreement, does not automatically bar oral modification of the contract. *See Cambridgeport Sav. Bank v. Boersner*, 413 Mass. 432, 439 (1992) (hereinafter "*Cambridgeport*"). "Mutual agreement on modification of the requirement of a writing may . . . 'be inferred from the conduct of the parties and from the attendant circumstances' of the instant case.'" *Id.* (quoting *First Pa. Mortg. Trust v. Dorchester Sav. Bank*, 395 Mass. 614, 625 (1985). But the law "imposes stringent proof requirements for such oral modification." *Wagner And Wagner Auto Sales, Inc. v. Land Rover N. Am., Inc.*, 547 F.3d 38, 46 (1st Cir. 2008). The evidence of a subsequent oral modification "must be of sufficient force to overcome the presumption that the integrated and complete agreement, which requires written consent to modification, expresses the intent of the parties." *Cambridgeport*, 413 Mass. at 439 n. 10; *see also Wells Fargo Bus. Credit v. Environamics Corp.*, 77 Mass. App. Ct. 812, 817 (2010) ("[I]n order to support the existence of an oral modification . . . the parol evidence must be of sufficient strength to present an ambiguity between the actual conduct of the parties and the contract."); *see also Beal Bank S.S.B. v. Krock*, 97-CV-2241, 1998 WL 1085807, at *3 (1st Cir. 1998) ("Massachusetts . . . impose[s] a heavy burden on the party seeking to modify an integrated written contract by subsequent oral agreement."); *Lydon v. Nationwide Mut. Ins. Co.*, 91-CV-11971 (NG), 1997 WL 260064, at *10 (D. Mass. May 9, 1997) ("[T]he evidence must be sufficiently clear and convincing to overcome the 'presumption' that waiver was not intended.").

---

[7] Informal memorialization could include, for example, email communications between the parties.

To defend against LoJack's motion for summary judgment, GLM offers the following evidence: (1) Tabackman's testimony that in exchange for GLM's assistance in recruiting distributors to sell LoJack products, Wafer offered that GLM would receive the "best price" on SVRUs and would also receive a $2.00 commission for each SVRU sold by a GLM-recruited distributor[8] (Tabackman Tr. 142-44); (2) DelGuercio's testimony that though he was not a part of the discussions regarding best price, he was "aware" that such discussions had occurred (DelGuercio Tr. 83-87); (3) Wafer's testimony that *VMS* paid GLM a $2.00 per Unit commission, and that Wafer gave GLM the best price promise "based on conversations" he had had with Abely and Ron Rossi, then-LoJack CEO (Wafer Tr. 75-78); (4) Tabackman's and Wafer's testimony that GLM attempted to recruit new distributors, and that *VMS* paid GLM the $2.00 commission fees for those distributors (Wafer Tr. 75; Tabackman Tr. 143; Tabackman Aff. ¶ 47); (5) e-mails that, GLM argues, suggest that LoJack attempted to hide from GLM pricing arrangements that LoJack had with other distributors. (Dkt. 63-7, Att. Ex J-L.)

Applying the standards set forth under Massachusetts law, GLM has failed to present—or put in genuine dispute—"evidence of sufficient force to overcome the presumption" that the parties did not intend to waive the written modification requirement in "the fully integrated and complete [Distribution Agreement]." *See Cambridgeport*, 413 Mass. at 439; *Lydon*, 1997 WL 260064, at *10. The evidence does not suggest that *Wafer* had the authority to bind *LoJack* to a best price promise, and there is a complete lack of evidence suggesting that *LoJack* (or GLM, as discussed *infra*) acted in accord with the alleged oral modification or believed that the Distribution Agreement had been orally modified.

---

[8] Tabackman also testified that Wafer told him that Joe Abely told Wafer that GLM would get the best deal. This testimony is barred from consideration because it is inadmissible hearsay.

14

That GLM attempted to recruit distributors and that VMS paid GLM a $2.00 per Unit commission fails to demonstrate anything beyond GLM's own (and perhaps VMS's) subjective belief as to the existence of an oral modification of the Distribution Agreement. *See Wells Fargo Bus. Credit*, 77 Mass. App. Ct. at 819 (citations omitted). Indeed, the fact the VMS—not LoJack—paid GLM the $2.00 commission from GLM-recruited distributors suggests that this oral modification, to the extent it existed, was between GLM and VMS.[9] This is in harmony with, according to Levy (GLM's vice-president), GLM's contemporaneous understanding of the recruiting agreement it had with VMS. (Levy Tr. 32-33 (Dkt. 60-3, Att. 2); Def. 56. 1 ¶¶ 5, 33.)

The VMS/LoJack Agreement obligated VMS and Wafer to recruit distributors like GLM for LoJack. It stands to reason that, in an effort to satisfy its responsibilities under the VMS/LoJack Agreement, Wafer promised $2.00 of VMS's commission received from LoJack to GLM for GLM-recruited distributors.[10] The VMS/LoJack Agreement does not refer to any promise by LoJack to compensate GLM in way for assisting VMS in recruiting distributors. The VMS/LoJack Agreement was amended twice in writing, as required by its terms; neither amendment referred to any agreement by LoJack to compensate GLM in any way. (Def. 56.1 ¶

---

[9] This understanding of the best price promise is what GLM initially pleaded in its complaint. There, GLM alleged that "[i]n an effort to secure [GLM's] help in signing other LoJack Distributors throughout the country, George Wafer, President of VMS, promised Gary Tabackman that [GLM] would receive the 'best price' from LoJack. In addition, [sic] to the 'best price,' VMS promised to pay $2.00 of its commission received from LoJack to GLM for each LoJack unit that was purchased by a Distributor which GLM helped to recruit." (FAC ¶ 18.)

[10] Certainly Wafer, even if a LoJack agent, would have been free to make agreements on behalf of his own company, VMS. Because the terms of the VMS/LoJack Agreement required VMS to recruit distributors, VMS was entitled to do that the best way it saw fit, including soliciting GLM's assistance in recruiting other distributors. None of that equates, however, to an amendment of GLM's Distribution Agreement with LoJack.

41.)  The parties clearly understood—as evidenced by their practice—that any amendment had to be memorialized by signed writing.

The problems with Wafer's testimony that he promised GLM the best price "based on conversations" with LoJack are two-fold.  First, this alone is not the kind of evidence sufficiently clear and convincing to overcome the deference to which the plain language of the Distribution Agreement is entitled.  *See Lydon*, 1997 WL 260064, at *10.  Second, the "attendant circumstances" do not factually support Wafer's testimony.  For example, GLM was aware that any changes to the Distribution Agreement, especially with respect to price, had to be completed via a signed, written instrument.  Indeed, any time there was a price change during the course of the Distribution Agreement, a written PCN document was prepared and signed by the parties. (Def. 56.1 ¶ 75.)  Moreover, in or around September of 2005, Tabackman began corresponding by electronic mail with Abely about a proposed price increase for the SVRUs.  (*Id.* ¶ 43.) Tabackman requested that LoJack not increase GLM's price.  (*Id.* ¶ 44.)  Not once during approximately six months of correspondence relating to the price increase did Tabackman mention or refer to any "best price" promise by LoJack.  (*Id.* ¶ 45.)  It strains credulity to believe that Tabackman would have failed to mention that LoJack was contractually bound to give his company the best price on SVRUs, if GLM was in fact so entitled, during a six-month negotiation over precisely that—the price LoJack was charging GLM for SVRUs.

LoJack's internal e-mails also do not support GLM's position.  The Court has reviewed the e-mails in question (Dkt. 63-7, Att. Ex. J-L), and finds no mention of a best price guarantee. The text most supportive of GLM's argument is contained in an *internal* LoJack e-mail written by DelGuercio, the GLM relationship manager, wherein he attempts to persuade his colleagues that GLM should get a better deal due to their large sales volume.  It reads, "[a]s we've

discussed, I have concerns, given the tight geography, it's only a matter of time that GLM will gain exposure to some of our more aggressive pre-installation pricing guidelines and this would have them feeling like they are entitled to deeper pricing discounts given the current volume trends." (*Id.* at ECF pg. 115.) Whatever support this lends GLM's argument, it cuts more sharply against it. The absence of any 'best price' reference is conspicuous; and the fact that GLM would feel "entitled" to a better deal (not even the best) based on its performance, rather than based on a contractual guarantee, is damning.

Tabackman's self-serving affidavit, which partly contradicts his deposition testimony, along with the equivocal assertions as to the issue of oral modification made by DelGuercio and Wafer in their affidavits, do not provide the specificity necessary to establish a genuine dispute of material fact where a fully integrated agreement is at issue. *See Wells Fargo Bus. Credit*, 77 Mass. App. Ct. at 817-18 (citing *Community Natl. Bank v. Dawes*, 369 Mass. 550, 554 (1976)). The alleged "best price" promise is not clearly or expressly manifested in any written document or the subsequent conduct of at least one of the parties to the alleged oral modification, LoJack. Even if Wafer had the authority to bind LoJack, the fact that LoJack did nothing to act in conformity with the alleged oral modification suggests that it never believed it was bound by the deal between Wafer and VMS. While GLM can demonstrate that *it* attempted to act on the alleged oral modification by recruiting distributors, it has no evidence of any such action taken by LoJack on the other side of the alleged modification. At most, the evidence shows that GLM had an agreement with *VMS* to recruit distributors for LoJack's products—a conclusion reinforced by the fact that the $2.00 commission was paid by VMS, not LoJack. Furthermore, the claim that GLM sought to recruit distributors because of a "best price" promise from *LoJack* is critically undercut by other evidence, such as Tabackman's failure to rely on, or even

reference, a "best price" promise during the September 2005 to March 2006 price negotiations with Abely.

In light of the applicable standards pertaining to fully integrated agreements with written modification clauses, GLM needed to demonstrate that *both parties* believed an oral modification had been reached. Memorialization of the agreement, action in conformity with the agreement, written communications, such as an e-mail, recognizing the terms of the agreement, among other things, may have sufficed. None of that exists here.

## 2. GLM's Other Breach Theories

In its complaint, in addition to the "best price" theory, GLM also alleged that LoJack breached the Distribution Agreement by failing to: (1) provide GLM with product unless it paid in advance; (2) after the Distribution Agreement was terminated, credit GLM's account for returned product, and pay GLM $50 per Unit sold to dealers in Plaintiff's territory for six months post-termination; and (3) credit GLM for unclaimed incentive payments. In its motion for summary judgment, LoJack argued that these theories were nonviable because (1) LoJack was not obligated to ship product to GLM when GLM was in material breach of the Distribution Agreement; (2) LoJack's termination of the Distribution Agreement in October 2010 extinguished its obligation to make any post-termination contract payments to GLM; and (3) there was no agreement binding LoJack to credit GLM for any monies in connection with the incentive program. The Court now turns to these disputes.

First, GLM alleges that LoJack breached the Distribution Agreement when, contrary to the terms of the Distribution Agreement, in September 2010—just prior to termination—LoJack required GLM to pre-pay for any Units it wanted to purchase. (FAC ¶ 124.) At the time LoJack requested pre-payment, GLM owed LoJack over $1,000,000 for product previously ordered and

received by GLM.  (Def. 56.1 ¶¶ 86, 89-91.)  GLM's failure to pay for product it purchased and received constituted a material breach under the Distribution Agreement.  *See Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 12 (1st Cir. 2006) (holding that failure to pay for goods constitutes a material breach) (citing *Lease-It, Inc. v. Massachusetts Port Authority*, 33 Mass. App. Ct. 391, 396 (1992)).  According to Section 15.2 of the Agreement, "[t]he failure of either party to require the performance or obligation of this Agreement, or the waiver of either party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach."  GLM's material breach, therefore, released LoJack from its obligation to supply to GLM without advance payment.  *See Teragram*, 444 F.3d 1 at 11 ("[A] material breach by one party excuses the other party from further performance under the contract.") (quoting *Ward v. Am. Mut. Liab. Ins. Co.*, 15 Mass. App. Ct. 98, 100 (1983)).

Next, GLM claims that it was entitled to certain post-termination payments, *i.e.*, credit for returned product and payment for SVRUs sold by GLM to dealers, following termination of the Distribution Agreement in October 2010.  (FAC ¶ 124.)  On October 6, 2010, LoJack sent GLM a notice that showed that GLM had a balance due of over $1,000,000, of which hundreds of thousands of dollars were more than 120 days past due.  (*Id.* ¶ 86.)  The letter requested that GLM bring its account up to date.  (Dkt. 60-3, Att. 27.)  In response, on October 12, 2010, GLM sent a letter to LoJack stating that it was giving the required two-weeks' notice of termination under Section 12. 3 of the Distribution Agreement (no-cause termination), which would take effect as of October 26, 2010.  (Def. 56.1 ¶ 88.)  On October 22, 2010, LoJack replied with a letter to Tabackman terminating the Distribution Agreement, effective immediately pursuant to

Section 12.2 due to GLM's material breach, namely GLM's substantial overdue balance for product ordered and received by GLM.  (*Id.* ¶ 89.)

Because LoJack properly terminated the Distribution Agreement for cause, it was not obligated to make any post-termination payments to GLM.  Pursuant to Section 12. 5 of the Agreement, "[i]n the event that, after any termination of this Agreement, **other than by LoJack pursuant to section 12.2** [for-cause termination], LoJack continues to make sales to [specified dealers recruited by GLM], LoJack will pay [GLM] a fee of $50 per unit with respect to all SVRUs sold to such dealer within 18-days of the termination of this Agreement."  (*Id.* ¶ 78.) These payments, therefore, were not due if LoJack terminated the Distribution Agreement for-cause pursuant to Section 12.2.  (*Id.* ¶ 80.)  As discussed above, due to GLM's failure to pay, LoJack was entitled to terminate for cause.  Thus, pursuant to the clear terms of the Distribution Agreement, LoJack's for-cause termination became effective immediately, and released LoJack of its post-termination obligations.  *See Liberty Mut. Ins. Co. v. Gibbs*, 773 F.2d 15, 17 (1st Cir. 1985) ("Under Massachusetts law, "[w]here the wording of the contract is unambiguous, the contract must be enforced according to its terms.") (citation omitted)); *see also Seaco Ins. Co. v. Barbosa,* 435 Mass. 772, 779 (2002) ("If a contract . . . is unambiguous, its interpretation is a question of law that is appropriate for a judge to decide on summary judgment.")

Finally, GLM alleges that LoJack improperly withheld credit for pre-paid incentive monies not claimed by dealership salespeople.  (FAC ¶ 124.)  The sales incentive program is not addressed in the Distribution Agreement.[11]  However, according to LoJack's written Rewards Policy, all unclaimed incentives were the property of LoJack.  (*Id.* ¶¶ 70-71.)  The policy

---

[11] Because GLM's breach of contract claim asserts that LoJack breached the Distribution Agreement, and the Rewards Policy is outside the scope of the Distribution Agreement, GLM's claim could fail for this reason alone.

specifically states, "All LoJack Rewards VIN incentives must be claimed within 90 calendar days from the date of LoJack equipment invoicing. All VIN incentives that expire are the property of LoJack Corporation." (Rewards Policy at 1.)

Tabackman asserts that he was told otherwise, namely that GLM would receive any unclaimed incentive payments. However, Tabackman's conduct rebuts his self-serving claim that there was an oral modification to the written Rewards Policy. Sometime prior to 2006, GLM requested that LoJack pay it for unclaimed incentives. (Def. 56. 1 ¶ 73.) LoJack refused this request as contrary to the Rewards Policy on or before March 9, 2006. (*Id*. ¶ 74.) Thereafter, Tabackman, without protest, signed several documents known as PCNs, each of which stated at the bottom that all unclaimed incentives belonged to LoJack. (*Id*. ¶ 75.) Therefore, there is no evidence that the Rewards Policy provided for anything other than what was made clear by its written terms, and GLM was not entitled to any unclaimed incentives pursuant to those terms.

### B. Duty of Good Faith and Fair Dealing Claim

GLM's claim for breach of the common law doctrine of the duty of good faith and fair dealing alleges that, "LoJack's agreement to sell GLM its [SVRUs] at its 'best price' required LoJack to be honest in fact and take no action that would undermine its promise to GLM or deny GLM the fruits of its bargain." (FAC ¶ 128.)

Under Massachusetts law, every contract is "subject, to some extent, to an implied covenant of good faith and fair dealing." *Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 385 (2005). "The concept of good faith 'is shaped by the nature of the contractual relationship from which the implied covenant derives,' and the 'scope of the covenant is only as broad as the contract that governs the particular relationship.'" *Young v. Wells Fargo Bank, N.A.*, 717 F.3d

224, 238 (1st Cir. 2013) (quoting, *Ayash*, 443 Mass. at 385). The implied covenant may not be "invoked to create rights and duties not otherwise provided for in the existing contractual relationship." *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).

The Court has already concluded that there is insufficient evidence to establish an oral modification to the Distribution Agreement regarding best price. Because LoJack's breach of good faith and fair dealing claim depends on proof of the asserted "best price" promise, the Court grants summary judgment in favor of LoJack on this claim.

C. Chapter 93A Claim

To make out an unfair competition claim under Chapter 93A, a plaintiff "must establish that the alleged offending act was (1) within at least the penumbra of common law, statutory law or other established concepts of unfairness, (2) is immoral or otherwise unscrupulous, and (3) inflicted injury on another business." *Rohm & Haas Elec. Materials, LLC v. Elec. Circuits Supplies, Inc.*, 759 F. Supp. 2d 110, 123 (D. Mass. 2010) (quoting *Franklin v. Ciroli*, 865 F.Supp. 940, 947 n. 18 (D. Mass. 1994)). "A showing of bad faith requires dishonest purpose, conscious wrongdoing, or unfairness beyond bad judgment or failing to abide by the terms of a contract." *Id.* (citation omitted). Or, as the First Circuit has put it, "[t]he objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble world of commerce." *Saint-Gobain Indus. Ceramics Inc. v. Wellons, Inc.*, 246 F.3d 64, 73 (1st Cir. 2001).

GLM's Chapter 93A claim is predicated on its allegations that LoJack induced GLM to continue the relationship by falsely stating that GLM was receiving LoJack's best price. *G.L.M. Sec. & Sound, Inc. v. LoJack Corp.*, 10-CV-4701 (JS) (ARL), 2012 WL 4512499, at *6

(E.D.N.Y. Sept. 28, 2012).[12]  To the extent GLM's claim is based on lies or deception about a perceived best price agreement, the claim fails because the Court has found no such agreement existed.  *See Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B.*, 62 Mass. App. Ct. 34, 41 (2004); *Cantell v. Hill Holliday Connors Cosmopulos, Inc.*, 55 Mass. App. Ct. 550, 556 (2002); *Park Drive Towing, Inc. v. City Of Revere*, 442 Mass. 80, 86 (2004).  Without a best price agreement, even assuming LoJack hid the fact that it offered better prices to other dealers and misled GLM about the same, LoJack's conduct does not rise to the level necessary to sustain a Chapter 93A claim.  *See Massachusetts Sch. of Law at Andover, Inc. v. Am. Bar Ass'n,* 142 F.3d 26, 41 (1st Cir. 1998) (holding that to sustain a Chapter 93A claim, "the defendant's conduct must be not only wrong, but also egregiously wrong—and this standard calls for determinations of egregiousness well beyond what is required for most common law claims.").

The Court, therefore, grants summary judgment in favor of LoJack on GLM's Chapter 93A claim.

D.  LoJack's Counterclaims

LoJack counterclaims that it is owed compensation for products and services GLM ordered and received from LoJack, from which GLM profited when it resold the products, and then failed to pay LoJack for more than $1,000,00 worth of products and services without any legal justification.  (Dkt. 60-1 ("Mov. Br.") at 22.)

GLM essentially concedes that if LoJack did not breach the Distribution Agreement, then LoJack is entitled to payment for goods and services rendered.   As discussed below, LoJack has demonstrated the existence (1) a written or oral agreement (2) for a valid consideration, (3)

---

[12] This is the only theory under which the Court (Seybert, *J.*) granted GLM leave to proceed on its Chapter 93A claim.  *G.L.M. Sec. & Sound, Inc*., 2012 WL 4512499, at *6.

performance by LoJack, and breach by GLM, and that (4) LoJack suffered damages as result. *See Mass. Cash Register*, *Inc.*, 901 F.Supp. 404 at 415.

The Agreement set forth the price and payment terms obligating both LoJack and GLM. (Agr. ¶ 6.1.) LoJack sent GLM invoices from March to October of 2010 relating to orders placed by GLM, and products and services shipped and billed to GLM. (Def. 56. 1 ¶¶ 90-181.) GLM admits receiving the products and services, and its failure to pay for either. (*Id*.) GLM sold the SVRUs to dealers for at least $300 per unit. (*Id.* at 67.) On October 6, 2010, LoJack sent GLM a notice which showed that GLM had a balance due of over $1,000,000, of which hundreds of thousands of dollars were more than 120 days past due. (*Id.* ¶ 86.) Thus, LoJack has made out a breach of contract claim, *see Signarella v. Boston*, 342 Mass. at 387, and summary judgment is granted to LoJack on this counterclaim.[13]

LoJack also brings a counterclaim for breach of good faith and fair dealing based on two theories. The first boils down to the fact that GLM did not pay for goods and services received. This is denied as duplicative of its breach of contract claim. Second, LoJack "contends that GLM breached the implied covenant in making its phony complaint about the alleged 'best price' issue in the summer of 2010 as a means to gain leverage to negotiate with LoJack about the million dollar debt it owed to LoJack." (Mov. Br. at 23-4.) In support of this contention LoJack argues that "[n]ot until GLM was significantly behind in its payments to LoJack did it put in writing its 'best price' theory, which first appeared in its First Amended Complaint," and "GLM has not been able to produce a single document during the eight year term of the parties' relationship that speaks to, or mentions[,] 'best price.'" (*Id.* ¶ 24.) However persuasive a theory,

---

[13] LoJack's quasi-contract counterclaims, for goods sold and delivered and for unjust enrichment, were brought "as alternatives to its breach of contract claim." (Mov. Br. 24.) They are thus denied as moot.

LoJack has not offered evidence as to GLM's motivation that would preclude a rational trier of fact from finding in favor of GLM on this claim. LoJack's motion for summary judgment on this counterclaim is, therefore, denied. *See Donnelly*, 691 F.3d at 141.

### III.    **LoJack's Motion to Strike**

Following submission of the parties' briefs on summary judgment, LoJack moved to strike portions of the affidavits filed by GLM in support of its opposition to LoJack's motion for summary judgment, primarily on the ground that "they impermissibly contradict prior sworn testimony." (Dkt. 62 at 3.)  Because LoJack's motion for summary judgment is granted, its motion to strike is denied as moot.  The Court notes, however, that where statements in the subject affidavits failed to "set out facts that would be admissible in evidence," Fed. R. Civ. P. 56(c)(4), or contradicted clear prior deposition testimony, the Court declined to consider those statements. *See Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) ("The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony.").

### IV.    **GLM's Motion to Amend**

On December 19, 2013, more than one month after the summary judgment motion had been fully briefed, and more than seven months after the deadline for parties to do so, GLM moved to amend its operative complaint.  (Dkt. 69; (*See* Dkt. 44 (setting the deadline for amendment of pleadings as 2/14/13))).  The upshot of GLM's motion is that although its FAC "characterized LoJack's best-price promise as a modification to the parties' initial written [Distribution Agreement]," GLM now submits that the evidence adduced during discovery

"supports the view that the [best price agreement] was in fact distinct" from the Distribution Agreement. (Dkt. 69-2 ("Amend Br.") at 3.)

Rule 15(a) of the Federal Rules of Civil Procedure ("FRCP") provides that a party may amend its complaint once as a matter of course before a responsive pleading has been served; thereafter, the party may do so "only with . . . the court's leave," which should "freely" be given "when justice so requires." Fed. R. Civ. P. 15(a)(2). But where, as here, a motion to amend is filed after the deadline the court has set for amending the pleadings, Rule 16(b)'s more stringent "good cause" standard applies. *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000). [14]

GLM's motion fails for two reasons. First, GLM's proposed amendment is futile. *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) ("A district court has discretion to deny leave for good reason, including futility…") Here, the "separate agreement" theory fails for the same reason as the "oral modification" theory: there is insufficient evidence to demonstrate that *LoJack* ever agreed to offer GLM the best price. The evidence GLM could offer in support of its proposed new claim would create no triable issue of fact, and LoJack would still be entitled to judgment as a matter of law under FRCP 56. *See Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110-11 (2d Cir. 2001) (holding that when a motion to amend is filed in tandem with a fully briefed summary judgment motion, the summary judgment standard, rather than the motion to dismiss standard, applies in determining futility); *see also Decter v. Second Nature Therapeutic Program, LLC*, 13-CV-3519 (JFB), 2014 WL 4378805, at *12 (E.D.N.Y. Sept. 5, 2014) (denying leave to amend as futile because the amended complaint did

---

[14] The parties dispute whether the Court should apply the more stringent standard imposed by Rule 16(b), rather than the more lenient one under Rule 15. The issue is ultimately irrelevant because GLM's motion does not satisfy either standard.

"not contain facts that overcome the legal defects identified by the Court in [its] Memorandum and Order in connection with the claims that are being dismissed, nor could any such additional facts be alleged that could cure the legal defects.")

Second, even were GLM's claims viable, the motion would still be denied on the ground of undue delay. "Delay in seeking leave to amend a pleading is generally not, in and of itself, a reason to deny a motion to amend. However, the Court may deny a motion to amend when the movant knew or should have known of the facts upon which the amendment is based when the original pleading was filed, particularly when the movant offers no excuse for the delay." *Smith v. Westchester Cnty. Dep't of Corr.*, 12-CV-3941 (SHS) (FM), 2014 WL 4384104, at *10 (S.D.N.Y. Sept. 3, 2014) (citations and quotations omitted). That is precisely the case here. All of the facts on which GLM relies in support of its motion to amend were within its ken at the time it filed its First Amended Complaint. GLM has not cited, nor can the Court find, anything produced by LoJack during discovery that supports the proposition that GLM's new theory was only recently discovered. *Cf. Parker*, 204 F.3d at 341 (refusing to find good cause where the information supporting the amendment to the complaint was available to support movant's claim, "and nothing he learned in discovery otherwise altered that fact."). Even if GLM's motion was based on new evidence, it should have noticed its motion for leave to amend shortly after the close of discovery, not after reading LoJack's summary judgment papers and deciding it had a better theory for its case.

For these reasons, GLM's motion to amend is denied.

## CONCLUSION

In summary, LoJack's motion for summary judgment as to GLM's claims for breach of contract, breach of the duty of good faith and fair dealing, and violation of Massachusetts

General Law 93A is GRANTED. LoJack's motion for summary judgment is GRANTED as to its breach of contract claim and DENIED as to the remainder of its counterclaims. LoJack's motion to strike is DENIED as moot. GLM's motion to amend is DENIED.

The parties shall submit by October 17, 2014, a letter to the Court advising (1) whether LoJack intends to go forward with its remaining counterclaims, and (2) a jointly agreed upon schedule regarding damages briefing regarding the breach of contract claim on which LoJack has prevailed.

SO ORDERED:

/s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: September 19, 2014
Brooklyn, New York